Joshua A. Sussberg, P.C.
Christopher J. Marcus, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:   (212) 446-4800
Facsimile:   (212) 446-4900

James H.M. Sprayregen, P.C.
Benjamin M. Rhode (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:   (312) 862-2000
Facsimile:   (312) 862-2200

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| BCBG MAX AZRIA GLOBAL HOLDINGS, LLC, *et al.*,[1] | Case No. 17-10466 (___) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF HOLLY FELDER ETLIN, CHIEF RESTRUCTURING OFFICER OF BCBG MAX AZRIA GLOBAL HOLDINGS, LLC, (I) IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS AND (II) PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2**

I, Holly Felder Etlin, Chief Restructuring Officer of BCBG Max Azria Global Holdings, LLC and certain of its subsidiaries hereby declare under penalty of perjury:

1.      I am a Managing Director at AlixPartners LLP ("AlixPartners") and have served as the Chief Restructuring Officer of BCBG Max Azria Global Holdings, LLC ("Global Holdings") since January 12, 2017.[2]   I have over thirty years of experience providing

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: BCBG Max Azria Global Holdings, LLC (6857); BCBG Max Azria Group, LLC (5942); BCBG Max Azria Intermediate Holdings, LLC (3673); Max Rave, LLC (9200); and MLA Multibrand Holdings, LLC (3854).   The location of the Debtors' service address is:   2761 Fruitland Avenue, Vernon, California 90058.

[2]   Global Holdings, a debtor and debtor in possession in the above-captioned chapter 11 cases, is a limited liability company organized under the laws of the State of Delaware.   I also serve as the Chief Restructuring Officer of certain subsidiaries of Global Holdings, including each of the above-referenced debtors and debtors in

restructuring and reorganization services for companies, their creditors, and other stakeholders, including extensive experience in the retail sector.

2.      I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records. I submit this declaration to assist the Court and parties in interest in understanding the circumstances compelling the commencement of these chapter 11 cases and in support of the Debtors' chapter 11 petitions and certain motions and applications filed today.

3.      Except as otherwise indicated, all facts in this declaration are based upon my personal knowledge, my discussions with the Debtors' management team and advisors, including the AlixPartners team working under my supervision, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge. I am over the age of 18 and authorized to submit this declaration on behalf of the Debtors. If called upon to testify, I could and would testify competently to the facts set forth in this declaration.

**Preliminary Statement**

4.      BCBG—an acronym for the French phrase "*bon chic, bon genre*," meaning "good style, good attitude"—was founded by Max Azria in Los Angeles, California in 1989. Over the course of the next three decades, BCBG grew to well over 550 stores spread across the United States, Canada, Europe, and Japan, becoming a well-known and respected name in high-end women's apparel and accessories. Unfortunately, like many other apparel and retail companies, BCBG has fallen victim in recent years to adverse macro-trends, including a general shift away from brick-and-mortar to online retail channels, a shift in consumer demographics away from

_____

possession (collectively, the "Debtors," and together with Global Holdings' non-Debtor subsidiaries, "BCBG"). Debtor BCBG Max Azria Group, LLC has principal assets located in the Southern District of New York.

branded apparel, expensive leases, under-penetration of the Debtors' wholesale and licensing segments, and expensive investments in overseas operations and distributor agreements. These trends have directly impacted BCBG's sales and operations, with consolidated net sales declining over 20 percent since fiscal year 2014 from $785 million to approximately $615 million in the most recent fiscal year.

5.      Guggenheim Partners Investment Management, LLC ("GPIM," and together with its affiliates, "Guggenheim"), through clients and managed funds, has maintained a relationship with BCBG dating back to 2006, when GPIM first arranged financing for the company to pursue expansion projects. As operating conditions in the apparel industry became more challenging over the next decade, certain of BCBG's operational issues came into sharper focus, including a cost structure misaligned with market realities, a lagging online presence, an overextended physical store footprint, an unexploited intellectual property portfolio, and an under-developed wholesaling division.

6.      When growth slowed and eventually contracted, the Debtors found themselves overleveraged and short on liquidity. After reviewing, considering, and pursuing all strategic alternatives on the heels of the "Great Recession," the confluence of issues plaguing the company necessitated an out-of-court restructuring in early 2015. The out-of-court restructuring included the equitization of more than $300 million of secured term loans and a $100 million equity investment. The out-of-court restructuring was followed by a secured "rescue" financing in August 2016. As part of these transactions, Max Azria relinquished his majority equity position, and, effective August 12, 2016, retired from his roles as BCBG's chief executive officer and a manager on the Global Holdings' board.[3]

---

[3]   Mr. Azria is a non-voting, non-participating observer on Global Holdings' board.

7.      Notwithstanding its difficulties, BCBG remains a valuable and iconic brand.  In an effort to ensure its longevity, BCBG has already undertaken a variety of operational initiatives to address its issues.  This includes commencing the closure of 120 stores in early 2017 (to effect a downsizing of its brick-and-mortar store footprint) and preparing for near term headcount and other cost reductions.  Further, BCBG has arrived in chapter 11 with a transaction structure and process that it believes will preserve and capitalize on the value inherent in its business and brand.

8.      At the direction of their recently appointed independent managers, the Debtors are in negotiations with their junior secured lenders (the "Tranche B" lenders) to finalize the terms of a chapter 11 plan, a draft of which was filed today.  The plan includes a "toggle" feature, contemplating either (a) the sale of the Debtors' assets to a third party or (b) a debt for equity conversion on terms to be negotiated.   Consistent with this process, the Debtors have begun marketing their assets and today filed a motion seeking approval of bidding procedures to continue these efforts.  The proposed debtor-in-possession financing, the plan, and the related bidding procedures all are designed to facilitate a process that will maximize value, the likelihood of a going concern transaction for the benefit of stakeholders enterprise-wide, and the confirmation of a chapter 11, all within six months.  The overall process itself will minimize the Debtors' expected stay in chapter 11 and related costs.  Moving with speed is critical to the Debtors' ability to continue operating as a going concern.

9.      Both the Debtors' existing secured asset-based lenders—who maintain a first priority security interest in the Debtors' inventory—and certain secured term loan lenders—who maintain a first priority security in the Debtors' intellectual property and a second priority security interest in inventory—have agreed to provide debtor-in-possession financing to facilitate

this process. More specifically, the asset-based lenders will continue to lend money on terms similar to those under the Debtors' existing asset-based lending facility. Certain secured term lenders have agreed to provide a $80 million junior debtor-in-possession facility, including up to $45 million in new money. The milestones under both financing arrangements, subject in all respects to the Court's availability, contemplate the following:

- on or before March 10, 2017, the Debtors will distribute informational packages to potential bidders;

- on or before March 30, 2017, the Debtors will secure entry of an order approving their proposed bidding procedures;

- on or before May 9, 2017, any interested bidder must submit a qualified bid to participate in the auction;

- on or before May 22, 2017, the Debtors will commence the auction in accordance with the bidding procedures;

- on or before May 30, 2017, (a) the Debtors will secure entry of an order approving their disclosure statement and (b) in the absence of an acceptable third-party bid, the Debtors and the Tranche B lenders will agree to the specific terms of the debt-for-equity conversion and exit financing;

- on or before July 10, 2017, the Debtors will secure entry of an order approving their chapter 11 plan; and

- on or before July 28, 2017, the Debtors will emerge from these chapter 11 cases.

10.    To familiarize the Court with the Debtors, their businesses, the circumstances leading to these chapter 11 cases, and the relief the Debtors are seeking in those certain motions and applications filed contemporaneously, I have organized this declaration as follows:

- **Part I** provides a general overview of the Debtors' corporate history and operations;

- **Part II** provides an overview of the Debtors' prepetition capital structure;

- **Part III** describes the circumstances leading to these chapter 11 cases;

- **Part IV** describes the Debtors' proposed debtor-in-possession financing, bidding procedures, and chapter 11 plan;

- **Part V** sets forth the evidentiary basis for the relief requested in each of the first day pleadings; and

- **Part VI** sets forth certain additional information about the Debtors, as required by Local Bankruptcy Rule 1007-2.

## I.    General Background.

11.    It has been said that "the difference between Fashion and Style is quality."[4]    For nearly 30 years, the Debtors have been famous for producing high-quality women's dresses and sportswear, including dresses frequently seen on the red carpet and runways.    After years of success and growth, the Debtors now find themselves caught behind the evolution of customer tastes and the rapid decline of brick-and-mortar retail in favor of online retail.    Despite these headwinds, the Debtors maintain a loyal customer base for their well-established brands.    The Debtors believe that this will enable them to achieve higher sales productivity by transitioning to more efficient operations while developing a more robust online sales presence, wholesale, and licensing business.

12.    After founding BCBG in 1989, Max Azria built it and affiliated brands into a billion dollar fashion empire, with hundreds of stores spread across the globe in the United States, Canada, Europe, and Japan.    In 1998, the company bought the *Herve' Leger* fashion house, becoming the first American designer in history to acquire a French couturier.    BCBG Max Azria and *Herve' Leger* are the Debtors' two primary brands; the brands' dresses have been a staple at New York Fashion Week and other fashion events since the mid-1990s.    The Debtors

---

[4]    Georgio Armani:  http://www.elledecor.com/design-decorate/interior-designers/interviews/a3918/10-questions-giorgio-armani-a-56509/.

also sell apparel under the BCBGeneration brand, which is aimed at younger customers and typically sells at a lower price point.

### A.    The Debtors' Business Operations.

13.    The Debtors generally specialize in women's apparel and accessories with a focus on women's dresses, most of which retail for between $250 and $750.  The Debtors maintain control over their proprietary brands by designing, sourcing, marketing, and selling their own merchandise, with limited licensing activities.  While the Debtors license the BCBG brand image to some complementary products, this license revenue makes up only a small proportion of enterprise-wide revenue.

14.    BCBG operates in all fifty states, as well as in Canada, Europe, and Japan. BCBG's products are sold in more than 480 domestic locations, including more than 120 standalone retail stores, approximately 58 factory outlet stores, and approximately 290 "partner shops."  The Debtors' partner shop arrangements are governed by agreements under which they lease space in large, well-known department stores from which they sell their branded merchandise (the Debtors retain title to the merchandise until it is sold).  The Debtors' primary partner shop counterparties are Bloomingdale's, Inc., Dillard's, Inc., Hudson's Bay Company (Canada only), Lord & Taylor, and Macy's, Inc.  Although a number of the Debtors' standalone BCBG-branded retail and factory outlet stores have struggled to meet performance goals, the partner shops generally have remained profitable.  As described below, in the weeks preceding the commencement of these chapter 11 cases, the Debtors commenced store closures in approximately 120 locations, primarily standalone BCBG-branded retail and factory outlet stores.

15.    The operations of the Debtors' wholly-owned foreign affiliates have historically performed at a loss.  The Debtors do not intend to have any wholly-owned foreign-affiliated

operations (with the possible exception of the Hudson's Bay Company partner shops in Canada, described below) upon emergence from these chapter 11 cases. Instead, the Debtors' go-forward business plan is focused on a reduced domestic physical footprint, accompanied by increased intellectual property licensing, wholesaling, and online retail activities. International activities will be focused on certain distribution licenses and wholesale sales.

16.    Through BCBG Max Azria Canada, Inc. ("BCBG Canada"), BCBG operates approximately 51 stores across Canada. BCBG Canada also operates a number of profitable partner shops in Canada under an agreement with Hudson's Bay Company. BCBG Canada is the borrower of approximately $10.4 million in obligations under the Canadian sub-facility of the ABL Facility (the payment of which is guaranteed by each of the Debtors). BCBG Canada has simultaneously filed a "notice of intention to make a proposal" under the relevant provisions of Canada's Bankruptcy and Insolvency Act (the "Canadian Proceeding"). As part of the Canadian Proceedings, BCBG Canada intends to liquidate and wind down all of its standalone locations, while exploring alternatives to preserve the value of the Hudson's Bay Company partner shops for the benefit of the BCBG enterprise. BCBG Canada is not a Debtor in these chapter 11 cases and the Canadian Proceedings will proceed along a separate, parallel track.

17.    The operations of the Debtors' Japanese affiliate ("BCBG Japan") consist of approximately 13 standalone stores. BCBG does not intend to further support the Japanese operations. BCBG's management team and advisors are exploring alternatives under which a third party will agree to assume BCBG Japan's operations, license certain BCBG intellectual property, and buy inventory from the Debtors at wholesale to sell in BCBG-branded, Japanese stores. If an arrangement cannot be secured, BCBG Japan's operations are likely to be wound down.

18.     The operations of the Debtors' European affiliates (collectively, "BCBG Europe") are primarily located in France and include approximately 34 standalone stores, as well as a number of "franchise" arrangements under which third parties purchase inventory wholesale from the Debtors to sell in BCBG-branded stores.  BCBG's management team and advisors are exploring alternatives in Europe similar to those in Japan.

19.     The Debtors are also party to approximately 20 distribution agreements covering Central and South America, Europe, and the Middle East under which the Debtors sell inventory at wholesale to certain counterparties.  The counterparties license the BCBG brand and sell the inventory either at retail or wholesale in their respective foreign jurisdictions.  The Debtors intend to eliminate subscale and unprofitable distribution agreements, while focusing on the profitable agreements, as a part of their go-forward operations.

### B.      The Debtors' Cost Structure.

#### 1.      Supply Chain.

20.     The Debtors maintain an integrated supply chain aimed at ensuring the uninterrupted flow of fresh merchandise to their brick-and-mortar locations.  The Debtors design merchandise in house and contract with various foreign manufacturers, predominantly located in China and Hong Kong (the "Manufacturers").

21.     The Manufacturers generally manufacture and ship inventory and other goods to the Debtors either "free on board" ("FOB") or "delivery duty paid" ("DDP").  Under an FOB arrangement, the Debtors pay freight forwarders to transport merchandise and other goods from Southeast Asia to the Debtors' U.S.-based warehouse and title passes to the Debtors when merchandise and goods are loaded for shipment to the United States.  Under the DDP arrangements, the Manufacturer pays to ship the goods to the Debtors' U.S.-based warehouse and title to the manufactured goods does not pass to the Debtors until they arrive at the Debtors'

9

U.S.-based warehouse.   The Debtors incur a range of customs/import duties in the regular operation of their supply chain.

22.     The Debtors predominantly operate their own warehouses—including one warehouse in Los Angeles and one warehouse in Canada.  Both warehouses are owned by Max Azria and leased to the Debtors.  The Debtors also contract with a third-party warehouseman to conduct their e-commerce business.  The Debtors ship inventory through various third-party shippers and freight forwarders to their U.S., Canadian, Japanese, and European operations from their U.S. and Canadian warehouses. Supply chain costs totaled $35.8 million in 2016, with monthly costs ranging from $2.4 million to $4.3 million.  The Debtors anticipate these costs will be substantially reduced in fiscal year 2017 due to the smaller store base and cost-reduction initiatives.

### 2.     Employee Compensation and Benefits.

23.     The Debtors employ approximately 4,800 employees domestically including 1,900 full time employees and 2,900 part-time employees.  The Debtors estimate that their bi-weekly gross payroll (including taxes and benefits) will be approximately $4.0 million for domestic employees over the course of these chapter 11 cases.  The Debtors currently maintain a substantially higher number of employees than similarly sized competitors.   As the Debtors implement broader operational right-sizing measures, including a reduced physical store footprint, the Debtors believe that a more efficient allocation of employees will present a significant opportunity for savings.

24.     The Debtors contribute to a number of employee benefit plans providing medical, pharmacy, dental, vision, workers' compensation, and other ancillary benefits to the Debtors' employees.   Payments by the Debtors on account of these plans totaled approximately

$18.5 million in 2016.  The Debtors are not party to any collective bargaining agreements.  The Debtors have no defined benefit pension plans.

### 3.    Real Estate Obligations.

25.    The Debtors lease all of their freestanding store locations.  Many of the Debtors' store leases have a fixed rental payment due in advance and require the Debtors to pay additional rent based on specified percentages of sales after the Debtors achieve certain annual sales thresholds.  The Debtors estimate that the aggregate occupancy costs for the Debtors' go-forward freestanding stores will be approximately $50 million in fiscal year 2017.  In addition, the Debtors lease approximately 265,000 square feet of office space in Los Angeles, California, a building that is owned by Max Azria, as their corporate headquarters and to house certain of the Debtors' design, sourcing, and production functions.  In addition, the Debtors lease a 27,000 square foot showroom in New York City, as well as office space for substantially all of the Debtors' wholesaling functions.

### C.    The February 2015 Out-of-Court Restructuring.

26.    The Debtors historically funded various expansion projects through syndicated lending facilities organized by third-party financial institutions.  The Debtors sought additional financing in early 2006 to pursue further growth opportunities.  GPIM, through its clients and managed funds, provided more than $200 million in new secured term loans to, among other things, pursue expansion opportunities in Europe and purchase G&G Retail, Inc. out of bankruptcy in February 2006.  The Debtors re-branded G&G Retail as "Max Rave."

27.    After a track record of sustained success since its founding, the company's acquisition strategy ultimately proved unprofitable.  Additionally, the "Great Recession" had a significant negative impact on the Debtors' businesses as consumer spending tightened.  By 2012, as a result of operational shortcomings, certain macro-trends, and unsuccessful expansion

efforts, the Debtors found themselves in difficult financial straits.  The Debtors engaged with

their existing lenders to consider all strategic alternatives.  This included a nearly two-year

process (between 2012 and 2014) to identify and engage potential strategic buyers or investors,

while also considering other alternatives, including an initial public offering.  The Debtors'

liquidity position continued to deteriorate.  Adverse macroeconomic trends, following the pursuit

(unsuccessfully) of various strategic alternatives, which caused the company to be unable to pay

interest at all, necessitated a comprehensive out-of-court restructuring in early 2015.  To ease the

company's cash-pay interest burden and avoid an event of default under its financing obligations

so as to allow the strategic alternatives to be pursued, the term loan lenders agreed to accept

interest payments in kind ("PIK") to stave off defaults.  By 2015, the Debtors' aggregate funded

debt had grown to nearly $700 million—more than $550 million of which was secured term loan

debt held by GPIM clients and managed funds (comprised of original loans, purchased loans, and

accrued PIK interest).

28.    After other strategic alternatives proved unsuccessful, the Debtors and their key

stakeholders reached agreement on a comprehensive out-of-court restructuring transaction in

accordance with the terms of the Contribution Agreement dated as of January 26, 2015

(the "Contribution Agreement").  The transactions contemplated in the Contribution Agreement

closed in February 2015 (the "February 2015 Restructuring").

29.    As part of the February 2015 Restructuring, the Debtors entered into an exchange

agreement with their existing term loan lenders.  More specifically, the more than $550 million

in then-existing term loans held by GPIM clients and managed funds were exchanged for:[5]

(a) $250 million in junior secured "Tranche B" term loans (which include a PIK interest feature,

---

[5]    The existing term loans were aggregated into a single entity—Designer Apparel Dual Holdings, LLC ("Dual Holdings").

currently accruing at 10 percent per annum); (b) 600,000 non-convertible preferred equity units in Global Holdings, with an aggregate liquidation preference of $150 million; and (c) 400,000 of Global Holdings' "Class C" common units, constituting a 40 percent ownership interest.

30.    Midland National Life Insurance Company and North American Company for Life and Health Insurance[6] also provided $35 million in new senior secured financing.  In addition to the prepayment and extinguishment of certain outstanding secured term loans, the Debtors used proceeds from the transaction to pay down approximately $73.6 million of their asset-based lending facility.  Finally, to facilitate the February 2015 Restructuring, Guggenheim, though affiliated entity Fashion Funding, LLC, provided a $100 million equity investment in return for 400,000 of Global Holdings' "Class B" common units, constituting a 40 percent ownership interest.[7]

31.    Until early 2015, Max Azria, together with his wife Lubov Azria, owned 100 percent of BCBG's common equity.  In addition to their ownership stakes, Max Azria historically served as chief executive officer of BCBG, with Lubov Azria serving as chief creative officer.  As contemplated in the Contribution Agreement, and in addition to relinquishing 80 percent of their equity stake to effectuate the February 2015 Restructuring, Max and Lubov Azria agreed to:

- irrevocably transfer and assign certain "Publicity Rights" to BCBG, including the commercial use of their names and likenesses in connection with BCBG's lines of business;

---

[6]    Midland National Life Insurance Company and North American Company for Life and Health Insurance are directly or indirectly wholly owned by Sammons Financial Group, Inc.  Guggenheim Partners, LLC, the parent of GPIM, is an affiliate of Sammons Enterprises, Inc., the parent company of Sammons Financial Group, Inc. and its affiliated companies.

[7]    Fashion Funding, LLC subsequently transferred a portion of the Class B units to its subsidiaries, Fashion Funding II, LLC and Fashion Funding III, LLC, which, together with Fashion Funding LLC, currently hold all of the outstanding Class B common units.

- non-solicitation and non-compete restrictions that extend through January 3, 2022—including, for example, an agreement not to use or exploit their Publicity Rights (*e.g.*, their names or any confusingly similar variation) in connection with any competing line of business—that Max and Lubov Azria expressly acknowledged as a condition to the lenders' willingness to enter into the Contribution Agreement;

- the terms of standalone employment agreements, each dated February 5, 2015, for three year terms;

- the exchange of mutual releases with the parties to the Contribution Agreement; and

- non-disparagement restrictions, including a prohibition against making any disparaging comments to the press or any entity with which BCBG has a business relationship.

32.     The February 2015 Restructuring resulted in the substantial deleveraging of the Debtors' balance sheet—with the Debtors' funded-debt obligations reduced from nearly $700 million to approximately $325 million—extended the Debtors' liquidity runway, and helped the Debtors to maintain important vendor relationships.

**D.     The August 2016 Financing.**

33.     In the summer of 2016, the Debtors once again faced a liquidity crisis in light of market conditions and operational losses.   Following the February 2015 Restructuring, the Debtors had implemented various operational initiatives aimed at increasing profitability, including changes to the Debtors' senior management, but the Debtors continued to underperform financially.  In August 2016, Allerton Funding, LLC committed to provide rescue financing in the form of "New Tranche A" secured term loans through an amendment to the Debtors' existing secured term loan facility.

34.     More specifically, Allerton Funding, LLC committed to provide three separate Tranche A secured term loans: "Tranche A-1" ($3.9 million), "Tranche A-2" ($46.1 million), and "Tranche A-3" ($25 million) (collectively, the "New Tranche A Loans").  Tranche A-1 ($3.9

14

million) was funded in connection with the closing of the financing, and Tranche A-2 ($46.1 million) was funded shortly thereafter.    Tranche A-3 was to be made available to the Debtors only if certain conditions were satisfied.[8]    The New Tranche A loans were made on a senior secured basis, junior in priority to the Tranche A loans but senior in priority to the Tranche B loans.    The Term Loan Credit Agreement (as defined below) contains certain intercreditor provisions and an intercreditor addendum attached as Annex II governing the relative priority of the Tranche A loans, the New Tranche A loans, and the Tranche B loans.    The following chart illustrates the priority waterfall between the existing Term Loan Facility tranches (amounts outstanding include PIK interest, where applicable):

| Funded Debt | Amount Outstanding | Payment Priority |
|---|---|---|
| Tranche A | $35.0 million | First |
| New Tranche A (A-1) | $4.2 million | Second (*pari passu*) |
| New Tranche A (A-2) | $48.5 million | Second (*pari passu*) |
| New Tranche A (A-3) | $0 (undrawn) | Second (*pari passu*) |
| Tranche B | $289.4 million | Third |

35.    In connection with the provision of the New Tranche A loans, BCBG Investor LLC, Max Azria, and certain affiliated entities entered into a letter agreement, dated July 26, 2016 to memorialize certain terms with respect to the new money investment that were critical to fund ongoing operations.    The transactions contemplated under the letter agreement were effectuated on August 12, 2016 (the "August 2016 Financing").    As memorialized in the letter agreement, and in consideration for the payment of $3.9 million, Mr. Azria agreed to, among other things, retire from his roles as chief executive officer of BCBG and a member of the Global Holdings' board of managers.    This agreement relieved the company of all obligations under Mr. Azria's Employment Agreement.    Mr. Azria expressly agreed, however, that all

---

[8]    The conditions to funding this additional $25 million have not been satisfied.  Nonetheless, on February 15, 2017, the Debtors requested that the New Tranche A lender waive the applicable conditions precedent and fund the undrawn $25 million in availability under the New Tranche A loans.  No funding has been provided.

restrictive covenants were in full force and effect, that his remaining Global Holdings common equity interest would be transferred to a voting trust, and that he would agree to a release of any and all claims.

36.    The graphic below depicts the Debtors' capital structure (a) before the February 2015 Restructuring Transactions, (b) after the February 2015 Restructuring Transactions, (c) after the August 2016 Financing, and (d) as of the Petition Date (as described in detail below).



## II.    The Debtors' Prepetition Corporate and Capital Structure.

37.    The chart below depicts the Debtors' current corporate structure. Global Holdings and each of its U.S.-incorporated subsidiaries that are obligors (either as a borrower or guarantor) under the ABL Facility and Term Loan Facility (each as defined below) are Debtors in these chapter 11 cases.



38.    As of the Petition Date, the Debtors' capital structure consisted of outstanding funded-debt obligations in the aggregate principal amount of approximately $459.7 million, consisting of the ABL Facility and Term Loan Facility. The following table summarizes the Debtors' outstanding funded-debt obligations, including PIK interest (where applicable).

| Funded Debt | Maturity | Principal Amount |
|---|---|---|
| ABL Facility | February 2020 | $82 million |
| Term Loan Tranche A | February 2020 | $35.0 million |
| Term Loan Tranche A-1 | February 2020 | $4.2 million |
| Term Loan Tranche A-2 | February 2020 | $48.5 million |
| Term Loan Tranche A-3 | February 2020 | $0 (undrawn) |
| Term Loan Tranche B | February 2020 | $289.4 million |
| | Total: | $459.7 million |

### A.    ABL Revolving Credit Facility.

39.    BCBG Max Azria Group, LLC, as borrower, BCBG Max Azria Canada Inc., as the Canadian borrower, the guarantors party thereto, the lenders party thereto (the "ABL

Lenders"), and Bank of America, N.A. (the "ABL Agent"), as administrative agent, are parties to that certain Second Amended and Restated Loan Agreement, dated as of February 5, 2015 (as amended, amended and restated, supplemented, or otherwise modified, refinanced, or replaced from time to time prior to the Petition Date, the "ABL Credit Agreement"). The ABL Credit Agreement provides for a senior secured revolving credit facility (the "ABL Facility") that consists of "Tranche A," "Tranche A-1," and a Canadian revolving credit sub-facility. The maximum availability is $82.5 million under Tranche A, $2.5 million under Tranche A-1, and $15.0 million under the Canadian revolving credit facility, subject to certain terms and conditions. As of the Petition Date, the aggregate borrowing base (*i.e.*, the effective maximum availability) was approximately $82 million. Each non-borrower Debtor has guaranteed all obligations under the ABL Facility, including the Canadian sub-facility. Obligations under the ABL Facility are secured by a first priority lien on the Debtors' accounts receivable, inventory, deposit accounts, security accounts, cash, and cash equivalents and a second priority lien on all other property of the grantors, including the Debtors' intellectual property (the "ABL Collateral"). As of the Petition Date, approximately $82 million remained outstanding under the Revolving Facility.

40.      The Debtors have entered into deposit account control agreements in favor of the ABL Agent with respect to each of its bank accounts. Thus, substantially all of the Debtors' cash is subject to a perfected security interest in favor of the ABL Agent. Under the ABL Facility, so long as excess availability is less than fifteen percent of the then-applicable borrowing base, the Debtors must remit all cash receipts on a daily basis to a non-Debtor account maintained by the ABL Agent (the "Agent Account"). Due to the Debtors' ongoing liquidity constraints, the excess availability under the ABL Facility was less than fifteen percent as of the

Petition Date (and for a number of months preceding the Petition Date).  Accordingly, each day, any excess cash in the Collection Account is swept to the Agent Account.

###### B.    Term Loan Credit Facility.

41.    BCBG Max Azria Group, LLC, as borrower, the guarantors party thereto, the lenders party thereto, and Guggenheim Corporate Funding, LLC, as administrative agent and collateral agent (in such capacity, the "Term Loan Agent") are party to that certain Fifth Amended and Restated Credit and Guarantee Agreement, dated as of August 12, 2016 (as amended, amended and restated, supplemented, or otherwise modified, refinanced, or replaced from time to time prior to the Petition Date, the "Term Loan Credit Agreement").  The aggregate Term Loan Agreement commitment consists of the Tranche A loans, the New Tranche A loans (including the Tranche A-1, Tranche A-2, and Tranche A-3 loans), and Tranche B loans (collectively, the "Term Loan Facility").    Each non-borrower Debtor has guaranteed all obligations under the Term Loan Facility.  Obligations under the Term Loan Agreement are secured by a second priority lien on the Debtors' accounts receivable, inventory, deposit accounts, security accounts, cash, and cash equivalents and a first priority lien on all other property of the borrowers and guarantors, including the Debtors' intellectual property (the "Term Loan Collateral").  As of the Petition Date, approximately $377.0 million in aggregate principal amount remained outstanding under the Term Loan Agreement.

42.    ***Tranche A Term Loan.***  Tranche A of the Term Loan Facility was the new money term loan financing put in place as part of the February 2015 Restructuring.  As of the Petition Date, approximately $35.0 million remained outstanding in Tranche A loans.  Under the Term Loan Credit Agreement, the Tranche A loans have a first payment priority before all of the New Tranche A loans and Tranche B loans.  The Tranche A loans bear an effective cash interest rate of 10 percent.

43.    ***New Tranche A Term Loan.***   New Tranche A (*i.e.*, Tranches A-1, A-2, and A-3) of the Term Loan Facility was put in place as part of the August 2016 Financing.  Tranches A-1 and A-2 of the New Tranche A loans were funded either contemporaneously with or shortly after the August 2016 Financing; Tranche A-3 ($25 million) is undrawn.   As of the Petition Date, $52.6 million in New Tranche A loans are outstanding.  Under the Term Loan Credit Agreement, the New Tranche A loans have a second payment priority (on a *pari passu* basis), junior to the Tranche A loans and senior to the Tranche B loans.  The New Tranche A loans bear an effective PIK interest rate of 15 percent.

44.    ***Tranche B Term Loan.***   Tranche B of the Term Loan Facility are the term loans put in place as part of the February 2015 Restructuring.   In light of continued PIK interest accumulation since the August 2016 Financing, as of the Petition Date, an aggregate of approximately $289.4 million was outstanding under Tranche B of the Term Loan Facility. Under the Term Loan Credit Agreement, the Tranche B loans have a third payment priority after the Tranche A loans and the New Tranche A loans.  The Tranche B loans bear an effective PIK interest rate of 10 percent.

## C.    Common and Preferred Equity Interests.

45.    As of the Petition Date, Guggenheim, its affiliates, and its managed funds directly or indirectly hold 80 percent of the common equity interests in Global Holdings—40 percent in Class B common units and 40 percent in Class C common units.  Fashion Funding also holds 600,000 of Global Holdings' preferred units.  Max and Lubov Azria directly or indirectly hold 20 percent of the common equity interests in Global Holdings in "Class A" common units.  Each of the Global Holdings Class B, Class C, and preferred units have a distribution preference (totaling $350 million) ahead of the Class A common units.  In connection with his status as a

Class A common unitholder, Max Azria is designated as an observer of the board in a non-voting and non-participating capacity.

## III.    Events Leading to these Chapter 11 Cases.

46.    A confluence of factors contributed to the Debtors' need to commence these chapter 11 cases. These factors include the general downturn in the retail industry, which led to a decrease in sales and increased operating losses and the marked shift away from brick-and-mortar retail to online channels. The Debtors' cost structure has become increasingly misaligned and sales have remained depressed (exacerbated by unsuccessful acquisitions and foreign operations). All of which has impaired the Debtors' liquidity time and time again.

### A.    Challenging Operating Environment and Operational Right-Sizing.

47.    The Debtors, and many other apparel and retail companies, have faced a challenging commercial environment over the past several years brought on by increased competition and the shift away from shopping at brick and mortar stores. Given the Debtors' substantial brick and mortar presence, and the expenses associated therewith, the Debtors' business has been heavily dependent on physical consumer traffic, and resulting sales conversion, to meet their sales and profitability targets. The combination of the above factors, and others plaguing the retail industry as a whole, contributed to the Debtors falling short of their targeted sales, profitability performance, and increasing operational losses.

48.    Despite their substantial brick-and-mortar footprint, the Debtors have not established a large online presence, and online sales, which account for an increasing proportion of retail spending, make up a relatively small proportion of the Debtors' sales. The Debtors have increased their online presence—including by continuing to develop their own website—but fully exploiting the growth of online retail remains an ongoing process for the Debtors. The Debtors' lack of a fully developed online presence has put downward pressure on the Debtors'

revenue, and has hurt their comparative performance against competitors with more modern online-centric sales models.

49.    In addition to the rise of online retail, the Debtors' businesses have been harmed by their failure to adapt to recent consumer trends, including lower price points due to competitive pressure.  BCBG designs and manufactures high quality items meant to be worn for many years, with correspondingly higher price points.  BCBG has underpenetrated its wholesale business and has not exploited its many licensing opportunities, in contrast to some of its key competitors.  Instead, by focusing on unprofitable foreign operations, which lost approximately $23 million in fiscal year 2016, the Debtors have further strained their resources by supporting those businesses.

### B.    Supply Chain and Borrowing Base Challenges.

50.    As the Debtors' liquidity has tightened, the supply chain vendors have begun to place pressure on the supply chain cost structure.  Vendors have begun refusing to ship inventory until the Debtors pay (which can result in completed merchandise being stuck overseas).  This in turn worsens the Debtors' liquidity (including by reducing the borrowing base under the ABL Facility), creating a negative feedback loop.  Without the flow of fresh inventory, the Debtors' retail business will effectively starve.

51.    Additionally, as described above, due to the limited borrowing base availability under the ABL Facility, the ABL Agent sweeps all of the Debtors' available cash on a daily basis.  This, combined with the Debtors' vendors' unwillingness to ship new inventory on credit, has limited the Debtors' ability to purchase new inventory.  As is typical in the apparel industry, the Debtors' inventory levels form a substantial portion of the ABL Facility borrowing base— thus, the Debtors' inability to ship new inventory only exacerbates the ABL Facility borrowing

base constraints, which, in a vicious cycle, further limits the Debtors' ability to ship fresh inventory.

52.     A critical component of the Debtors' proposed debtor-in-possession financing (the "Proposed DIP Financing"), described in greater detail below, is securing adequate liquidity to reverse the above-described cycle during these proceedings.  The flow of fresh inventory is the lifeblood of retail and wholesale sales, and ensuring the flow of inventory to the Debtors' customers during these chapter 11 cases will maximize the value of the Debtors' estates.

**C.     Board Exploration of Strategic Alternatives and Independent Investigation.**

53.     Recognizing the need to explore restructuring alternatives, the Debtors retained Kirkland & Ellis LLP, as legal advisor, and AlixPartners, as restructuring and financial advisor (including Chief Restructuring Officer and Interim Chief Financial Officer) on or about January 11, 2017.    In February 2017, the Debtors retained Jefferies, LLC ("Jefferies"), as their investment banker.  Also, in January 2017, the holders of Global Holdings Series B and Series C common units, appointed Homi Patel, Bennett Nussbaum, and Robert Rosenberg to the Board as independent managers (the "Independent Managers") of the Board.  Each of the Independent Managers has extensive experience serving on boards of managers and boards of directors, including in distressed situations.

54.     In the weeks since their appointment, the Independent Managers have played a key role in the restructuring negotiations and the analysis of, among other things, operational restructuring initiatives, the Proposed DIP Financing, the Debtors' chapter 11 plan (the "Plan"), the proposed bidding procedures related thereto (the "Bidding Procedures"), and related matters. The Independent Managers have also directed Kirkland & Ellis LLP to conduct an investigation into all potential estate causes of action, including any claims or causes of action against existing

lenders or equity holders.  The investigation was commenced in the weeks preceding the Petition

Date and is ongoing.

55.    As part of the investigation, the Independent Managers have begun to collect

documents, including documents related to all dealings between the Debtors, their term lenders,

and Max Azria.  The Independent Managers have also begun interviewing the Debtors senior

management, including the company's general counsel and interim chief executive officer.

**D.    Operational Right-Sizing Initiatives and ABL Forbearance.**

56.    In light of the foregoing, the Debtors began to aggressively pursue operational

right-sizing initiatives in the weeks immediately preceding the Petition Date.  Significantly, on

February 1, 2017, the Board authorized the closing and winding down of approximately

120 brick-and-mortar store locations, predominantly standalone BCBG-branded retail and

factory outlet stores.  Immediately thereafter, the Debtors engaged the joint venture of Hilco

Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (collectively, the

"Liquidators") to begin liquidating the inventory in the closing stores and otherwise preparing

the stores for turnover to the applicable landlords.  The Liquidators' efforts are ongoing as of the

Petition Date and the Debtors will seek to assume the fee agreement in place with the Liquidators

so that the Liquidators may continue their work uninterrupted.

57.    Additionally, on February 14, 2017, the Debtors and the ABL Agent entered into

a forbearance agreement (the "ABL Forbearance").  Prior to entry into the ABL Forbearance,

due to the Debtor's shrinking inventory base and the fact that all of the Debtors' cash was swept

on a daily basis under the terms of the ABL Credit Agreement, the Debtors had very limited cash

to continue to fund operations.  Under the terms of the ABL Forbearance, the ABL Lenders

agreed to, among other things, (a) forbear from exercising certain rights and remedies through

February 28, 2017, and (b) temporarily reduce the borrowing base availability block by

$5 million, resulting in the release of critical funds to allow the Debtors to purchase (and sell) new inventory.

58.    The Debtors will continue to implement operational right-sizing measures postpetition, including store closures, a potential reduction in force, and contract renegotiations and rejections, which will maximize the value of the Debtors' estates by creating the most attractive, going concern business possible to shop to potential purchasers in accordance with the proposed bidding procedures.

**IV.    The Proposed DIP Financing, Marketing Process, and Chapter 11 Plan.**

59.    To fund the administration of these chapter 11 cases, the ABL Lenders, the Tranche A lenders, and the Tranche B lenders have agreed to fund the Proposed DIP Financing. The ABL Lenders have agreed to continue to lend money on terms similar to those under the Debtors' existing asset-based lending facility.  The Tranche A lenders and the Tranche B lenders have agreed to provide a $80 million junior debtor-in-possession facility, including up to $45 million in new money.  The Tranche A lenders will fund $4.8 million of new money financing, while their $35 million in outstanding Tranche A loans will convert to postpetition debtor-in-possession loans.  The Tranche B lenders will fund the remaining $40.2 million of the new money financing.

60.    Both the revolving and term loan portions of the Proposed DIP Financing are critical to the Debtors' ability to operate smoothly postpetition, including by providing sufficient liquidity to fund the administrative cost of these chapter 11 cases and, importantly, payments to the Manufacturers and other participants in the Debtors' supply chain to ensure the free flow of inventory to the Debtors' stores and wholesale customers.   Based on my knowledge and extensive discussions with the Debtors' management team and advisors, including a team from AlixPartners acting under my supervision, I believe that the Proposed DIP Financing gives the

Debtors sufficient liquidity to stabilize their operations and fund the administration of these chapter 11 cases as the Debtors seek to implement the restructuring contemplated by the Plan. Finally, based on extensive discussions with the Debtors' advisors, including Jefferies, I understand that the Proposed DIP Financing is on the most favorable terms available in light of the circumstances of these chapter 11 cases.

61.    The Debtors' current Plan includes a toggle feature, resulting in either the sale of some or all of the Debtors' assets or a debt for equity conversion on terms to be negotiated with the Tranche B lenders. The Plan toggle provides the Debtors with the latitude necessary to negotiate the precise terms of their ultimate emergence from chapter 11 and the terms of the Plan may be revised as necessary to implement the terms of an acceptable third-party bid. The Bidding Procedures and Plan provide for substantial flexibility with respect to the structure of any transaction—*e.g.*, the sale of all or only some of the Debtors' assets or the sale of the common equity interests in reorganized Global Holdings. The Bidding Procedures are designed to—and the Debtors believe the Bidding Procedures will actually operate to—maximize the likelihood of an overbid for the benefit of enterprise-wide stakeholders.

62.    Preserving value for the benefit of the Debtors' estates depends in large part on the Debtors proceeding swiftly to confirmation of the Plan and minimizing the effects of the Debtors' chapter 11 cases on the value of the Debtors' "brand"—a critical component of the value of the Debtors' businesses. Due to the fact that customer sentiment shifts rapidly and stakeholders (including key suppliers and landlords) often turn swiftly against apparel and retail debtors, such debtors often do not fare well in bankruptcy—in many instances electing to liquidate as opposed to reorganize. The Debtors intend to swiftly proceed with a fair and

efficient process to preserve and maximize the value of that achievement for enterprise-wide stakeholders.

## V.    Evidentiary Support for First Day Motions.

63.    Contemporaneously, the Debtors have filed a number of first day pleadings seeking relief that the Debtors believe is necessary to enable them to efficiently administer their estates with minimal disruption and loss of value during the liquidation process described herein. The Debtors request that the relief requested in each of the first day motions be granted as critical elements in ensuring the maximization of value of the Debtors' estates.  I believe that the relief requested in the first day motions is necessary to allow the Debtors to operate with minimal disruption during the pendency of these chapter 11 cases.  I have reviewed each of the first day motions discussed below and the facts set forth in each first day motion are true and correct to the best of my knowledge and belief with appropriate reliance on corporate officers and advisors. A description of the relief requested in and the facts supporting each of the first day motions is set forth in **Exhibit A** attached hereto and incorporated herein by reference.

## VI.    Information Required by Local Bankruptcy Rule 1007-2.

64.    Local Bankruptcy Rule 1007-2 requires certain information related to the Debtors, which I have provided in the exhibits attached hereto as **Exhibit B** through **Exhibit M**. Specifically, these exhibits contain the following information with respect to the Debtors (on a consolidated basis, unless otherwise noted):[9]

- **Exhibit B**. Pursuant to Local Bankruptcy Rule 1007-2(a)(3), provides the names and addresses of the members of, and attorneys for, any committee organized prior to the order for relief in these chapter 11 cases, and a brief description of the circumstances

---

[9]    The information contained in **Exhibit B** through **Exhibit M** attached to this declaration does not constitute an admission of liability by, nor is it binding on, the Debtors.  The Debtors reserve all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt.

surrounding the formation of the committee and the date of the formation.

- **Exhibit C**. Pursuant to Local Bankruptcy Rule 1007-2(a)(4), provides the following information with respect to each of the holders of the Debtors' fifty (50) largest unsecured claims, excluding claims of insiders:  the creditors name; the address (including the number, street, apartment, or suite number, and zip code, if not included in the post office address); the telephone number; the name(s) of the person(s) familiar with the Debtors' account; the nature and approximate amount of the claim; and an indication of whether the claim is contingent, unliquidated, disputed, or partially secured.

- **Exhibit D**. Pursuant to Local Bankruptcy Rule 1007-2(a)(5), provides the following information with respect to each of the holders of the five largest secured claims against the Debtors:  the creditor's name; address (including the number, street, apartment, or suite number, and zip code, if not included in the post office address); the amount of the claim; a brief description of the claim; an estimate of the value of the collateral securing the claim; and an indication of whether the claim or lien is disputed at this time.

- **Exhibit E**. Pursuant to Local Bankruptcy Rule 1007-2(a)(6), provides a summary of the Debtors' assets and liabilities.

- **Exhibit F**. Pursuant to Local Bankruptcy Rule 1007-2(a)(7), provides a summary of the publicly held securities of the Debtors.

- **Exhibit G**. Pursuant to Local Bankruptcy Rule 1007-2(a)(8), provides the following information with respect to any property in possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, or secured creditors, or agent for such entity:  the name; address; and telephone number of such entity and the court in which any proceeding relating thereto is pending.

- **Exhibit H**. Pursuant to Local Bankruptcy Rule 1007-2(a)(9), provides a list of property comprising the premises owned, leased, or held under other arrangement from which the Debtors operate their business.

- **Exhibit I**. Pursuant to Local Bankruptcy Rule 1007-2(a)(10), sets forth the location of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the U.S.

- **Exhibit J**. Pursuant to Local Bankruptcy Rule 1007-2(a)(11), provides a list of the nature and present status of each action or proceeding, pending or threatened, against the Debtors or their property where a judgment or seizure of their property may be imminent.

- **Exhibit K**. Pursuant to Local Bankruptcy Rule 1007-2(a)(12), sets forth a list of the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

- **Exhibit L**. Pursuant to Local Bankruptcy Rule 1007-2(b)(1)-(2)(A), provides the estimated amount of payroll to the Debtors' employees (not including officers, directors, and equityholders) and the estimated amounts to be paid to officers, equityholders, directors, and financial and business consultants retained by the Debtors, for the 30-day period following the Petition Date.

- **Exhibit M**. Pursuant to Local Bankruptcy Rule 1007-2(b)(3), provides a schedule, for the 30-day period following the Petition Date, of estimated cash receipts and disbursements, net gain or loss, obligations and receivables expected to accrue but remain unpaid, other than professional fees, for the 30-day period following the filing of the chapter 11 cases, and any other information relevant to an understanding of the foregoing.

*[Remainder of page intentionally left blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

statements are true correct.

Dated:  March 1, 2017                 */s/ Holly Felder Etlin*
New York, New York                  Name: Holly Felder Etlin
                                    Title:   Chief Restructuring Officer
                                    BCBG Max Azria Global Holdings, LLC

## <u>EXHIBIT A</u>

**Evidentiary Support for First Day Motions**

<u>**Evidentiary Support for First Day Motions**</u>[10]

I.    **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing The Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Lenders, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief (the "<u>DIP Motion</u>").**

1.    Pursuant to the DIP Motion, the Debtors seek entry of interim and final orders approving the Proposed DIP Financing.  The Debtors require immediate access to the Proposed DIP Financing to avoid any further harm to their business—already battered by the adverse market conditions—and preserve value enterprise-wide.  As of the Petition Date, the Debtors have minimal cash on hand and they do not have readily available sources of additional financing.  Accordingly, without additional financing, the Debtors lack sufficient funds to operate their businesses and continue paying their postpetition obligations as they come due.

2.    In light of the Debtors' constrained liquidity position, AlixPartners and Jefferies commenced an evaluation of the Debtors' financing needs and funding alternatives for an in-court restructuring.  AlixPartners and Jefferies worked closely with the Debtors, their management team, and their advisors to determine the Debtors' cash requirements.  Based on my knowledge and extensive discussions with the Debtors' management team and advisors, I believe that time and an appropriate amount of additional funding will permit the Debtors to complete the restructuring transactions described herein.

3.    As part of AlixPartners' evaluation of the Debtors' liquidity position and financing needs, AlixPartners worked with the Debtors' management team and treasury personnel to develop and analyze the Debtors' cash flow forecasts, which take into account

---

[10]   Capitalized terms used in this **<u>Exhibit A</u>** and not otherwise defined shall have the meanings given to them in *Declaration of Holly Felder Etlin, Chief Restructuring Officer of BCBG Max Azria Global Holdings, LLC, (I) in Support of Debtors' Chapter 11 Petitions and First Day Motions and (II) Pursuant to Local Bankruptcy Rule 1007-2* or the first day motions described herein, as applicable.

anticipated cash receipts and disbursements during the projected period, and considered a number of factors, including the effect of the chapter 11 filing on the Debtors' operations, fees and interest expenses associated with the Proposed DIP Financing, professional fees, and required ordinary course operational expenses. Based upon these forecasts and extensive discussions with the Debtors' management team and advisors, I do not believe that the Debtors are able to generate sufficient levels of operating cash flow in the ordinary course of business to cover their working capital needs and the projected costs of these chapter 11 cases without debtor-in-possession financing.

4.     Accordingly, since it would not be possible to administer the Debtors' chapter 11 cases solely on a "cash collateral" basis, AlixPartners and the Debtors determined that obtaining debtor-in-possession financing at the start of these chapter 11 cases is crucial to the Debtors' continued viability.  Further, I understand that the Debtors have not discovered sufficient unencumbered assets to secure sufficient debtor-in-possession financing to fund a non-consensual chapter 11 case.  Thus, I believe that approval of the Proposed DIP Financing is in the best interests of the Debtors and their stakeholders and provides the Debtors with sufficient liquidity to administer these chapter 11 cases.

5.     Under the Proposed DIP Financing, the ABL Lenders have agreed to continue to lend money on terms similar to those under the Debtors' existing asset-based lending facility. The Tranche A lenders and the Tranche B lenders have agreed to provide a $80 million junior debtor-in-possession facility, including up to $45 million in new money.  The Tranche A lenders will fund $4.8 million of new money financing, while their $35 million in outstanding Tranche A loans will convert to postpetition debtor-in-possession loans.  The Tranche B lenders will fund the remaining $40.2 million of the new money financing.  AlixPartners and Jefferies worked

closely with the Debtors' management team and other advisors to determine the appropriate amount of debtor-in-possession financing that would be necessary to satisfy the foregoing obligations.  After reviewing the Debtors' projected operating cash flows and working capital requirements, AlixPartners, Jefferies, and the Debtors' management team concluded that the Proposed DIP Financing would provide enough liquidity to facilitate the administration of these chapter 11 cases and fund all payments contemplated by the first day motions described herein.

6.    Based on the foregoing, I believe that the amount of the Proposed DIP Financing is appropriate and justified in light of the Debtors' businesses and their liquidity needs, and will inure to the benefit of the Debtors' estates, their stakeholders, and stakeholders on an enterprise-wide basis.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the DIP Motion.

7.    Further support for the relief requested in the DIP Motion is set forth in the *Declaration of Jeffrey Finger in Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing The Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Lenders, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* filed contemporaneously herewith.

## II.    Debtors' Motion Seeking Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief (the "<u>Joint Administration Motion</u>").

8.    Pursuant to the Joint Administration Motion, the Debtors request entry of an order:  (a) directing procedural consolidation and joint administration of these chapter 11 cases and (b) granting related relief, including the authority to file their monthly operating reports required by the *Operating Guidelines and Reporting Requirements for Debtors in Possession*

*and Trustees* issued by the Office of the United States Trustee for the Southern District of New

York  by consolidating the information required for each Debtor in one report that tracks and

breaks out all of the specific information (*e.g.*, receipts, disbursements, etc.) on a debtor-by-

debtor basis in each monthly operating report.   Given the integrated nature of the Debtors'

operations, joint administration of these chapter 11 cases will provide significant administrative

convenience without harming the substantive rights of any party in interest.

9.       Many of the motions, hearings, and orders in these chapter 11 cases will affect

each and every Debtor entity.   The entry of the order directing joint administration of these

chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections.   Joint

administration also will allow the U.S. Trustee and all parties-in-interest to monitor these chapter

11 cases with greater ease and efficiency.   Moreover, joint administration will not adversely

affect the Debtors' respective constituencies because this motion seeks only administrative, not

substantive, consolidation of the Debtors' estates.   Parties-in-interest will not be harmed by the

relief requested; instead, parties-in-interest will benefit from the cost reductions associated with

the joint administration of these chapter 11 cases.   Accordingly, on behalf of the Debtors, I

respectfully submit that the joint administration of these chapter 11 cases is in the best interests

of their estates, their creditors, and all other parties-in-interest.

**III.     Debtors' Motion Seeking Entry of an Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures and (II) Granting Related Relief (the "<u>Case Management Motion</u>").**

10.       Pursuant to the Case Management Motion, the Debtors seek entry of an order:

(a) approving and implementing the notice, case management, and administrative procedures;

and (b) granting related relief.  The proposed Case Management Procedures, among other things:

(a) establish requirements for filing and serving Court Filings; (b) delineate standards for notices

of hearings and agenda letters; (c) fix periodic omnibus hearing dates and articulate mandatory

4

guidelines for the scheduling of hearings and objection deadlines; and (d) limit matters that are required to be heard by the Court.  Given the size and complexity of these chapter 11 cases, I believe that implementing the Case Management Procedures will facilitate the fair and efficient administration of these cases and promote judicial economy.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Case Management Motion.

**IV.    Debtors' Motion for Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, Statements of Financial Affairs, and Rule 2015.3 Financial Reports, and (II) Granting Related Relief (the "<u>Schedules and Statements Extension Motion</u>").**

11.    Pursuant to the Schedules and Statements Extension Motion, the Debtors seek entry of an order:  (a) extending the deadline by which the Debtors must file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs by 30 days, for a total of 44 days from the Petition Date, without prejudice to the Debtors' ability to request additional extensions; (b) extending the deadline by which the Debtors must file their initial reports of financial information with respect to entities in which the Debtors hold a controlling or substantial interest as set forth in Federal Rule of Bankruptcy Procedure 2015.3 to the later of: (i) 30 days after the meeting of creditors to be held pursuant to Section 341 of the Bankruptcy Code or (ii) 44 days from the Petition Date, or to file a motion with the Court seeking a modification of such reporting requirements for cause, without prejudice to the Debtors' ability to request additional extensions; and (c) granting related relief.

12.    To prepare their Schedules and Statements, the Debtors will have to compile information from books, records, and documents relating to thousands of claims, assets, and contracts from each Debtor entity.  Accordingly, collection of the necessary information will require a significant expenditure of time and effort on the part of the Debtors and their

5

employees.  Additionally, because numerous invoices related to prepetition goods and services have not yet been received and entered into the Debtors' accounting system, it may be some time before the Debtors have access to all of the information required to prepare the Schedules and Statements.

13.    Although the Debtors, with the assistance of their professional advisors, are mobilizing their employees to work diligently and expeditiously on preparing the Schedules and Statements, resources are strained.  Given the amount of work entailed in completing the Schedules and Statements and the competing demands on the Debtors' employees and professionals to assist in efforts to stabilize business operations during the initial postpetition period, the Debtors likely will not be able to properly and accurately complete the Schedules and Statements within the required time period.

**V.    Debtors' Motion Seeking Entry of an Order (I) Authorizing the Debtors to (A) Prepare a List of Creditors in Lieu of Submitting a Formatted Mailing Matrix and (B) File a Consolidated List of the Debtors' 50 Largest Unsecured Creditors, (II) Authorizing the Debtors to Redact Certain Personal Identification for Individual Creditors, (III) Approving the Form and Manner of Notifying Creditors of Commencement of These Chapter 11 Cases, and (IV) Requesting Related Relief (the "Matrix Motion").**

14.    Pursuant to the Matrix Motion, the Debtors seek entry of the order in accordance with the Rule 5075-1 of the Local Bankruptcy Rules for the Southern District of New York, (a) authorizing the Debtors to:  (i) prepare a consolidated list of creditors in lieu of submitting separate mailing matrices for each Debtor, (ii) file a consolidated list of the Debtors' 50 largest unsecured creditors, and (iii) mail initial notices through their Proposed Claims and Noticing Agent;  (b) authorizing the Debtors to redact certain personal identification information for individual creditors; (c) approving the form and manner of notifying creditors of commencement of these chapter 11 cases; and (d) granting related relief.

6

15.    I believe that permitting the Debtors to maintain a single consolidated list of creditors in lieu of filing a separate creditor matrix for each Debtor is warranted under the circumstances of these chapter 11 cases.  Specifically, maintaining a single consolidated list of creditors will benefit the Debtors and their estates by allowing the Debtors to more efficiently provide required notices to parties-in-interest and reduce the potential for duplicate mailings. Indeed, many of the Debtors' creditors overlap and thus, to the extent that the Debtors are required to maintain separate mailing matrices, a substantial number of parties likely would receive multiple copies of the same notice.

16.    Accordingly, the Debtors, working with the proposed Claims and Noticing Agent, have prepared a single, consolidated list of the Debtors' creditors in electronic format.  To ensure that no parties-in-interest are prejudiced, the Debtors will make their consolidated list of creditors available in readable electronic format to any party in interest who so requests (or in non-electronic format at such requesting party's sole cost and expense).  Accordingly, I submit that the preparation and maintenance of a single consolidated creditor list is warranted under the facts and circumstances present in these chapter 11 cases.

**VI.    Debtors' Application for Entry of an Order (I) Authorizing and Approving the Appointment of Donlin, Recano, &Company, Inc. as Claims and Noticing Agent and (II) Granting Related Relief (the "<u>Claims Agent Application</u>").**

17.    Pursuant to the Claims Agent Application, the Debtors seek entry of an order appointing Donlin, Recano, & Company, Inc. as the Claims and Noticing Agent for the Debtors in their chapter 11 cases, including assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Debtors' chapter 11 cases.  Given the complexity of these chapter 11 cases and the number of creditors and other parties in interest involved in these chapter 11 cases, I believe that appointing Donlin, Recano, &

Company, Inc. as the notice and claims agent in these chapter 11 cases will maximize the value of the Debtors' estates for all its stakeholders.

VII.    **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, and (C) Maintain Existing Business Forms, (II) Authorizing the Debtors to Continue Intercompany Transactions, and (III) Granting Related Relief (the "Cash Management Motion").**

18.    Pursuant to the Cash Management Motion, the Debtors seek entry of interim and final orders:  (a) authorizing the Debtors to: (i) continue to operate their cash management system, (ii) honor certain prepetition obligations related thereto, and (iii) maintain existing business forms; (b) authorizing the Debtors to continue intercompany transactions in the ordinary course and granting superpriority administrative expense status to postpetition intercompany balances; and (c) granting related relief.

19.    The Debtors operate a complex cash management system that is typical of multi-store retail operations and comparable to the centralized cash management systems used by other similarly sized retail companies to manage the cash flow of operating units in a cost-effective, efficient manner.  The Debtors use their Cash Management System in the ordinary course to transfer and distribute funds and to facilitate cash monitoring, forecasting, and reporting.  The Debtors' treasury department maintains daily oversight over the Cash Management System and implements cash management controls for entering, processing, and releasing funds, including in connection with intercompany transactions.  Additionally, the Debtors' corporate accounting, cash forecasting, and internal audit departments regularly reconcile the Debtors' books and records to ensure that all transfers are accounted for properly.

20.    The Cash Management System is comprised of approximately 253 bank accounts, each as described in more detail in the Cash Management Motion.  Historically, the Debtors estimate that they pay approximately $29,000 in Bank Fees each month, depending on

transaction volume.  The Debtors estimate that approximately $29,000 in prepetition Bank Fees remain outstanding as of the Petition Date.  The Debtors estimate that cash collections average approximately $36.6 million per month, including store cash receipts, credit card receipts, partner shop payments, and e-commerce sales.  In addition, the Debtors estimate that total disbursements will range between $16.0 million and $59.2 million per month during these chapter 11 cases.  On average, approximately $32.0 million flows through the Cash Management System on a monthly basis.

21.    Further, the banks where the Debtors hold accounts:  (a) have executed a Uniform Depository Agreement with, and are designated as authorized depositories by, the U.S. Trustee pursuant to the U.S. Trustee Operating Guidelines; (b) are insured by federal agencies, such as the Federal Deposit Insurance Corporation; or (c) are otherwise well-capitalized and financially stable financial institutions.  Requiring the Debtors to transfer any of the above-mentioned Bank Accounts to a designated authorized depository would place a needless administrative burden on the Debtors and impose significant costs to the Debtors' estates.

22.    As part of their Cash Management System, the Debtors utilize various preprinted business forms in the ordinary course.  To minimize expenses to their estates and avoid confusion during the pendency of these chapter 11 cases, the Debtors request that the Court authorize the Debtors' continued use of all existing preprinted correspondence and business forms (including, without limitation, letterhead, checks, and other business forms) as such forms were in existence immediately before the Petition Date, without reference to the Debtors' status as debtors in possession, rather than requiring the Debtors to incur the expense and delay of ordering entirely new business forms.

23.     In the ordinary course of business, the Debtors engage in routine business relationships with each other resulting in intercompany receivables and payables. Accordingly, at any given time there may be Intercompany Claims owing by one Debtor to another Debtor. For example, in the normal course of business, certain of the Debtors' wholly owned subsidiaries (including certain foreign subsidiaries) purchase inventory from the wholesale segment of the Debtors' business to supply the Debtors' foreign stores. As a result, intercompany balances in favor of BCBG Max Azria Group, LLC from certain of its subsidiaries (including foreign subsidiaries) are typically outstanding at any given time. Payments from the subsidiaries are generally paid into the Collection Account. The Intercompany Claims are reflected as journal entry receivables and payables, as applicable, in the respective Debtors' accounting systems.

24.     The Debtors track all fund transfers in their respective accounting system and can ascertain, trace, and account for all Intercompany Transactions. The Debtors will continue to track postpetition intercompany transfers. Discontinuing the Intercompany Transactions would unnecessarily disrupt the Cash Management System and the Debtors' operations to the detriment of the Debtors and their creditors and other stakeholders. The Debtors seek the authority to continue the Intercompany Transactions in the ordinary course of business, in a manner consistent with prepetition practice.

25.     I believe that the relief requested in the Cash Management Motion is essential to the continued operation of the Debtors' business and denial of such relief would severely disrupt, if not cripple, the Debtors' business. I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11.

Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the

Cash Management Motion.

**VIII. Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing, but not Directing, the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Employee Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief (the "Wages Motion").**

26.        Pursuant to the Wages Motion, the Debtors seek entry of interim and final orders:

(a) authorizing, but not directing, the Debtors to (i) pay prepetition wages, salaries, other

compensation, and reimbursable employee expenses and (ii) continue employee benefits

programs in the ordinary course, including payment of certain prepetition obligations related

thereto; and (b) granting related relief.

27.        As set forth above, as of the Petition Date, the Debtors employ approximately

4,800 employees, including approximately 1,900 full-time and approximately 2,900 part-time.

The Debtors' Employees perform a wide variety of functions critical to the administration of

these chapter 11 cases.  In many instances, the Employees include personnel who are intimately

familiar with the Debtors' businesses, processes, and systems, who possess unique fashion

design skill and experience, or who have developed relationships with wholesalers and

distributors that are essential to the Debtors' business.  These individuals cannot be easily

replaced.  Without the continued, uninterrupted services of the Employees, the ability of the

Debtors maintain and administer their estates will be materially impaired.

28.        To minimize the personal hardship the Employees could suffer if prepetition

Employee-related obligations are not paid when due or as expected and to maintain stability in

the Debtors' workforce during the administration of these chapter 11 cases, the Debtors, by this

motion, seek authority, but not direction, to:  (a) pay and honor certain prepetition claims relating

to, among other things, wages, salaries, and other compensation, payroll services, federal and

state withholding taxes and other amounts withheld (including garnishments, Employees' share of insurance premiums, and taxes), reimbursable expenses, health insurance, workers' compensation benefits, life insurance, short- and long-term disability coverage, and certain other benefits that the Debtors have historically provided in the ordinary course; and (b) pay all costs incident to the Employee Compensation and Benefits.

29.     I believe that paying prepetition wages, employee benefits, and similar obligations will benefit the Debtors' estates and their creditors by allowing the Debtors' business operations to continue without interruption.  Indeed, without the relief requested herein, Employees may seek alternative employment opportunities, perhaps with the Debtors' competitors.  Such a development would deplete the Debtors' workforce, thereby hindering the Debtors' ability to operate their business and, likely, diminishing stakeholder confidence in the Debtors' ability to successfully reorganize.  The loss of valuable Employees and resulting need to recruit new personnel (and the costs attendant thereto) would be distracting at this crucial time when the Debtors need to focus on stabilizing their business operations.  There can be no doubt that the Debtors must do their utmost to retain their workforce by, among other things, continuing to honor all wage, benefits, and related obligations, including the prepetition Employee Compensation and Benefits.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Wages Motion.

**IX.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Claims of Lien Claimants, Import and Export Claimants, and 503(b)(9) Claimants, and (III) Granting Related Relief (the "<u>Lien Claimants Motion</u>").**

30.     Pursuant to the Lien Claimants Motion, the Debtors seek entry of interim and final orders:  (a) authorizing the Debtors to pay an aggregate amount up to $4.1 million, absent further order of the Court, on account of prepetition claims held by (i) certain shippers and

warehousemen, (ii) certain import and export claimants, and (iii) certain 503(b)(9) claimants; and (b) granting related relief.

31.    ***Lien Claimants***:  The Debtors' business depends on the uninterrupted flow of inventory and other goods through its supply chain and distribution network, including the purchase, importation, storage, and shipment of the Debtors' merchandise and other personal property.  Generally, the Debtors design the Merchandise in house and contract with various foreign manufacturers, located predominantly in China and Hong Kong, to produce and inspect the Merchandise.  Depending on the nature of the Debtors' arrangement with a given manufacturer, the manufacturers or the Debtors, through freight forwarders, ship the Merchandise to certain warehouses that serve as the Debtors' distribution centers.  These warehouses are predominantly operated by the Debtors themselves, with the exception of certain warehouses for e–commerce that are operated by third-party warehousemen.  Additionally, the flow of Merchandise from the Debtors' manufacturers, to the Warehousemen or the Debtors' owned warehouses, and ultimately to (a) stock the Debtors' domestic brick and mortar stores and partner shops, (b) fulfill orders placed with the Debtors' e–commerce provider, or (c) fulfill wholesale orders of the Debtors' distributors, wholesalers, foreign affiliates, depends on the services provided by, among others, various freight forwarders, common carriers, and custom brokers.

32.    Collectively, the Debtors estimate approximately $1.75 million of third-party shipping and storage charges are due and owing as of the Petition Date, of which approximately $700,000 may come due within 25 days after the Petition Date.

33.    ***Import Claimants***:  In the ordinary course of their businesses, the Debtors import inventory and related materials from the Foreign Vendors.  In the ordinary course, the Debtors

also export inventory  to foreign countries, including inventory to be sold in the Debtors' stores located in Canada, Europe, and Japan. Timely receipt or transmittal, as applicable, of the Imported Goods and Exported Goods is critical to both the Debtors' domestic and foreign business operations. Any disruption or delay would adversely affect the Debtors' business operations and affect the Debtors' ability to efficiently administer these chapter 11 cases.

34.     In connection with the import and export of goods, the Debtors may be required to pay various charges, including customs duties, detention and demurrage fees, tariffs and excise taxes, freight forwarding, and other similar obligations. The Debtors pay approximately $15.2 million annually on account of Import/Export Charges.  The Debtors estimate that approximately $1.55 million in Import/Export Charges for goods currently in transit is outstanding as of the Petition Date, approximately $1.1 million of which may come due in the first 25 days after the Petition Date  Absent payment to parties to whom the Debtors owe Import/Export Charges may interfere with the transportation of the Imported Goods or Exported Goods.

35.     *503(b)(9) Claimants*:  The Debtors may have received certain inventory, goods, or materials from various foreign and domestic vendors within the 20-day period immediately preceding the Petition Date.  The Debtors believe that as of the Petition Date, they owe approximately $800,000 on account of goods delivered within the 20 days immediately preceding the Petition Date, none of which will come due in the first 25 days after the Petition Date, and the value of which may be entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.  Each of the 503(b)(9) Claimants provide materials that are necessary for the Debtors' business operations.  The Debtors believe a 503(b)(9) Claimant may refuse to supply new orders without payment of its prepetition claims  or reduce the Debtors' existing

14

trade credit—or demand payment in cash on delivery—further exacerbating the Debtors' financial constraints.

36.    I believe that the relief requested in the Lien Claimants Motion is essential to the continued operation of the Debtors' business and denial of such relief would severely disrupt, if not cripple, the Debtors' business.  I believe that the relief requested in the Lien Claimants Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11. Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Lien Claimants Motion.

**X.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto and (II) Granting Related Relief (the "Customer Programs Motion").**

37.    Pursuant to the Customer Programs Motion, the Debtors seek entry of interim and final orders:  (a) authorizing the Debtors to maintain and administer their customer-related programs as described in this motion and honor certain prepetition obligations related thereto; and (b) granting related relief.  The Debtors estimate that, as of the Petition Date, there is approximately $8.3 million outstanding on account of the Customer Programs.

38.    The Debtors have historically provided certain incentives, discounts, and accommodations to their customers to attract and maintain positive customer relationships.  The Customer Programs promote customer satisfaction and inure to the goodwill of the Debtors' business and the value of their "brand."  Accordingly, maintaining the goodwill of their customers is important to the Debtors' ongoing operations in these chapter 11 cases, and is necessary to maximize value for the benefit of all of the Debtors' stakeholders.  Accordingly, on

15

behalf of the Debtors, I respectfully submit that the Court should approve the Customer

Programs Motion.

**XI.    Debtors' Motion for Entry of Interim and Final Orders (I) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Utility Services, (II) Determining Adequate Assurance of Payment for Future Utility Services, (III) Establishing Procedures for Determining Adequate Assurance of Payment, and (IV) Granting Related Relief (the "<u>Utilities Motion</u>").**

39.    Pursuant to the Utilities Motion, the Debtors seek entry of interim and final

orders:   (a) prohibiting utility providers from altering, refusing, or discontinuing services;

(b) determining adequate assurance of payment for future utility services; (c) establishing

procedures for determining adequate assurance of payment for future utility services; and

(d) granting related relief.

40.    In connection with the operation of their businesses, the Debtors obtain water,

sewer service, electricity, waste disposal, natural gas, and other similar services from a number

of utility providers or their brokers.  On average, the Debtors pay approximately $850,000 each

month for third-party Utility Services, calculated as a historical average payment for the twelve-

month period ended December 31, 2016.  Accordingly, the Debtors estimate that their cost for

Utility Services during the next 30 days (not including any deposits to be paid) will be

approximately $850,000.   The Debtors estimate the amount currently held as deposits or

prepayments with respect to any Utility Provider is approximately $320,000. To provide

additional assurance of payment, the Debtors propose to deposit into a segregated account

$298,421, which represents an amount equal to approximately one half of the Debtors' average

monthly cost of Utility Services, calculated based on the Debtors' average utility expenses over

the twelve months ended December 31, 2016.

41.    Preserving Utility Services on an uninterrupted basis is essential to the Debtors'

operations.  The Debtors' business includes more than 195 brick and mortar locations, as well as

a showroom, warehouses, and corporate offices. These locations require electricity, telecommunications, internet, water, waste management (including sewer and trash), and other utility services to operate. Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtors' business operations would be severely disrupted, and such disruption would jeopardize the Debtors' ability to administer their chapter 11 cases. Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Utilities Motion.

**XII.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing, but not Directing, the Debtors to (A) Pay Their Obligations Under Insurance Policies Entered Into Prepetition, (B) Continue to Pay Brokerage Fees, (C) Renew, Supplement, Modify, or Purchase Insurance Coverage, (D) Honor the Terms of the Financing Agreements and Pay Premiums Thereunder, and (E) Enter Into New Financing Agreements in the Ordinary Course of Business and (II) Granting Related Relief (the "<u>Insurance Motion</u>").**

42.    Pursuant to the Insurance Motion, the Debtors seek entry of interim and final orders: (a) authorizing, but not directing, the Debtors to (i) pay their obligations under insurance policies entered into prepetition, (ii) continue to pay certain brokerage fees, (iii) renew, supplement, modify, or purchase insurance coverage in the ordinary course, (iv) enter into new premium financing agreements in the ordinary course of business, and (v) honor the terms of the Financing Agreements (as defined below) and pay premiums thereunder; and (b) granting related relief.

43.    In the ordinary course of business, the Debtors maintain approximately 18 insurance policies administered by multiple third-party insurance carriers. The Insurance Policies provide coverage for, among other things, the Debtors' directors' and officers' liability (including tail coverage), property, aircraft, commercial crime, marine cargo, general liability, automobile liability, and foreign commercial liability. The aggregate annual premium for the Insurance Policies is approximately $3.1 million, plus applicable taxes and surcharges. Some, but not all, of the Insurance Policies are financed through premium financing agreements  with

First Insurance Funding.  Pursuant to the Financing Agreements, the Debtors are required to make 10 monthly premium payments of approximately $230,000 in the aggregate beginning on July 1, 2016.  The Financing Agreements renew in May and June.  As of the Petition Date, there is approximately $725,000 outstanding on account of the Financing Agreements, some or all of which will come due during the pendency of these chapter 11 cases.

44.    In connection with the Insurance Policies, the Debtors obtain insurance brokerage services from Lockton Companies, Inc. for all insurance coverage other than the aircraft Insurance Policy, which services are obtained from Andreini & Company Inc.  The Brokers assist the Debtors in obtaining comprehensive insurance coverage for their operations in the most cost-effective manner, negotiating policy terms, provisions, and premiums, assisting the Debtors with claims, and providing ongoing support throughout the applicable policy periods. The Debtors pay the Brokers aggregate annual fees in an amount equal to approximately $300,000 and aggregate annual commissions in an amount equal to approximately $60,000.  The flat annual fee is due and payable prior to the start of the applicable service period, which generally corresponds with the start of the Insurance Policies' terms.  The Brokers collect the commission payments as part of the premiums paid on the Insurance Policies.  As of the Petition Date, the Debtors not believe that they owe any amounts to the Brokers on account of fees, commissions, or any other prepetition obligations.

45.    I believe continuation of the Insurance Policies and the Financing Agreement and entry into new insurance policies and premium financing agreements is essential to the preservation of the value of the Debtors' properties and assets.  Further, I believe that continuation of the services of the Brokers is necessary to assure the Debtors' ability to secure Insurance Policies on advantageous terms at competitive rates, facilitate the proper maintenance

of the Debtors' Insurance Policies postpetition, and ensure adequate protection of the Debtors'

property postpetition.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court

should approve the Insurance Motion.

**XIII.  Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing, but not Directing, the Payment of Certain Prepetition Taxes and Fees and (II) Granting Related Relief (the "<u>Taxes Motion</u>").**

46.    Pursuant to the Taxes Motion, the Debtors seek entry of interim and final orders:

(a) authorizing, but not directing, the Debtors, in their sole discretion, to remit and pay certain

accrued and outstanding prepetition taxes, including sales and use taxes, franchise taxes, and

similar taxes and fees in an amount up to $2,600,000, absent further order of the Court; and

(b) granting  related  relief.    The  Debtors  estimate  that,  as  of  the  Petition  Date,  there  is

approximately $2,600,000 outstanding on account of Taxes and Fees.

47.    In the ordinary course of business, the Debtors collect, incur, and pay sales taxes,

use taxes, annual report and licensing fees, personal property taxes, franchise taxes and fees, and

various other governmental taxes, fees, and assessments.  The Debtors remit the Taxes and Fees

to various federal, state, and local governmental units, including taxing authorities.  Taxes and

Fees  are  remitted  and  paid  by  the  Debtors  through  checks  and  electronic  transfers  that  are

processed through the financial institutions at which the Debtors maintain the bank accounts that

comprise their cash management system.

48.    Payment of the Taxes and Fees is critical to the Debtors' continued and

uninterrupted operations.  The Debtors' failure to pay prepetition Taxes and Fees may cause the

Authorities to take precipitous action, including, but not limited to, conducting audits, filing

liens, preventing the Debtors from doing business in certain jurisdictions, seeking to lift the

automatic stay, or pursuing payment of the Taxes and Fees from the Debtors' officers and

directors, all of which would greatly disrupt the Debtors' operations and ability to focus on their reorganization efforts.

49.    I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Taxes Motion.

## __EXHIBIT B__

## Committees Organized Prepetition

None.

## EXHIBIT C

**Consolidated List of the Holders of the Debtors' 50 Largest Unsecured Claims**

Pursuant to Local Rule 1007-2(a)(4), the following is a consolidated list of the Debtors' creditors holding the 50 largest unsecured claims (the "Consolidated Creditor List") based on the Debtors' unaudited books and records as of the Petition Date. The Consolidated Creditor List has been prepared in accordance with Bankruptcy Rule 1007(d) and does not include (i) persons who come within the definition of "insider" set forth in section 101(31) of the Bankruptcy Code or (ii) secured creditors, unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the 50 largest unsecured claims.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

| | Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim | Amount of claim |
|---|---|---|---|---|
| 1 | Silvereed (Hong Kong) Limited Centennial Building, 1st Floor 926 Cheung Sha Wan Road Kowloon, Hong Kong | Attn: Nancy Yuans/Hokaki Telephone: 852 3921-1924 Email: hoKaKi@GMRHK.com nancyyuans@lifung.com | Trade | $6,368,886.94 |
| 2 | Mega Link International Holdings Limited Lladro Centre, 13th & 14th Floors 72-80 Hoi Yuen Road Kwun Tong, Kowloon, Hong Kong | Attn: Sally Chan/Jeff Wong Telephone: 011-852-2-370-8033 Email: sally.c@megalink.com.hk Jeff.w@megalink.com.hk | Trade | $5,351,909.79 |
| 3 | Dada Trading Co. Ltd. 388 21 Seokyo-Dong Mapo-Ku, Seoul, South Korea | Attn: Yumi Park Telephone: 82-2-326-1418/9 Email: yumi@dadatex.co.kr | Trade | $4,270,789.59 |
| 4 | Renaissance Fashion Ltd. New Trend Centre, 18th Floor, Room 18052 104 King Fuk St. San Po Kong, Kowloon, Hong Kong | Attn: Catherine Wong Telephone: 36166121 Email: catherine.wong@ren-fashion.com | Trade | $2,863,544.68 |

| | Name of creditor and complete mailing address, including zipcode | Name, telephone number and email address of creditor contact | Nature of claim | Amount of claim |
|---|---|---|---|---|
| 5 | Trade Harvest Industrial Limited Premier Centre, 10th Floor, Room 7 20 Cheung Shun Street Kowloon, Hong Kong | Attn: Climas Lo Telephone: 852-3568-0268 Email: climas@hangluen.com.hk | Trade | $2,686,319.67 |
| 6 | Kiaterry Textile Corp. Ltd. Cambridge House, Room 1401 26-28 Cameron Road Tsimshatsui, Kowloon, Hong Kong | Attn: Linda Yip Telephone: 0086-20-38306589 Email: linda@kiaterry.com.cn | Trade | $2,342,877.00 |
| 7 | Kysazoze Limited Billion Plaza 2, 27th Floor, Flat D 10 Cheung Yue Street Cheung Sha Wan, Kowloon, Hong Kong | Attn: Fiona Chiu Telephone: 852-3188 8950 Email: fiona@kysazoze.com | Trade | $2,241,567.23 |
| 8 | Coddy Global Ltd. Tun Hwa South Road, 13th Floor, No. 2, Sec. 1 Taipei, Taiwan ROC | Attn: Angela Lee/Sherry Tsai Telephone: 886-2-2781-5550 ext 115 Email: Angela_Lee@coddy.com.tw Sherry_tsai@coddy.com.tw | Trade | $2,134,621.83 |
| 9 | Aptos, Inc. 15 Governor Drive Newburgh, NY 12550 | Attn: Nathalie Roy Telephone: 514-428-2278 Email: nroy@aptos.com | Professional Services | $2,036,108.02 |
| 10 | Mystic Inc. P.O. Box 786105 Philadelphia, PA 19178-6105 | Attn: Mukesh Patel Telephone: 917-339-2536 Email: mpatel@hermankay.com | Trade | $2,026,166.54 |
| 11 | Perf Star Global Limited Tun Hwa South Road, 12th Floor, No. 2 Sec. 1 Taipei, Taiwan 10506 | Attn: Landy Lee Telephone: 02-27813880 Email: landy_lee@wintex.com.tw | Trade | $1,743,089.60 |

| | Name of creditor and complete mailing address, including zipcode | Name, telephone number and email address of creditor contact | Nature of claim | Amount of claim |
|---|---|---|---|---|
| 12 | Polaris Handelsgesell Schaft Landstrasse Hauptstrasse 146-148/16/B2 Vienna, Austria A1030 | Attn: Bettina Lichtenberger Telephone: 43 1 7105133-24 Email: blichtenberger@polarisfamily.com | Trade | $1,564,870.07 |
| 13 | A & Feng Fashion Ltd New Tech Plaza, 71st Floor, Room 702 34 Tai Yau St. San Po Kong, | Attn: Jan Lam Telephone: 2761 0390 Email: jan@fengfashion.com | Trade | $1,441,219.66 |
| 14 | Best Silk Limited Silvercord Tower 2, 5th Floor, Unit 503 30 Canadaton Rd. Tsimshatsui, Kowloon, Hong Kong | Attn: David He Wei Telephone: 852-687-63718 Email: shipment@jiajuan.com | Trade | $1,398,623.94 |
| 15 | Ernst & Young LLP P.O. Box 846793 Los Angeles, CA 90084-6793 | Attn: Leslie DeHoff Telephone: 213-240-7472 Email: leslie.dehoff@ey.com | Professional Services | $1,393,294.24 |
| 16 | Simon Property Group, Inc. 225 West Washington Street Indianapolis, IN 46204 | Attn: Dan Seabaugh Telephone: 317-263-7646 Email: dseabaugh@simon.com | Contracts | $1,384,067.82 |
| 17 | Collection 18 1370 Broadway, 17th Floor New York, NY 10018 | Attn: Vincent Zheng Telephone: N/A Email: vzheng@collectionxiix.com | Trade | $1,354,026.23 |
| 18 | SAP Industries Inc. 3999 West Chester Pike Newton Square, PA 19073 | Attn: Matt Laukaitis Telephone: 425-922-8072 Email: matt.laukaitis@sap.com | Professional Services | $1,184,904.18 |

| | Name of creditor and complete mailing address, including zipcode | Name, telephone number and email address of creditor contact | Nature of claim | Amount of claim |
|---|---|---|---|---|
| 19 | Pepperjam, LLC P.O. Box 787432 Philadelphia, PA 19178 | Attn: Jason Weidner Telephone: 215-272-2983 Email: jaweidner@pepperjam.com | Professional Services | $1,169,258.39 |
| 20 | Andari Fashion Inc. 9626 Telstar Avenue El Monte, CA 91731 | Attn: Wei Ling Telephone: 626-575-2759 Email: Weiling.Kazuno@andari.com | Trade | $1,149,745.74 |
| 21 | US Customs Service 6650 Telecom Drive, Suite 100 Indianapolis, IN 46278 | Attn: Kandace Niemi Telephone: 877-227-5511 206-592-2054 (direct) Email: kandace.niemi@apexglobe.com | Trade | $1,038,830.12 |
| 22 | RL Criss Cross Inc. 555 8th Ave., Suite 1910 New York, BY 10018 | Attn: Richard Meng Telephone: 86-021-32503203*807 Email: realinues@aol.com | Trade | $788,604.45 |
| 23 | Hing Shing Looping Manufacturing Co. Ltd Wing Tai Centre, 10th Floor, Flat B 12 Hing Yip Street Kowloon, Hong Kong | Attn: Yee Wong Telephone: 2343 6072,3761 6300 Email: yee.wong@hingshing.com | Trade | $787,305.13 |
| 24 | Winston & Strawn LLP 36235 Treasury Center Chicago, IL 60694-6200 | Attn: Dan Webb Telephone: 312-558-5856 Email: dwebb@winston.com | Professional Services | $781,243.32 |
| 25 | FCI Groups, Inc. 755 E. Pico Blvd. Los Angeles, CA 90021 | Attn: Lente Bagunu Telephone: 213-747-3900 Email: lentefci@gmail.com | Trade | $721,621.87 |

4

| | Name of creditor and complete mailing address, including zipcode | Name, telephone number and email address of creditor contact | Nature of claim | Amount of claim |
|---|---|---|---|---|
| 26 | Forementini SRL Via A. Volta 414 Sant'Elpidio A Mare (FM), Italy 63811 | Attn: Giovanni Pierantozzi Telephone: 073486381 Email: giovanni@formentini.it | Trade | $710,046.19 |
| 27 | Rodeo Collection Ltd 9629 Brighton Way, 2nd Floor Beverly Hills, CA 90210 | Attn: Bahador Mahboubi Telephone: 310-275-9700 Email: bahador@dmanage.com | Contracts | $583,110.00 |
| 28 | Shanghai Shenda (Hong Kong) Company Ltd Tung Che Commerical Center, Flat/Room 2201 246 Des Voeuz Rd West Hong Kong | Attn: Dongming Pan Telephone: 86-139-0163-5309 Email: pan@panfame.com | Trade | $557,398.89 |
| 29 | Leap Sheen Limited Wen-Hsin Road, 12th Floor, No. 306, Sec. 1 Taichung City, Taiwan 408. ROC | Attn: Janna Chen Telephone: 886-4-3283536 Email: jannac@maxgreat.com | Trade | $504,220.97 |
| 30 | Priority Fulfillment Services, Inc. P.O. Box 95420 Grapevine, TX 76099-9734 | Attn: Melanie Prada Telephone: 972-881-2900 x 3683 Email: mprada@pfsweb.com | Professional Services | $463,260.44 |
| 31 | Demandware, Inc. 5 Wall Street Burlington, MA 01803 | Attn: Paul DiBartolomeo Telephone: 781-425-7547 Email: pdibartolomeo@demandware.com | Professional Services | $449,485.67 |
| 32 | Gaflana Industry Limited The Third Industrial Zone, No. 8 Qing Feng 3rd Road Shijing, Baiyun District Guangzhou, China 510430 | Attn: Kim Shek Telephone: 86-20-8105-0622 #813 Email: kimshek@gaflana.com | Trade | $393,624.45 |

|  | Name of creditor and complete mailing address, including zipcode | Name, telephone number and email address of creditor contact | Nature of claim | Amount of claim |
|---|---|---|---|---|
| 33 | Galo Shoes, Inc.<br>150 Pompton Plains Crossroads<br>Box 4505<br>Wayne, NJ 07474-4505 | Attn: Felix Galo<br>Telephone: 201-641-0896<br>Email: fxg396@gmail.com | Contracts | $373,749.18 |
| 34 | Sears Holdings Corporation<br>12670 Collections Dr.<br>Sublease, Unit 68738 Vernon, CA<br>Chicago, IL 60693 | Attn: Michael Dunne<br>Sears Lease Accounting<br>Telephone: 847-286-4927<br>Email:<br>michael.dunne@searshc.com | Contracts | $372,416.76 |
| 35 | Morinda International Corporation Ltd<br>1522 Nan Fung Center<br>264-298 Canadastle Peak<br>Tseun Wan, L New Territories, Hong Kong | Attn: Allan Xue<br>Telephone: 0086-769-83332684<br>Email: morindajane@morinda-cn.com | Trade | $371,491.33 |
| 36 | T1 Atelier Company Ltd.<br>Laford Center, 11th Floor,<br>Units 07-08<br>838 Lai Chi Kok Road<br>Cheun Sha Wan, Kowloon, Hong Kong | Attn: Kim Chun<br>Telephone:  852-3104-1061<br>Email: kimchun.kh@t1atelier.com | Contracts | $356,286.96 |
| 37 | Westin St Francis Hotel<br>335 Powell St.<br>San Francisco, CA 94102 | Attn: Marcelo Infante<br>Telephone: 415-774-0131<br>Email:<br>marcelo.infante@westin.com | Contracts | $341,249.90 |
| 38 | VCS Group LLC<br>3451 Bonita Bay Blvd., Suite 200<br>Bonita Springs, FL 34134 | Attn: Sonya Voronkova/Camuto Group<br>Telephone: 239-301-3019<br>Email:<br>sonya.voronkova@camutogroup.com | Trade | $323,716.53 |
| 39 | Prime Apparel, Inc.<br>5667 Mansfield Way<br>Bell, CA 90201 | Attn: Irene Mac<br>Telephone: 323-269-6106<br>Email:<br>irenem@primeapparelinc.com | Trade | $313,548.88 |

| | Name of creditor and complete mailing address, including zipcode | Name, telephone number and email address of creditor contact | Nature of claim | Amount of claim |
|---|---|---|---|---|
| 40 | Sinosky Corporation Ltd Sinosky Building Hu Zhou Street, No. 18 Gongshu District, Hangzhou, China 310015 | Attn: Shelly Jiang Telephone: 86-571-89919733 Email: shellyjiang@sinoskycorp.com | Trade | $310,469.99 |
| 41 | Dave Foster Builders, Inc. 2290 Alahao Place, Unit 400 Honolulu, HI 96819 | Attn: David Foster Telephone: 808-848-2101 Email: dave@davefosterbuilders.com | Trade | $301,253.90 |
| 42 | Velocity Technology Solutions, Inc. 1901 Roxborough Road, 4th Floor Charlotte, NC 28211 | Attn: Theresa Prewett Telephone: 904-716-7011 Email: theresa.prewett@velocitycloud.com | Professional Services | $300,972.41 |
| 43 | Criteo Corp. P.O. Box 392422 Pittsburgh, PA 15251-9422 | Attn: Julie Wu Telephone: 917-204-0562 Email: j.wu@criteo.com | Professional Services | $300,097.21 |
| 44 | FedEx 500 Ross Street, Room 154-0455 Pittsburgh, PA 15262 | Attn: Belinda Nolte Telephone: 855-285-7012x3042 Email: belinda.nolte@fedex.com | Trade | $298,090.74 |
| 45 | Twitter, Inc. P.O. Box 12027 Newark, NJ 07101-5027 | Attn: Joan Juan Telephone: 00632-433-6500 loc 18712 Email: joanjuan@twitter.com | Professional Services | $294,621.27 |
| 46 | Daejee Metal Co. Ltd 173-5 Sukchon Dong, Songpa Gu Seoul, South Korea | Attn: Sunny Kim Telephone: 82-2-416-9081 Email: sunny@daejee.net | Trade | $291,181.18 |

| | Name of creditor and complete mailing address, including zipcode | Name, telephone number and email address of creditor contact | Nature of claim | Amount of claim |
|---|---|---|---|---|
| 47 | Westfield 11601 Wilshire Blvd., 11th Floor Los Angeles, CA 90025 | Attn: John Kim Telephone: 310-478-4456 Email: jkim@westfield.com | Contracts | $290,085.72 |
| 48 | 1450 Broadway, LLC 1375 Broadway, 12th Floor New York, NY 10018 | Attn: Bobby Zar Telephone: 212-944-2510 Email: bobby@azrgroupny.com | Contracts | $288,756.57 |
| 49 | Huge Well (Hong Kong) Ltd Yu Feng International Building, 22nd Floor West Yan An Road, No. 777 Shanghai, China 200050 | Attn: Cherry Wang Telephone: 86-216-225-6000 Email: cherrywang@generalorientltd.com | Trade | $286,777.42 |
| 50 | West Coast Distribution (Contractors) 2608 37th St. Vernon, CA 90058 | Attn: Alex Francia Telephone: 323-374-6706 Email: alexf@wcdistribution.com | Trade | $286,353.91 |

## <u>EXHIBIT D</u>

### Consolidated List of the Holders of the Debtors' Five Largest Secured Claims

Pursuant to Local Rule 1007-2(a)(5), the following is a list of creditors holding the five largest secured claims against the Debtors, on a consolidated basis, as of the Petition Date.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors.  The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt.  The descriptions of the collateral securing the underlying obligations are intended only as brief summaries.  In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

| | Name of Creditor | Creditor Name, and complete mailing address, including zip code of employee, agents, or department of creditor familiar with claim who may be contacted | Amount of Claim (as of February 28, 2017) | Collateral Description and Value |
|---|---|---|---|---|
| 1. | Bank of America, N.A.<br><br>(ABL Facility Agent) | Bank of America, N.A.<br>Retail Finance Group<br>100 Federal Street<br>Boston, MA 02110<br>Attention David R. Vega<br>Telecopier: (617 434-4131 | $82 million | Obligations under the ABL Facility are secured by a first priority lien on the Debtors' accounts, inventory, deposit accounts, security accounts, cash, and cash equivalents and a second priority lien on all other property of the grantors, including the Debtors' intellectual property. |
| 2. | Guggenheim Corporate Funding, LLC<br><br>(Term Loan Facility Agent) | Guggenheim Corporate Funding, LLC<br>330 Madison Avenue, 10th Floor<br>New York, New York 10017<br>Attention: Catherine Chantharaj<br>Telecopier: (212) 918-8786 | 377.0 million | Obligations under the Term Loan Agreement are secured by a second priority lien on the Debtors' accounts, inventory, deposit accounts, security accounts, cash, and cash equivalents and a first priority lien on all other property of the borrowers and guarantors, including the Debtors' intellectual property. |

## EXHIBIT E

### Summary of the Debtors' Assets and Liabilities

Pursuant to Local Rule 1007-2(a)(6), the following are estimates of the Debtors' total assets and liabilities on a consolidated basis.  The following financial data is the latest available information and reflects the Debtors' financial condition, as consolidated with its affiliated Debtors and non-Debtors as of the Petition Date.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt.

| Assets and Liabilities | Amount |
|---|---|
| Total Assets<br>(Book Value as of December 31, 2016) | $223 million |
| Total Liabilities<br>(Book Value as of December 31, 2016) | $651 million |

## <u>EXHIBIT F</u>

### Summary of the Publicly Held Securities of the Debtors

Pursuant to Local Rule 1007-2(a)(7), the following lists the number and classes of shares of stock, debentures, or other securities of the Debtors that are publicly held, and the number of holders thereof as of the Petition Date.

None.

## EXHIBIT G

### Summary of Debtors' Property Held by Third Parties

Pursuant to Local Rule 1007-2(a)(8), the following lists the Debtors' property, as of the Petition Date, that is in the possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, secured creditor, or agent for any such entity.

Certain property of the Debtors is likely to be in the possession of various other persons, including maintenance providers, shippers, common carriers, materialmen, custodians, public officers, mortgagees, pledges, assignees of rents, secured creditors, or agents. Through these arrangements, the Debtors' ownership interest is not affected. In light of the movement of this property, providing a comprehensive list of the persons or entities in possession of the property, their addresses and telephone numbers, and the location of any court proceeding affecting such property would be impractical. The Debtors estimate that (a) the value of goods held in third-party warehouses is approximately $8.6 million; (b) the value of goods in transit is approximately approximately $1.3 million; (c) the aggregate value of lease security deposits is approximately $1.0 million; and (d) the aggregate value of utilities provider deposits is approximately $320,000.

## <u>EXHIBIT H</u>

**Summary of Debtors' Property From Which the Debtors' Operate Their Business**

Pursuant to Local Rule 1007-2(a)(9), the following lists the location of the premises owned, leased, or held under other arrangement from which the Debtors operate their businesses as of the Petition Date.

| Property Address | City | State | Country | Owned or Leased |
|---|---|---|---|---|
| 1450 Broadway, 16th-17th Floor (Showroom) | New York | NY | USA | Leased |
| 2761 Fruitland Avenue (Corporate Headquarters) | Vernon | CA | USA | Leased |
| 4701 South Santa Fe Avenue (Warehouse) | Vernon | CA | USA | Leased |
| 5525 Soto Street (Warehouse) | Vernon | CA | USA | Leased |

In addition to the foregoing, the Debtors and their non-Debtor affiliates operate more than 550 stores spread across all fifty states in the United States, Canada, Japan, and Europe. The debtors conduct substantial retail operations at each of these locations. Due to the voluminous nature of such information, each store location is not listed here.

## <u>EXHIBIT I</u>

**Location of the Debtors' Substantial Assets, Books and Records, and Nature and Location of Debtors' Assets Outside the United States**

Pursuant to LBR 1007-2(a)(10), the following provides the location of the Debtors' substantial assets, books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States as of the Petition Date.

| Debtors' Assets | Location |
|---|---|
| Inventory, Books and Records, and Various FF&E (Showroom) | 1450 Broadway, 16th-17th Floor New York, NY 10018 |
| Books and Records | 2761 Fruitland Avenue Vernon, CA 90058 |
| Inventory and Various FF&E (Warehouse) | 4701 South Santa Fe Avenue Vernon, CA 90058 |
| Inventory and Various FF&E (Warehouse) | 5525 Soto Street Vernon, CA 90058 |

In addition to the foregoing, the Debtors and their non-Debtor affiliates operate more than 550 stores spread across all fifty states in the United States, Canada, Japan, and Europe. The Debtors maintain inventory, various FF&E, and other assets at each of these premises. Due to the voluminous nature of such information, each store location is not listed here.

## <u>EXHIBIT J</u>

### Summary of Legal Actions against the Debtors

Pursuant to Local Rule 1007-2(a)(11), the following lists material actions and proceedings pending or threatened against the Debtors or their properties where a judgment against the Debtors or a seizure of their property may be imminent as of the Petition Date.  This list reflects actions or proceedings considered material by the Debtors and, if necessary, will be supplemented in the corresponding schedules to be filed by the Debtors in these chapter 11 cases.

| Entity | Counterparty | Nature of the Claim | Status |
|---|---|---|---|
| BCBG Max Azria Group, LLC | Danielle Creacy | Hostile Work Environment | Pending |
| BCBG Max Azria Group, LLC | Robynette Robinson Gardenia Zuniga-Haro | Employee Wage Action | Pending |
| BCBG Max Azria Group, LLC | Krista Behr | Employee Wage Action | Pending |
| BCBG Max Azria Group, LLC | Maria Ramos | Unfair Competition | Pending |
| BCBG Max Azria Group, LLC | Angela Reed | Employee Discrimination | Pending |
| BCBG Max Azria Group, LLC | Tatiana Lukashova | Employee Discrimination | Pending |
| BCBG Max Azria Group, LLC | Francisca Cid | Wrongful Termination | Pending |

## <u>EXHIBIT K</u>

### Debtors' Senior Management

Pursuant to Local Rule 1007-2(a)(12), the following provides the names of the individuals who constitute the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their responsibilities and relevant experience as of the Petition Date.

| Name / Position | Relevant Experience / Responsibility | Tenure |
|---|---|---|
| Marty Staff<br><br>Interim Chief Executive Officer | Mr. Staff has been the Chief Executive Officer of Global Holdings since August 2016. | Aug. 2016 - Present |
| Holly Felder Etlin<br><br>Chief Restructuring Officer | Ms. Etlin has been the Chief Restructuring Officer of Global Holdings since January 2017. | Jan. 2017 - Present |
| Deborah Rieger-Paganis<br><br>Interim Chief Financial Officer | Ms. Rieger-Paganis has been the Chief Financial Officer of Global Holdings since January 2017. | Jan. 2017 - Present |
| Erica Alterwitz Meierhans<br><br>General Counsel | Ms. Meierhans has been the General Counsel of Global Holdings since October 2015. | Oct. 2015 - Present |

## EXHIBIT L

**Debtors' Payroll for the 30 Day Period Following the Filing of the
Debtors' Chapter 11 Petitions**

Pursuant to Local Rules 1007-2(b)(1)-(2)(A) and (C), the following provides, for the 30-day period following the Petition Date, the estimated amount of weekly payroll to the Debtors' employees (exclusive of officers, directors, and stockholders), the estimated amount paid and proposed to be paid to officers, stockholders, and directors, and the amount paid or proposed to be paid to financial and business consultants retained by Debtors.

| Payments | Payment Amount |
| --- | --- |
| Payments to employees (not including officers, directors, and stockholders) | $8.9 million |
| Payments to officers, directors, and stockholders | $50,000 |
| Payments to financial and business consultants | $1.1 million |

## <u>EXHIBIT M</u>

**Debtors' Estimated Cash Receipts and Disbursements for the Thirty (30) Day Period
Following the Filing of the Chapter 11 Petitions**

Pursuant to Local Rule 1007-2(b)(3), the following provides, for the 30-day period following the Petition Date, the Debtors' estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| Type | Amount |
|---|---|
| Cash Receipts | $45.4 million |
| Cash Disbursements | $49.1 million |
| Net Cash Loss | $3.7 million |
| Unpaid Obligations (excluding professional fees) | $5 million |
| Unpaid Receivables (excluding professional fees) | $3.5 million |