NOLD MUCHINSKY PLLC
David A. Nold, *pro hac vice*
10500 NE 8th Street, Suite 930
Bellevue, WA 98004
(425) 289-5555
dnold@noldmuchlaw.com
Attorneys for Bellevue Square, LLC

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>BCBG MAX AZRIA GROUP, LLC, et al.<br><br>Debtors. | Chapter 11<br><br>Case No. 17-10466 (MKV)<br>Case No. 17-10465 (MKV)<br><br>(Joint Administration Requested) |

**DECLARATION OF ROBERT DALLAIN IN SUPPORT OF BELLEVUE SQUARE, LLC'S OBJECTION TO DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS**

I, ROBERT DALLAIN, declare under penalty of perjury under the laws of New York and the laws of the Untied States, that the following is true and correct to the best of my knowledge, information, and belief:

1.    I am Vice President of Kemper Development Company, managing member of Bellevue Square, LLC. I am primarily responsible for managing Bellevue Square.

2.    Bellevue Square owns the Shopping Center at which the Debtor leases retail space (the "Leased Premises") pursuant to the Lease. Specifically, the Shopping Center is part of the "Bellevue Collection", which features a fusion of sophisticated shopping, dining, nightlife, and luxury hotels in downtown Bellevue, Washington. Accordingly, the Lease contains very specific

DECLARATION OF ROBERT DALLAIN IN SUPPORT
OF BELLEVUE SQUARE, LLC'S OBJECTION TO DEBTOR'S
MOTION FOR INTERIM AND FINAL ORDERS- 1

**Nold ♦ Muchinsky PLLC**
10500 NE 8th Street, Suite 930
Bellevue, WA 98004
425.289.5555 FAX 425.289.6666

restrictions and covenants, which are of paramount concern for Bellevue Square and to other

Shopping Center tenants. A true and correct copy of excerpts of the Lease and amendments

thereto (less the exhibits which are voluminous and not relevant) is attached hereto as **Exhibit A**

and incorporated by reference herein.

    3.    The salient facts are as follows:

    &bull;    On January 23, 2017, Landlord served a Notice of Default in compliance

with the lease between the parties ("Lease") and Washington law. Attached as **Exhibit B** and

incorporated by reference herein is a Declaration of Service with this notice of default attached.

$68,813.65 was due at the time. (Id.)

    &bull;    Debtor neither cured the default nor vacated the Leased Premises.

    &bull;    On January 30, 2017, Landlord notified Debtor that it had exercised its

right to terminate the Lease pursuant to its terms, effective January 30, 2017. Attached as

**Exhibit C** is the notice of termination that was validly served on Tenant that same day.

    &bull;    On February 3, 2017, Debtor commenced a "going out of business sale" at

140 stores – including Bellevue Square in violation of the Lease.

    &bull;    That same day, Bellevue Square obtained a temporary restraining order

from King County Superior Court in Washington restraining Defendant from violating the Lease.

Attached as **Exhibit D** is a true and correct copy of this temporary restraining order.

    &bull;    On February 10 and February 13, Debtor made, and Landlord accepted,

partial payment of sums due.

    4.    No notice has been posted at the Leased Premises. Further, there is no evidence

in the record that the Attorney General has been notified or that the notice was recorded in King

County.

DECLARATION OF ROBERT DALLAIN IN SUPPORT
OF BELLEVUE SQUARE, LLC'S OBJECTION TO DEBTOR'S
MOTION FOR INTERIM AND FINAL ORDERS- 2

**Nold ♦ Muchinsky PLLC**
10500 NE 8th Street, Suite 930
Bellevue, WA 98004
425.289.5555 FAX 425.289.6666

5.      Although debtors typically claim that such sales have a positive impact on shopping centers in general and adjoining stores in particular, Bellevue Square has specific evidence that prior sales had the opposite effect on adjoining stores.  In 2014, Coldwater Creek was permitted (over Bellevue Square's objection) to conduct a GOB over the course of two months using the same liquidating agent as the one Debtor intends to employ here (Gordon Brothers/Hilco).

6.      The impact on the adjacent stores was drastic:

| Store | May 2014 | June 2014 |
|---|---|---|
| Comp. Store 1[1] | -19.74% | -8.55% |
| Comp. Store 2 | -2.49% | +1.36% |
| Comp. Store 3 | -4.27 | -21.16 |
| Comp. Store 4 | -10.02 | -20.98 |
| *Category as Whole* | *+10.44* | *+1.93* |

7.      This is in part because approximately 12 years ago, Bellevue Square began grouping tenants to take advantage of their synergies.  This is called a "Neighborhood Concept." There are approximately six to eight categories or "Neighborhoods" in the Bellevue Collection. Bellevue Square has concluded that retailers enjoy increased sales and consumers enjoy having a larger selection close at hand.

8.      Debtor exists in such a Neighborhood.  It was placed amid other stores targeting a similar demographic.  These stores would be unfairly disadvantaged by the GOB contemplated. That prejudice will be exacerbated the longer that the unchecked GOB is allowed to persist.

9.      Debtor already attempted to commence a GOB sale at the Leased Premises. Bellevue Square was forced to obtain a restraining order in State Court to enjoin this sale.

---

[1]For confidentiality reasons, the identities of these stores are withheld.  The underlying information is available to the Court *in camera* and Debtor's counsel upon request.

DECLARATION OF ROBERT DALLAIN IN SUPPORT
OF BELLEVUE SQUARE, LLC'S OBJECTION TO DEBTOR'S
MOTION FOR INTERIM AND FINAL ORDERS- 3

**Nold ♦ Muchinsky PLLC**
10500 NE 8th Street, Suite 930
Bellevue, WA 98004
425.289.5555 FAX 425.289.6666

Landlord expects that Debtor will again attempt to conduct such a sale in circumvention of the state court's order and the Lease.  Bellevue Square objects to the Motion because the proposal makes no provision for compliance with Washington law governing GOBs and inadequately protects the interests of the other tenants in the Shopping Center.

Dated:    March 1, 2017
          Bellevue, Washington

                                        Robert Dallain

DECLARATION OF ROBERT DALLAIN IN SUPPORT
OF BELLEVUE SQUARE, LLC'S OBJECTION TO DEBTOR'S
MOTION FOR INTERIM AND FINAL ORDERS- 4

**Nold ♦ Muchinsky PLLC**
10500 NE 8th Street, Suite 930
Bellevue, WA 98004
425.289.5555 FAX 425.289.6666

# EXHIBIT A

**BELLEVUE SQUARE LEASE**

**BETWEEN**

**BELLEVUE SQUARE MANAGERS, INC.**
**(LANDLORD)**

**AND**

**AZ3, INC.**
**(TENANT)**

BELLEVUE SQUARE LEASE

THIS LEASE is made and entered into this _23rd_ day of ___August___, 1996, between BELLEVUE SQUARE MANAGERS, INC., a Washington corporation ("Landlord"), and AZ3, INC., a California corporation ("Tenant").

## RECITALS

A.    Landlord is the owner and ground lessee of a regional shopping center in Bellevue, Washington, commonly known as Bellevue Square (referred to herein as the "Shopping Center").

B.    Landlord desires to lease certain space in Bellevue Square to Tenant, and Tenant desires to take and lease such space from Landlord.

NOW THEREFORE, for and in consideration of the rents reserved hereunder and the terms and conditions hereof, Landlord rents and leases to Tenant, and Tenant takes and leases from Landlord, the Leased Premises upon all the following terms and conditions.

1.    BASIC LEASE PROVISIONS AND IDENTIFICATION OF EXHIBITS

1.1    Basic Lease Provisions

LANDLORD:

Bellevue Square Managers, Inc.

ADDRESS OF LANDLORD:

Post Office Box 908
Bellevue, Washington 98009.

TENANT:

AZ3, Inc., a California corporation.

ADDRESS OF TENANT:

2761 Fruitland Avenue
Vernon, California 90058

TENANT'S PERMITTED TRADE NAME:

    B.C.B.G.

LEASED PREMISES:

    Space 122, containing 2,302 square feet of Floor Area.

LEASE TERM:

    Ninety-six (96) calendar months, plus that portion of a calendar month necessary, if at all, for the Expiration Date to occur on the last day of such calendar month.

OPENING DATE:

    November 1, 1996; provided, however, Tenant shall use its best efforts to open the Leased Premises for business on or before November 1, 1996.

COMMENCEMENT DATE:

    The earlier of November 1, 1996, or the Opening Date of Tenant's business in the Leased Premises, or as otherwise set forth in Section 3.1.

EXPIRATION DATE:

    October 31, 2004.

MINIMUM RENT:

    From and including the Commencement Date through and including October 31, 1998, Minimum Rent shall be Eight Thousand Two Hundred Forty-eight and 83/100 Dollars ($8,248.83) per month.

    From and including November 1, 1998, through and including October 31, 2002, Minimum Rent shall be Nine Thousand Two Hundred Eight and no/100 Dollars ($9,208.00) per month.

    From and including November 1, 2002, through and including the Expiration Date, Minimum Rent shall be Nine Thousand Seven Hundred Eighty-three and 50/100 Dollars ($9,783.50) per month.

PERCENTAGE RENT RATE:

    Six percent (6%).

PERMITTED USES:

> The principal use of the Leased Premises shall be the retail sale of high-quality women's clothing, and the incidental sale of related apparel accessories such as shoes, handbags, and belts; provided, however, Tenant shall not emphasize, promote, specialize in or primarily carry any particular related apparel accessory. The Leased Premises shall not be used for any other use or purpose.

WORKING DRAWINGS:

> The deadline for submission to Landlord of Tenant's Final Working Drawings for Tenant's Additional Improvements is July 31, 1996.

SECURITY DEPOSIT:

> None.

1.2 _Identification of Exhibits_. The Exhibits identified in this Section and attached to this Lease are incorporated by reference. Each party agrees to perform any obligations on its part stated in any of such Exhibits:

> _Exhibit A_. Legal Description of the Shopping Center and location of the Leased Premises.

> _Exhibit B_. Site Plan of the Shopping Center.

> _Exhibit C_. Plan of Leased Premises.

> _Exhibit D_. Tenant Construction Manual.

> _Exhibit E_. Mechanical/Electrical Schedule.

> _Exhibit F_. Lease Estoppel Certificate.

> _Exhibit G_. Subordination Agreement.

2.    _PREMISES_.

2.1 _Shopping Center_. The shopping center, of which the Leased Premises is a part, is legally described in _Exhibit A_ and depicted in the Site Plan attached hereto as _Exhibit B_ (the "Shopping Center"). The depiction of the Shopping Center on _Exhibit B_ shall not constitute a representation, covenant or warranty of any kind by Landlord.

2.2  <u>Leased Premises</u>.

(a)  <u>Generally</u>.  Landlord hereby leases and demises to Tenant, and Tenant hereby accepts from Landlord, subject to and with the benefit of the terms and provisions of this Lease, the Leased Premises described in Section 1.1 and depicted in <u>Exhibit C</u>.  The Leased Premises does not include the space above the suspended ceiling or below the surface of the floor slab; provided, however, Tenant shall be solely responsible for the cost of maintaining all systems (such as electrical, lighting, heating and plumbing) or portions thereof that exclusively serve the Leased Premises, but are located outside the Leased Premises.

(b)  <u>"As Built" Floor Area</u>.  The Floor Area of the Leased Premises shall be determined as of the time Landlord tenders possession of the Leased Premises to Tenant.  If Landlord or Tenant believes the "as built" Floor Area is materially greater or less (i.e. one percent (1%) or more) than the Floor Area set forth in Section 1.1 above and Landlord or Tenant desires to amend this Lease to reflect the "as built" Floor Area, the party wanting to so amend this Lease must notify the other party in writing, which notice must include specific information on the dimensions relied upon by the party giving any such notice.  Following receipt of any such notice, Landlord and Tenant shall attempt to agree upon the "as built" Floor Area of the Leased Premises.  If Landlord and Tenant are unable to agree upon the "as built" Floor Area of the Leased Premises within ten (10) days following receipt of the written notice provided for herein, the matter shall be submitted to the Project Architect for the Shopping Center.  The decision of the Project Architect regarding the "as built" Floor Area of the Leased Premises shall be final and binding on both Landlord and Tenant and, if the decision of the Project Architect is different from the Floor Area set forth in Section 1.1 above, this Lease shall be deemed to be amended, effective as of the Commencement Date of this Lease, to incorporate the Floor Area of the Leased Premises as determined by the Project Architect.  If the Floor Area of the Leased Premises as determined by the Project Architect is greater than the Floor Area set forth in Section 1.1 above, Tenant shall immediately pay to Landlord all additional Minimum Rent and Other Charge obligations resulting from the additional Floor Area as calculated from the Commencement Date.  If the Rent payable hereunder is increased pursuant to the immediately-preceding sentence, such Rent shall be increased in the same proportion that the "as built" Floor Area of the Leased Premises exceeds the Floor Area set forth in Section 1.1.  If the Floor Area of the Leased Premises as determined by the Project Architect is less than the Floor Area set forth in Section 1.1 above, Tenant shall receive a credit against future rent for all past Minimum Rent and Other Charge payments attributable to the excess Floor Area

paid for by Tenant prior to the Project Architect's determination. The cost and expense of the Project Architect's consideration of the matter, if any, shall be shared equally by Landlord and Tenant. If no objection to the Floor Area as set forth in Section 1.1 above is made by Tenant within thirty (30) days after the Commencement Date, Tenant shall be deemed to have waived and released any right to later object to the Floor Area as set forth in Section 1.1 above.

2.3 <u>Reserved to Landlord</u>. Landlord reserves the right from time to time to expand, reduce and otherwise change the size and dimensions of the Shopping Center; locate, relocate, alter and change the number and location of buildings and other improvements; change any building dimension, and the number of floors in any of the buildings, parking areas, identity and type of other stores and tenancies, shopping center name and names and the common areas located from time to time in or on the Shopping Center. Landlord further reserves the use of the exterior walls (other than storefronts), the roof, and the right to install, maintain, use, repair and replace pipes, ducts, conduits and wires leading through the Leased Premises in locations which will not materially interfere with Tenant's use thereof and which serve other parts of the Shopping Center. Landlord shall use reasonable efforts to locate such items under the floor, above the ceiling, adjacent to an interior wall other than the storefront and (to the extent reasonably practical) in a non-sales area and such use within the Leased Premises shall not exceed one percent (1%) of the Floor Area of the Leased Premises unless otherwise agreed. If Landlord's use hereunder exceeds one percent (1%) of the Floor Area of the Leased Premises, Tenant shall be entitled, as its sole and exclusive remedy, to a reduction in the stated Floor Area for the Leased Premises set forth in Section 1.1 above, and a proportional reduction in Minimum Rent and Other Charges due hereunder. Landlord also reserves the right to use the land below and the space above the Leased Premises in any manner and for any purpose which does not materially and permanently interfere with Tenant's use of the Leased Premises.

3.        <u>TERM</u>.

3.1 <u>Lease Term</u>. This Lease shall be for the term set forth in Section 1.1 above (the "Term" or "Lease Term") and shall commence on the Commencement Date set forth in Section 1.1 above or the date Tenant first opens for business to the public, whichever shall first occur. A "Lease Year" shall mean a calendar year commencing each January 1 and ending the following December 31. If the Commencement Date is a date other than the first day of January, the initial Lease Year shall be from the Commencement Date to December 31 of that calendar year. If the Expiration Date is a date other than December 31, the final Lease

Year shall be from January 1 of the calendar year of the Expiration Date to the Expiration Date.

3.2   _Termination_.   The Lease shall terminate on the Expiration Date set forth in Section 1.1 above, unless sooner terminated hereunder or by operation of law, without the necessity for any notice from either Landlord or Tenant to terminate the same.   If Tenant fails to surrender the Leased Premises at the end of the Lease Term, or any renewal or extension thereof, Tenant shall be liable for, and will indemnify Landlord against, all claims and demands made by any succeeding tenants against Landlord founded upon delay by Landlord in delivering possession of the Leased Premises to such succeeding tenant.

3.3   _Holding Over_.   Any holding over by Tenant after the expiration of the Lease Term hereof with Landlord's written consent shall be construed to be a tenancy from month to month. During such tenancy, Tenant shall pay to Landlord a monthly rental of twice the Minimum Rent payable during the last month of the Lease Term in addition to the Percentage Rent, Other Charges and additional rent as set forth herein.   Such month-to-month tenancy shall be subject to all of the terms, covenants, and conditions of this Lease.

3.4   _Pre-Commencement License_.   Tenant and Tenant's employees, agents and approved contractors and licensees may enter the Leased Premises and Shopping Center pursuant to a license granted under this Section 3.2 (the "Pre-Commencement License") for the limited purpose of constructing and installing Tenant's Additional Improvements and preparing to open Tenant's store in the Leased Premises to the public.   The Pre-Commencement License shall be subject to such reasonable restrictions and conditions as may be imposed by Landlord from time to time. Tenant's right to enter onto the Leased Premises and Shopping Center pursuant to the Pre-Commencement License shall not trigger the Commencement Date under Section 3.1 above as long as Tenant complies with the reasonable restrictions and conditions required by Landlord; provided, however, the terms and provisions of Articles 1, 2, and 3, Sections 4.5, 4.6, 5.1, 5.2, 5.4, and 5.5, Articles 6 through 26, and Article 30 of this Lease, and the provisions and requirements of the Tenant Information Manual shall automatically become effective and apply to all activities of Tenant and Tenant's employees, agents, contractors and licensees in, about, or relating to the Leased Premises or Shopping Center.   Notwithstanding anything herein to the contrary and without limiting the generality of the foregoing, Landlord may require Tenant and any of its agents, contractors or licensees to sign a separate indemnification and hold harmless instrument and provide appropriate evidence of insurance coverage as a condition to entering onto the Leased Premises and the

Shopping Center.  Tenant shall coordinate all activities on and about the Leased Premises relating to Tenant's Additional Improvements with Landlord's Tenant Coordinator and Tenant shall not interfere with or hinder Landlord or Landlord's other tenants with respect to their work or the use and enjoyment of other space within the Shopping Center.

4.      RENT.

   4.1 Minimum Rent.  Tenant shall pay to Landlord, without notice or demand and without any setoff or deduction whatsoever, as fixed Minimum Rent, the monthly sums set forth in Section 1.1 above (the "Minimum Rent"), which shall be paid in advance on or before the first day of each calendar month of the Lease Term.  If the Lease Term commences on a day other than the first day of a calendar month or expires on a day other than the last day of a calendar month, the Minimum Rent for such month shall be a prorated portion of the monthly Minimum Rent, based upon a thirty (30) day month.

   4.2 Percentage Rent.

      (a) Percentage Rent.  In addition to the Minimum Rent, Tenant shall pay to Landlord, without any setoff or deduction, Percentage Rent in an amount equal to Tenant's "Gross Sales," as described in Section 4.2(e) below, during each Lease Year of the Lease Term, or any fractional month during the Lease Term, multiplied by the Percentage Rent Rate specified in Section 1.1 above, less an amount equal to the Minimum Rent paid during such Lease Year.  The Percentage Rent shall be paid monthly as provided in Sections 4.2(b), 4.2(c) and 4.2(d) below.

      (b) Payment of Percentage Rent.  The Percentage Rent shall be payable by Tenant to Landlord on an accumulative basis in monthly installments within ten (10) days after the end of each calendar month, in an amount equal to the result obtained by:

         (i)  multiplying the total amount of Gross Sales made from the beginning of the then current Lease Year through the end of the calendar month for which the computation is being made by the Percentage Rent Rate, and

         (ii)  subtracting therefrom all amounts previously paid by Tenant as Minimum Rent and Percentage Rent for that Lease Year.

      If the calculation above indicates that Tenant has overpaid Percentage Rent for the period involved, the amount of the overpayment shall be credited towards the next Percentage Rent payments due.  In no event shall the total rent due for each

incur certain costs and expenses not contemplated under this
Lease, the exact amount of such costs being extremely difficult
or impractical to fix.  Such costs and expenses include, without
limitation, administrative and collection costs, processing and
accounting expenses, and interest and penalties imposed by the
terms of any contracts, mortgages or deeds of trust covering the
Leased Premises or the Shopping Center.  Therefore, if any
Minimum Rent, Percentage Rent, Other Charge or additional rent
payment is not received by Landlord from Tenant by the fifth
(5th) day after such payment is due, Tenant shall immediately pay
to Landlord a late charge equal to twelve percent (12%) of such
payment.  Landlord and Tenant agree that this late charge
represents a reasonable estimate of such costs and expenses and
is fair compensation to Landlord for its loss and expenses
suffered by such nonpayment by Tenant.  Acceptance of this late
charge shall not constitute a waiver of Tenant's breach or
default with respect to such nonpayment by Tenant nor prevent
Landlord from exercising any or all other rights and remedies
available to Landlord under this Lease.  Landlord shall apply
payments made by Tenant first to accrued charges, interest and
rent in the following order:  (i) Late Charges, (ii) interest,
(iii) additional rent, (iv) past due Minimum Rent, Percentage
Rent, Other Charges and any balance remaining to current Minimum
Rent, Percentage Rent and Other Charges and additional rent.

        4.6  <u>No Offsets or Deductions</u>.  All Minimum Rent,
Percentage Rent, Other Charges, and additional rent shall be paid
in lawful money of the United States of America and shall be paid
without offset or deduction at such place or places as may be
designated by Landlord from time to time.

5.       <u>USE</u>.

        5.1  <u>Permitted Uses and Trade Name</u>.  Tenant shall not
use, permit or suffer the use of the Leased Premises for any
business or purpose other than those specifically set forth in
Section 1.1 above.  Further, Tenant shall not conduct any
business in the Leased Premises under any trade name other than
the Permitted Trade Name set forth in Section 1.1 above.
Landlord makes no representation or warranty and has given no
assurance, express or implied, as to the availability or
continued availability of Tenant's Permitted Trade Name.  Tenant
shall indemnify, defend and hold Landlord harmless from any and
all losses, claims, causes of action, judgments and liabilities
(including but not limited to attorneys' fees and costs) arising
out of or relating to Tenant's use of its Permitted Trade Name,
including but not limited to trademark and service mark
infringement and dilution claims.

        5.2  <u>Uses Prohibited</u>.  Tenant shall not do, permit or
suffer anything to be done in or about the Leased Premises or the

Shopping Center or bring or keep anything therein which will in any way increase the existing rate of or affect any fire or other insurance upon the Leased Premises or the building of which the Leased Premises are a part, or cause a cancellation of any insurance policy covering the Leased Premises or building or any part thereof or any of its contents. Tenant shall not do, permit or suffer anything to be done in or about the Leased Premises or the Shopping Center which will in any way obstruct or interfere with the rights of other tenants or occupants of the Shopping Center or injure or annoy them, their customers or clients, nor shall Tenant use or allow the Leased Premises to be used for any purpose which is objectionable or offensive in Landlord's reasonable judgment or which may be unlawful. If Tenant permits or engages in any activity which, in Landlord's reasonable judgment, is objectionable, offensive or otherwise constitutes a nuisance to the customers or other tenants of the Shopping Center or that may be unlawful, Tenant shall immediately discontinue such activity or take immediate action to cause the activity to be discontinued with all due diligence if it cannot be immediately discontinued. Tenant's failure to comply shall constitute a material breach and default of this Lease and entitle Landlord to pursue its remedies for such a breach and default or, in the alternative, cause the performance of such work as may be appropriate to discontinue such activity and recover, as additional rent, the cost thereof, plus interest thereon at four percent (4%) over the prime rate of interest charged or published by Seattle-First National Bank on the first day of each month, commencing on the date due through the date of payment. Such additional rent shall become due and payable to Landlord ten (10) days following delivery of an invoice for same to Tenant.

    5.3   Operation of Business.

        (a)   Tenant shall conduct its business on the Leased Premises during the entire Lease Term hereof with diligence and efficiency so as to produce all of the Gross Sales which may be produced by such business, unless prevented from doing so by causes beyond Tenant's control. Tenant shall keep in stock on the Leased Premises a full and ample line of merchandise for the purpose of operating its business and shall maintain an adequate sales force. Subject to the provisions of this Lease, Tenant shall conduct and carry on Tenant's business in the Leased Premises without interruption and shall keep the Leased Premises open for business during the following days and hours, whichever requires the greater days and hours of operation: (i) during those days and hours that any two of the major department store tenants in the Shopping Center are open for business or (ii) during the days and hours designated from time to time by Landlord, which at the time of the execution of this Lease Landlord designates to be:

|                         |                        |
|-------------------------|------------------------|
| Monday through Saturday | 9:30 a.m. to 9:30 p.m. |
| Sunday                  | 11:00 a.m. to 6:00 p.m. |

This provision shall not apply if the Leased Premises are closed and the business of Tenant is temporarily discontinued therein on account of strikes, lockouts or similar causes beyond the reasonable control of Tenant.

(b)   If Tenant should fail to be open to the public on a fully-operational basis during all hours required under this Lease, in addition to being in material breach of this Lease, Tenant shall immediately pay to Landlord, for each hour or portion thereof that Tenant fails to open, either (i) One Hundred Dollars ($100.00), (ii) ten percent (10%) of Tenant's average hourly Gross Sales computed for the month immediately preceding the month in which Tenant fails to be so open, or (iii) such other amount as may be set forth in the rules and regulations of the Shopping Center promulgated by Landlord from time to time, whichever is greater.

5.4   <u>Compliance with Laws, Rules and Regulations.</u> Tenant shall, at its sole cost and expense, promptly comply with all local, state or federal laws, statutes, ordinances and governmental and quasi-governmental rules, regulations or requirements now in force or which may hereafter be in force with respect or related to Tenant's use and occupancy of the Leased Premises and Tenant's business conducted therein.

5.5   <u>Hazardous Material</u>.   Tenant shall not cause or permit any Hazardous Material, as defined below, to be brought upon, kept or used in or about the Leased Premises by Tenant, its agents, employees, contractors or invitees.  If Tenant breaches the obligations stated in the preceding sentence, or if the presence of any Hazardous Material caused or permitted by Tenant results in contamination of the Leased Premises or any part of the Shopping Center or any other property, or if contamination of the Leased Premises or any part of the Shopping Center or other property by any Hazardous Material otherwise occurs for which Tenant may be legally liable to Landlord for damage resulting therefrom, then Tenant shall indemnify, defend and hold Landlord harmless from any and all claims, judgments, damages, penalties, fines, costs, liabilities or losses (including, without limitation, diminution in value of the property, damages for the loss or restriction on use of rentable or usable space or of any amenity of the Shopping Center or the Leased Premises, damages arising from any adverse impact on marketing of space at the Shopping Center, damages to any other property and amounts paid in settlement of claims, attorneys' fees, consultant fees and expert fees) which arise during or after the Lease Term as a result of such contamination.  Without limiting the foregoing,

FMBSM002.LEA (01/12/95)
BCB.LEA (07/23/96)                   -21-

10.4  <u>HVAC Maintenance by Landlord</u>.  Landlord shall provide periodic HVAC maintenance for Landlord-provided HVAC units only.  This shall include periodic filter changes; refrigerant refills; routine inspections; replacement or repair of belts, bearings, compressor and fan motors, dryer units, sight glasses, shives, cooling systems, condenser and evaporator coils, thermostats, and relay connections.  The cost of such repairs shall be included in the Other Charges described in Section 4.3 above.  Landlord reserves the right to discontinue such service upon reasonable notice to Tenant, and thereafter, Tenant shall be responsible for the cost thereof.

10.5  <u>Surrender of Premises</u>.  At the expiration or sooner termination of this Lease, Tenant shall return the Leased Premises to Landlord in the same condition in which received (or, if altered by Landlord or by Tenant with Landlord's consent, then the Leased Premises shall be returned in such altered condition), reasonable wear and tear and damage by fire or other casualty excepted.  Tenant shall remove all inventory, furniture and similar personal property and any alterations or improvements which Landlord designates to be removed pursuant to Section 9.4 above, and shall restore the Leased Premises to the condition they were in prior to the installation of such items.  Tenant's obligations hereunder shall survive the expiration or termination of this Lease.

11.      <u>LIENS AND ENCUMBRANCES</u>.  No work performed by, through, under or for Tenant pursuant to this Lease shall be deemed to be for the immediate use or benefit of Landlord to the end that no mechanic's or other liens shall be allowed against the estate of Landlord by reason of any consent given by Landlord to Tenant to improve the Leased Premises.  Tenant shall keep the Leased Premises and the Shopping Center free and clear of all liens and encumbrances arising out of any work performed for, materials furnished or obligations incurred by or on behalf of Tenant, and Tenant shall indemnify and hold Landlord harmless from all costs, liabilities and expenses (including attorneys' fees) arising therefrom.  Prior to commencing any work on the Leased Premises, Tenant shall provide to Landlord, at Tenant's sole expense, separate payment and performance bonds in an amount equal to either (i) the actual contract price or (ii) one and one-half (1-1/2) times the estimated cost of any improvements, additions, or alterations which Tenant desires to make within the Leased Premises.  Such bonds shall cover the faithful performance of the contract and payment of all obligations arising therefrom and insure Landlord against any liability for mechanics', materialmen's, or other construction liens and the completion of any such work.  If any lien is filed against the Leased Premises or Shopping Center by any person claiming by, through or under Tenant, Tenant, at Tenant's sole cost and expense, shall immediately discharge the same or furnish to Landlord a bond in

form and amount and issued by a surety satisfactory to Landlord, indemnifying Landlord against all liability, costs and expenses, including but not limited to attorneys' fees, which Landlord may incur, directly or indirectly, as a result thereof and Landlord's reasonable administrative costs and expenses. If Tenant shall fail to cause such lien forthwith to be discharged of record or bonded, then, in addition to any other right or remedy of Landlord, Landlord may bond or discharge the same by paying the amount claimed to be due, and the amount so paid by Landlord, including reasonable attorneys fees incurred by Landlord in defending against such lien or in procuring its discharge of record, shall be due and payable by Tenant as additional rent.

12.    ASSIGNMENT AND SUBLEASING.

12.1 _Assignment or Sublease_. Tenant shall not assign, transfer, mortgage, pledge, hypothecate, encumber or otherwise transfer this Lease or any interest therein, nor sublease the whole or any part of the Leased Premises, nor shall this Lease or any interest hereunder be assignable or transferable by any process or proceeding of any court, or otherwise, without in each case first obtaining the prior written consent of Landlord, which consent may be withheld in Landlord's sole subjective discretion. Any such transaction undertaken without Landlord's prior written consent shall be null and void.

In determining whether to grant consent to Tenant's sublease, assignment, or transfer request, Landlord may consider any factor, including but not limited to the experience and business reputation of the proposed assignee, sublessee, or transferee in operating a business for the uses set forth in the Lease; whether the clientele, personnel and foot traffic generated by such proposed assignee, sublessee, or transferee is satisfactory to Landlord; notwithstanding that Tenant and/or others remain liable under the Lease, whether the proposed assignee, sublessee, or transferee has a net worth, and financial strength and credit record, satisfactory to Landlord; use of the Leased Premises by the proposed assignee, sublessee, or transferee must be identical to the use permitted by the Lease; use of the Leased Premises by the proposed assignee, sublessee, or transferee will not violate or create any potential violation of any laws; whether the quality of the business to be operated or likely to be operated by the proposed assignee, sublessee, or transferee is satisfactory to Landlord and whether the customary level of sales volume is likely to be sustained by the prospective assignee, sublessee, or transferee; whether Landlord's consent might result in a breach of any other lease or agreement to which Landlord is a party; and whether the product mix and target customer base of the proposed assignee, sublessee, or transferee is consistent with the product mix and target

customer base that Landlord is trying to maintain or achieve within the Shopping Center.

No assignment, sublease or other transfer shall relieve Tenant of any liability under this Lease.  The prohibition set forth in this Section 12 includes, without limitation (and the following shall be deemed to be "assignments"):  (i) a consolidation or merger of Tenant; (ii) a change in the ownership or voting rights of more than twenty-five percent (25%) of the issued and outstanding stock of any corporate tenant; (iii) any sublease, assignment or transfer which would otherwise occur by operation of law, merger, consolidation, reorganization, transfer or other significant change in corporate or proprietary structure; (iv) the sale, assignment or transfer of all or substantially all of the assets of Tenant, with or without the specific assignment of this Lease; and (v) a change in control in any partnership tenant.  The acceptance by Landlord of any amounts following any transaction prohibited hereunder shall not be deemed to be a consent by Landlord nor shall the same be deemed to be a waiver of any right or remedy of Landlord hereunder.  Consent to any such assignment, sublease or other transfer shall not operate as a waiver of the necessity for consent to any subsequent assignment, sublease or transfer.  If Landlord's consent is requested for an assignment, sublease or transfer of all or a portion of the Leased Premises, Landlord shall have the right to terminate this Lease with respect to that portion of the Leased Premises for which such consent is requested, at the proposed effective date of such assignment, sublease or transfer, and enter into the relationship of Landlord and Tenant with the proposed assignee, subtenant, or transferee based on the rent (and/or other compensation) and term agreed to by such assignee, subtenant or transferee and otherwise upon the terms and conditions of this Lease.  In connection with any sublease, assignment or transfer, Tenant shall promptly provide Landlord with fully executed copies of all assignment, sublease and assumption instruments.

12.2   <u>Assignee Obligations</u>.  As a condition to Landlord's consent, any potential assignee or transferee otherwise approved by Landlord shall expressly assume all existing and future obligations of Tenant under this Lease and shall be jointly and severally liable with Tenant for the payment of Minimum Rent, Percentage Rent, Other Charges, additional rent, and the performance of all terms, covenants and conditions of this Lease.

12.3   <u>Sublessee Obligations</u>.  As a condition to Landlord's consent, any potential sublessee otherwise approved by Landlord shall expressly assume all existing and future obligations of Tenant under the Lease during the term of the sublease and shall be jointly and severally liable with Tenant

for the payment of Minimum Rent, Percentage Rent, Other Charges, additional rent, and the performance of all terms, covenants, and conditions of this Lease.

12.4  <u>Conditional Consents</u>.  Any consent by Landlord to any assignment, sublease or other transfer may be subject to any terms or conditions as Landlord shall determine appropriate (including but not limited to requiring that any and all guarantors of the Lease agree to continue to guarantee the Lease obligations after the assignment) and all such terms and conditions shall be binding upon any person holding by, under or through Tenant.

12.5  <u>Attorneys' Fees and Costs</u>.  Tenant and any assignee, sublessee or transferee shall reimburse Landlord for Landlord's attorneys' fees and costs incurred in conjunction with the processing and documentation of any such requested transfer, assignment, subleasing or encumbrance.

13.    <u>COMMON AREAS AND FACILITIES</u>.

13.1  <u>Generally</u>.  The term "Common Areas and Facilities of the Shopping Center" refers to all on- and off-site areas and related facilities which are made available or used from time to time for the general use, convenience and benefit of Landlord and other persons entitled to occupy space in the Shopping Center, including their employees, invitees, licensees and guests, which areas shall include, but not be limited to, all parking structures and parking areas (including off-site parking), driveways, sidewalks, landscaped or planted areas, pedestrian areas, lobbies, and walkways.  The term "Common Areas and Facilities of the Shopping Center" also refers to all on- and off-site areas and related facilities which may not be accessible to Tenant and other persons entitled to occupy space in the Shopping Center, but which are used in conjunction with the operation, management, repair or maintenance of the Shopping Center including, but not limited to, janitorial closets, and on-site and off-site management offices and maintenance areas. Costs associated with that portion of the Common Areas and Facilities that are within or relate to the Enclosed Mall shall be considered Enclosed Mall Operation and Maintenance Expenses.

13.2  <u>Control and Maintenance of Common Areas by Landlord</u>.  Landlord shall at all times have the exclusive control and management of the Common Areas and Facilities of the Shopping Center.  Landlord shall keep or cause to be kept the Common Areas and Facilities of the Shopping Center in a neat, clean, and orderly condition, properly lighted and landscaped, and shall repair any damage thereto.  With respect to the Common Areas and Facilities of the Shopping Center, Landlord shall have the right from time to time to, without limitation:  employ personnel;

15.3 <u>Damages</u>. Landlord reserves all rights to the entire damage award or payment for any taking by eminent domain, and Tenant shall make no claim whatsoever against Landlord for damages for termination of its leasehold interest in the Leased Premises or for interference with its business. Tenant hereby grants and assigns to Landlord any right Tenant may now have or hereafter acquire to such damages and agrees to execute and deliver such further instruments of assignment thereof as Landlord may from time to time request. However, Tenant shall have the right to claim from the condemning authority all compensation that may be recoverable by Tenant on account of any loss incurred by Tenant in removing Tenant's merchandise, furniture and equipment or for damage to Tenant's business; provided, however, that Tenant may claim such damages only if they are awarded separately in the eminent domain proceeding and not as part of Landlord's damages.

16.    <u>TENANT'S DEFAULT</u>.

16.1 <u>Default</u>. The occurrence of any one or more of the following shall constitute a default and breach of this Lease by Tenant:

(a) <u>Vacating the Premises</u>. The vacating or abandonment of the Leased Premises by Tenant or the failure of Tenant to be open for business (except in the event of damage or destruction to the Leased Premises or when due to some other cause beyond Tenant's reasonable control, as set forth in Section 30.14, which prevents Tenant from conducting its business within the Leased Premises). An intent to vacate or abandon the Leased Premises shall be deemed to exist if Tenant's business in the Leased Premises remains closed to the public for more than five (5) days.

(b) <u>Failure to Pay Rent</u>. Tenant's failure to make any payment of Minimum Rent, Percentage Rent, Other Charges, or any other payment required to be made by Tenant hereunder, as and when due. Tenant shall cure any default under this Section 16.1(b) within three (3) days after written notice thereof by Landlord to Tenant.

(c) <u>Failure to Perform</u>. Tenant's failure to observe or perform any of the covenants, conditions or provisions of this Lease to be observed or performed by Tenant (other than as described in Sections 16.1(a) and (b) above). Tenant shall cure any default under this Section 16.1(c) within ten (10) days (except as otherwise provided in this Lease) after written notice thereof by Landlord to Tenant; provided, however, that if the nature of Tenant's default is such that more than ten (10) days are reasonably required for its cure, then Tenant shall commence

such cure as soon as reasonably possible, but in any event within said ten (10) day period, and thereafter Tenant shall diligently prosecute such cure to completion.

    (d) <u>Creditor Assignment, Bankruptcy, Receivership</u>. The making by Tenant of any general assignment or general arrangement for the benefit of creditors; or the filing by or against Tenant of a petition to have Tenant adjudged a bankrupt, or a petition or reorganization or arrangement under any law relating to bankruptcy (unless, in the case of a petition filed against Tenant, the same is dismissed within sixty (60) days of filing); or the appointment of a trustee or a receiver to take possession of substantially all of Tenant's assets located at the Leased Premises or of Tenant's interest in this Lease, where such seizure is not discharged in thirty (30) days after appointment of such trustee or receiver, or the filing of the petition for the appointment of the same, whichever shall first occur.

    (e) <u>Repeated Defaults</u>. Tenant's failure to perform or observe any of Tenant's obligations under the Lease after Tenant has failed to perform or observe any of Tenant's obligations under the Lease at least twice previously (despite the fact Tenant may have cured any such previous failures after notice from Landlord and within the notice period).

    16.2 <u>Remedies in Default</u>. In the event of any such default or breach by Tenant, Landlord may at any time after any applicable cure period, with or without notice or demand and without limiting Landlord in the exercise of a right or remedy which Landlord may have by reason of such default or breach:

    (a) <u>Terminate The Lease</u>. Terminate Tenant's right to possession of the Leased Premises by any lawful means, in which case this Lease shall terminate and Tenant shall immediately surrender possession of the Leased Premises to Landlord. In such event, Landlord shall be entitled to recover from Tenant all past due Minimum Rent, Percentage Rent, additional rent and Other Charges; the expenses of reletting the Leased Premises, including necessary repair, renovation and alteration of the Leased Premises; reasonable attorneys' fees; the worth at the time of award by the court having jurisdiction thereof of the amount by which the unpaid Percentage Rent, Minimum Rent, additional rent and Other Charges called for herein for the balance of the Lease Term after the time of such award exceeds the amount of such loss for the same period that Tenant proves could be reasonably avoided (the "worth at the time of award" shall be determined by discounting such excess amount by the discount rate of the Federal Reserve Bank of San Francisco plus one percent (1%)); and that portion of any leasing

commission paid by Landlord and applicable to the unexpired Lease Term of this Lease; or,

(b) <u>Continue The Lease</u>.  Maintain Tenant's right to possession, in which case this Lease shall continue in effect whether or not Tenant has vacated or abandoned the Leased Premises.  In such event Landlord shall be entitled to enforce all Landlord's rights and remedies under this Lease, including the right to recover the Minimum Rent, Percentage Rent, additional rent, Other Charges, damages from Tenant's default or breach, and any other payments as they may become due hereunder, and to specifically enforce Tenant's obligations hereunder and obtain injunctive relief from further defaults and breaches; or,

(c) <u>Other Remedies</u>.  Pursue any other remedy now or hereafter available to Landlord under the laws or judicial decisions of the State of Washington.

16.3  <u>Legal Expenses</u>.  If either party is required to bring or maintain any action (including assertion of any counterclaim or cross claim, or claim in a proceeding in bankruptcy, receivership or any other proceeding instituted by a party hereto or by others), or otherwise refers this Lease to an attorney for the enforcement of any of the covenants, terms or conditions of this Lease, the prevailing party, or the non-breaching party if no action is filed or no decision rendered regarding the merits of the action, shall, in addition to all other remedies provided herein, receive from the other party all the costs (including reasonable attorneys' fees) incurred in the enforcement of the covenants, terms and conditions of this Lease (whether or not an action is instituted) and including any such costs and fees incurred by the prevailing party on any appeal.

16.4  <u>Bankruptcy</u>.

(a) <u>Assumption of Lease</u>.  If Tenant becomes a Debtor under Chapter 7 of the Bankruptcy Code ("Code") or a petition for reorganization or adjustment of debts is filed concerning Tenant under Chapters 11 or 13 of the Code, or a proceeding is filed under Chapter 7 of the Code and is transferred to Chapters 11 or 13 of the Code, the Trustee or Tenant, as Debtor and as Debtor-In-Possession, may not elect to assume this Lease unless, at the time of such assumption, the Trustee or Tenant has:

(1) Cured all defaults under the Lease and paid all sums due and owing under the Lease or provided Landlord with "Adequate Assurance" (as defined below) that:  (A) within ten (10) days from the date of such assumption, the Trustee or Tenant will completely pay all sums due and owing under this Lease and compensate Landlord for any actual pecuniary loss

resulting from any existing default or breach of this Lease, including without limitation, Landlord's reasonable costs, expenses, accrued interest, and attorneys' fees incurred as a result of the default or breach; (B) within twenty (20) days from the date of such assumption, the Trustee or Tenant will cure all non-monetary defaults and breaches under this Lease; and (C) the assumption will be subject to all of the provisions of this Lease.

(2)    For purposes of this Section, Landlord and Tenant acknowledge that, in the context of a bankruptcy proceeding involving Tenant, at a minimum, "Adequate Assurance" shall mean:   (A) the Trustee or Tenant has and will continue to have sufficient unencumbered assets after the payment of all secured obligations and administrative expenses to assure Landlord that the Trustee or Tenant will have sufficient funds to fulfill the obligations of Tenant under this Lease, and to keep the Leased Premises fully stocked with merchandise and properly staffed with sufficient employees to conduct a fully-operational, actively promoted business in the Leased Premises; (B) the Bankruptcy Court shall have entered an Order segregating sufficient cash payable to Landlord and/or the Trustee or Tenant shall have granted a valid and perfected first lien and security interest and/or mortgage in property of Trustee or Tenant acceptable as to value and kind to Landlord, to secure to Landlord the obligation of the Trustee or Tenant to cure the monetary and/or non-monetary defaults and breaches under this Lease within the time periods set forth above; and (C) the Trustee or Tenant, at the very minimum, shall deposit a sum equal to two (2) month's Minimum Rent to be held by Landlord (without any allowance for interest thereon) to secure Tenant's future performance under the Lease.

(b)    <u>Assignment of Lease</u>.  If the Trustee or Tenant has assumed the Lease pursuant to the provisions of this Section for the purpose of assigning Tenant's interest hereunder to any other person or entity, such interest may be assigned only after the Trustee, Tenant or the proposed assignee have complied with all of the terms, covenants and conditions of this Lease, including, without limitation, those with respect to Minimum Rent, Percentage Rent and Other Charges, and the use of the Leased Premises by the proposed assignee shall be only as permitted in Section 1.1 above; Landlord and Tenant acknowledging that such terms, covenants and conditions are commercially reasonable in the context of a bankruptcy proceeding of Tenant. Any person or entity to which this Lease is assigned pursuant to the provisions of the Code shall be deemed without further act or deed to have assumed all of the obligations arising under this Lease on and after the date of such assignment.  Any such assignee shall upon request execute and deliver to Landlord an instrument confirming such assignment.  Without limiting the

requirements or application of this Section, this Lease shall be considered a lease of real property in a shopping center, as contemplated by 11 U.S.C. Section 365(b)(3).

(c)  Adequate Protection.  Upon the filing of a petition by or against Tenant under the Code, Tenant, as Debtor and as Debtor-In-Possession, and any Trustee who may be appointed agree to adequately protect Landlord as follows:  (1) to perform each and every obligation of Tenant under this Lease until such time as this Lease is either rejected or assumed by Order of the Bankruptcy Court; (2) to pay all monetary obligations required under this Lease, including without limitation, the payment of Minimum Rent, Percentage Rent, additional rent and Other Charges payable hereunder, which is considered reasonable compensation for the use and occupancy of the Leased Premises; (3) provide Landlord a minimum of thirty (30) days prior written notice, unless a shorter period is agreed to in writing by the parties, of any proceeding relating to any assumption of this Lease or any intent to abandon the Leased Premises, which abandonment shall be deemed a rejection of this Lease; and (4) to perform to the benefit of Landlord otherwise required under the Code.  The failure of Tenant to comply with the above shall result in an automatic rejection of this Lease.

16.5  Remedies Cumulative - Waiver.  Landlord's remedies hereunder are cumulative and Landlord's exercise of any right or remedy due to a default or breach by Tenant shall not be deemed a waiver of, or to alter, affect or prejudice any right or remedy which Landlord may have under this Lease or by law.  Neither the acceptance of rent, nor any other act or omission of Landlord at any time or times after the happening of any event authorizing the termination or forfeiture of this Lease, shall operate as a waiver of any past or future violation, breach or failure to keep or perform any covenant, agreement, term or condition hereof or to deprive Landlord of its right to terminate or forfeit this Lease, upon the written notice provided for herein, at any time that cause for termination or forfeiture may exist, or be construed so as at any time to stop Landlord from promptly exercising any other option, right or remedy that it may have under any term or provision of this Lease, at law or in equity.

17.    DEFAULT BY LANDLORD.  Landlord shall not be in breach or default under this Lease unless Landlord fails to perform obligations required of Landlord within a reasonable time, but in no event shall such time be less than thirty (30) days after written notice by Tenant to Landlord and to the holder of any mortgage or deed of trust covering the Leased Premises whose name and address shall have theretofore been furnished to Tenant in writing.  The notice shall specify wherein Landlord has failed to perform such obligation.  Notwithstanding the foregoing, if the nature of Landlord's obligation is such that more than thirty

FMBSM002.LEA (01/12/95)
BCB.LEA (07/23/96)                          -43-

20.    ACCESS BY LANDLORD.

20.1  Right of Entry.  Landlord or Landlord's employees, agents, and contractors shall have the right to enter the Leased Premises at any time to examine the same, and to show the Leased Premises to prospective purchasers or tenants of the Shopping Center, and to make such repairs, alterations, improvements or additions to the Leased Premises and/or the Shopping Center as Landlord may deem necessary or desirable.  If Tenant is not personally present to permit entry and an entry is necessary, Landlord may forcibly enter the same without rendering Landlord liable therefor.  Nothing contained herein shall be construed to impose upon Landlord any duty of repair of the Leased Premises or building of which the Leased Premises are a part except as otherwise specifically provided in this Lease.

20.2  Excavation.  If an excavation is made upon property adjacent to the Leased Premises, Tenant shall afford to the person causing or authorized to cause such excavation license to enter upon the Leased Premises for the purpose of doing such work as Landlord shall deem necessary to preserve the wall of the building of which the Leased Premises are a part from injury or damage and to support the same by proper foundations, without any claim for damages or indemnification against Landlord or diminution or abatement of rent.

21.    SURRENDER OF LEASED PREMISES.

21.1  Surrender of Possession.  Tenant shall promptly yield and deliver to Landlord possession of the Leased Premises at the expiration or prior termination of this Lease.  Landlord may place and maintain a "For Rent" sign in conspicuous places on the Leased Premises for sixty (60) days prior to the expiration or prior termination of this Lease.

21.2  Removal of Property.  Tenant shall remove all of its personal property and improvements designated to be removed pursuant to Sections 9.4 and 10.5 at the termination of this Lease either by expiration of the term or other cause, and shall pay Landlord for any damages or injury to the Leased Premises or the Shopping Center resulting from such removal.  If Tenant shall fail to remove any of its property of any nature whatsoever from the Leased Premises or the Shopping Center at the termination of this Lease or when Landlord has the right of re-entry, Landlord may remove and store such property without liability for loss thereof or damage thereto, such storage to be for the account and at the expense of Tenant.  If Tenant shall not pay the cost of storing any such property after it has been stored for a period of thirty (30) days or more, Landlord may, at its option, sell, or permit to be sold, any or all such property at public or private sale, in such manner and at such times and places as

Landlord in its sole discretion may deem proper, without notice
to Tenant, unless notice is required under applicable statutes,
and shall apply the proceeds of such sale:  first, to the cost
and expense of such sale, including reasonable attorneys' fees
actually incurred; second, to the payment of the costs or charges
for storing any such property; third, to the payment of any other
sums of money which may then be or thereafter become due to
Landlord from Tenant under any of the terms hereof; and, fourth,
the balance, if any, to Tenant.

    21.3  <u>Voluntary Surrender</u>.  The voluntary or other
surrender of this Lease by Tenant, or a mutual termination
thereof, shall not work a merger, but shall, at the option of
Landlord, terminate all or any existing subleases or subten-
ancies, or operate as an assignment to Landlord of any or all
such subleases or subtenancies.

22.    <u>QUIET ENJOYMENT</u>.  Tenant, subject to all of the terms
and conditions of this Lease, and upon fully complying with and
promptly performing all of the terms, covenants and conditions of
this Lease to be performed on its part and upon the prompt and
timely payment of all sums due hereunder, shall have and possess
the Leased Premises for the Lease Term set forth herein.

23.    <u>AUTHORITY OF PARTIES</u>.  Each individual executing this
Lease on behalf of Tenant personally represents and warrants that
he or she is duly authorized to execute and deliver this Lease on
behalf of Tenant, and that this Lease is binding upon Tenant in
accordance with its terms and, if Tenant is a corporation, in
accordance with a duly adopted resolution of the board of
directors of such corporation, and that such action and execution
is in accordance with the bylaws of Tenant.  If Tenant is a
corporation, Tenant shall, within thirty (30) days after
execution of this Lease, deliver to Landlord a certified copy of
a resolution of the board of directors of Tenant authorizing or
ratifying the execution of this Lease.

24.    <u>SIGNS</u>.  Tenant shall not place or suffer to be placed on
the exterior walls of the Leased Premises or upon the roof or any
exterior door or wall or on or within five feet (5') of the
exterior or interior of any window thereof any sign, awning,
canopy, marquee, advertising matter, decoration, letter or other
thing of any kind (exclusive of the signs, if any, which may be
provided for as part of Tenant's Additional Improvements and
which have been approved by Landlord.)

25.    <u>DISPLAYS</u>.  Tenant may not display or sell merchandise
outside the defined exterior walls and permanent doorways of the
Leased Premises, nor permit carts or racks or other similar
devices within the control of Tenant to be placed or stored in
such locations.  Tenant further agrees not to install any

exterior lighting, amplifiers or similar devices or use in or
about the Leased Premises, such as flashing lights, searchlights,
loudspeakers, phonographs or radio broadcasts. If music or any
other audio transmission emanating from within the Leased
Premises is objectionable or offensive (in the reasonable
judgment of Landlord), Landlord may require Tenant to stop or
decrease the volume of such sounds to a reasonable level, as
determined by Landlord, and Tenant shall immediately comply
therewith.

26.      NO AUCTIONS OR DISTRESS SALES.   Landlord and Tenant
acknowledge that Tenant's use of the Leased Premises as a
continuing business in compliance with the provisions of this
Lease specifically including but not limited to the terms and
provisions of Article 5 above is an essential part of the
bargained-for consideration of this Lease.  Tenant further
acknowledges that its failure to comply with the terms of Article
5, including the failure to maintain the business within the
Leased Premises as a going concern, will have a material adverse
impact on Landlord and the other tenants of the Shopping Center.
Therefore, it is an express condition and part of the
consideration of the Lease that Tenant shall not conduct or
permit to be conducted any sale by auction upon or from the
Leased Premises, whether the auction is voluntary, involuntary,
pursuant to any assignment for the payment of creditors, or
pursuant to any bankruptcy or other insolvency proceeding.  No
"auction," "fire," "bankruptcy," "going out of business," "lost
our lease," "moving," "store closing," "smoke (or other casualty)
damage," or other distress sales of any nature may be conducted
on the Leased Premises.  The violation of this Section shall be a
material breach of this Lease and shall immediately entitle
Landlord to the rights and remedies set forth in Section 16.2.

27.      MERCHANTS' ASSOCIATION.

         27.1  Generally.  Upon execution of this Lease, Tenant
shall become a member of the Bellevue Square Association, a
Washington not-for-profit corporation (or such other succeeding
corporation or merchants' association approved by Landlord), also
known and referred to herein as the "Merchants' Association."
Tenant shall take all actions necessary to remain a member in
good standing of the Merchants Association throughout the Lease
Term and during any holdover period.  Tenant shall comply with
all of the provisions, terms and conditions in the Articles,
Bylaws and Regulations of the Merchants' Association to the
extent they do not conflict with any of the provisions, terms or
conditions of this Lease.

         27.2  Tenant Contributions.  As part of Tenant's
obligation to be and remain a member in good standing of the
Merchants' Association and, without limiting the generality of

FMBSM002.LEA (01/12/95)
BCB.LEA (07/23/96)                      -49-

written advertising report as required by Section 28.2 above, Tenant shall immediately pay to Landlord, in addition to all other obligations owed under this Lease, a charge of One Hundred Dollars ($100) for each week the report is past due. Landlord and Tenant agree that said charge represents a fair and reasonable estimate of the actual losses and expenses that would be suffered as a result of the failure of Tenant to provide the advertising report, and is not a penalty. Acceptance of this charge shall not constitute a waiver by Landlord of Tenant's default with respect to the failure to provide the advertising report in compliance with the Lease or prevent Landlord from exercising any and all other rights and remedies available to Landlord under this Lease.

29.    <u>EXPANSION, RECONFIGURATION AND RELOCATION</u>.

29.1    <u>Possible Expansion and Reconfiguration of the Shopping Center</u>. Landlord is contemplating one or more expansions and/or reconfiguration of the Shopping Center. Such work may include, but would not necessarily be limited to, the construction and improvement of additional tenant spaces and pedestrian walkways on the west side of the Enclosed Mall and/or northeast corner of the Shopping Center, the expansion of a portion of the Enclosed Mall, an expansion of the Nordstrom store into the parking area on the west side of the store, an expansion of the Bon Marche store and the possible addition of a third level to the Enclosed Mall. Tenant has had an opportunity to ask questions of Landlord regarding said work and evaluate the proposed work. Tenant understands that if Landlord undertakes such a project during the Lease Term, even if only in part, the resulting noise, dust, debris, disruption and reconfiguration of the Shopping Center could adversely impact Tenant's business in the Leased Premises. Landlord will attempt to mitigate the adverse impact on Tenant and the other tenants in the Shopping Center, but Tenant understands and accepts the fact that some impacts may not be capable of mitigation or will be unreasonable or too costly to implement. The adverse impacts from such a project, if any, shall not constitute a default under this Lease by Landlord or a constructive eviction of Tenant. During the Lease Term, Landlord may find it necessary or desirable to enter the Leased Premises to inspect the same or perform certain work in or around the Leased Premises, including without limitation, the installation of temporary and permanent supports and other structures and facilities. Tenant consents to such actions by Landlord and Landlord's agents and contractors.

29.2    <u>Vacation or Relocation</u>. If at any time during the Lease Term Landlord determines in its sole subjective discretion that it is necessary or desireable that Tenant temporarily vacate the Leased Premises or be relocated to a different location in order to facilitate Landlord's expansion or reconfiguration of

FMBSM002.LEA (01/12/95)
BCB.LEA (07/23/96)                    -53-

the Shopping Center, Landlord may, upon not less than forty-five (45) days' advance written notice to Tenant and notwithstanding anything in this Lease to the contrary, either: (i) relocate Tenant to another retail space in the Shopping Center for the balance of the Lease Term, provided such other space has approximately the same number of square feet of floor area as the Leased Premises; (ii) terminate this Lease; or (iii) require that Tenant temporarily vacate the Leased Premises for a period of time.  If Landlord requires that Tenant temporarily vacate the Leased Premises hereunder, Tenant shall relinquish possession of the Leased Premises on the date set forth in Landlord's notice. All Minimum Rent and Other Charges due under this Lease for the period of time Tenant is required to vacate the Leased Premises, or actually vacates the Leased Premises, whichever is shorter, shall be fully abated.  In addition, Landlord shall reimburse Tenant for any actual reasonable out-of-pocket moving costs incurred by Tenant in moving Tenant's inventory and trade fixtures, if necessary.  Landlord shall not be responsible for any lost sales or other losses that may be suffered by Tenant as a result of the requirement that Tenant vacate the Leased Premises.  However, if Tenant is required to temporarily vacate the Leased Premises, the Lease Term and the date for any future increases in Minimum Rent shall be automatically extended for a period of time equal to the period of time Tenant is required to vacate the Leased Premises hereunder or the time Tenant actually vacated the Leased Premises, whichever is shorter.  After vacating the Leased Premises, Tenant shall retake possession and reopen for business on a fully-operational basis on the date specified by Landlord in a notice to Tenant.  If Landlord elects to relocate Tenant or terminate this Lease, Landlord's sole obligation to Tenant shall be limited to reimbursing Tenant for (i) a portion of Tenant's Initial Improvement Costs, as described below; and (ii) if Tenant is relocated, the actual reasonable out-of-pocket costs incurred in moving Tenant's inventory and trade fixtures to the new space.  If Tenant is relocated, the Minimum Rent for the new space shall be the same as the "per square foot" rate for the Leased Premises as described above. Upon the relocation of Tenant, the new space shall be considered the Leased Premises hereunder.  Tenant's Initial Improvement Costs for purposes of determining the amount to be reimbursed to Tenant shall be limited to Tenant's actual verifiable out-of-pocket costs for the initial permanent improvements constructed and installed by Tenant at the time Tenant first took possession of the Leased Premises and, shall be limited to the cost of those improvements and fixtures Tenant is unable to move to and utilize in the new space or another store.  The portion of Tenant's Initial Improvements Costs to be paid by Landlord shall equal the product of Tenant's Initial Improvement Costs multiplied by a fraction, the numerator of which shall be equal to the number of days from the effective date of the relocation or termination until the Expiration Date and the denominator of which shall be

equal to the total number of days in the Lease Term from the Commencement Date to the Expiration Date.

30.      MISCELLANEOUS.

30.1  Successors or Assigns.  Subject to Section 12 hereof, all the terms, conditions, covenants and agreements of this Lease shall extend to and be binding upon Landlord, Tenant, their respective heirs, administrators, executors, successors and assigns, and upon any person or persons coming into ownership or possession of any interest in the Leased Premises by operation of law of otherwise, and shall be construed as covenants running with the land.

30.2  Tenant Defined.  The word "Tenant" as used herein shall mean each and every person, partnership or corporation who is mentioned as a Tenant herein or who executes this Lease as Tenant.

30.3  Broker's Commission.  Tenant represents and warrants that it has incurred no liabilities or claims for brokerage commissions or finder's fees in connection with the execution of this Lease and that it has not dealt with or has any knowledge of any real estate broker, agent or salesperson in connection with this Lease.  Tenant agrees to indemnify and hold Landlord harmless from all such liabilities or claims (including, without limitation, attorneys' fees).

30.4  Partial Invalidity.  If any term, covenant, or condition of this Lease or the application thereof to any person or circumstance is, to any extent, invalid or unenforceable, the remainder of this Lease, and the application of the terms, covenants or conditions to persons or circumstances other than those which are held invalid or unenforceable, shall not be affected thereby and each term, covenant or condition of this Lease shall be valid and be enforced to the fullest extent permitted by law.

30.5  Landlord's Consent.  Unless otherwise specifically stated herein, whenever Landlord's consent is required, Landlord's consent may be withheld in Landlord's sole subjective discretion.

30.6  Recording.  Tenant shall not record this Lease. In addition, Tenant shall not record any so-called "short form" memorandum of this Lease except on a form acceptable to Landlord. The information set forth on any such short form memorandum of lease shall be limited to the identification of Landlord and Tenant, the Shopping Center and the Leased Premises, the Commencement Date, the length of the lease term and the Expiration Date.  It is a condition to the recording of any

memorandum of Lease that a true and accurate Expiration Date be set forth thereon.

30.7    _Notices_.  Any notices required in accordance with any of the provisions herein if to Landlord shall be delivered or mailed by registered or certified mail to the address of Landlord as set forth in Section 1.1, or at such other place as Landlord may in writing from time to time direct to Tenant, and if to Tenant, shall be delivered or mailed by registered or certified mail to Tenant at the Leased Premises.  If there is more than one Tenant, any notice required or permitted hereunder may be given by or to any one thereof, and shall have the same force and effect as if given by or to all thereof.  Any notices mailed to Tenant bearing the proper address and adequate postage for delivery shall be deemed effective upon deposit in the U.S. mail.

30.8    _Waiver_.  The waiver by Landlord of any term, covenant or condition herein contained shall not be deemed to be a waiver of any subsequent breach of the same or any other term, covenant or condition herein contained.  The subsequent acceptance of Minimum Rent, Percentage Rent, Other Charges or any other sum hereunder by Landlord shall not be deemed to be a waiver of any preceding default by Tenant of any term, covenant or condition of this Lease, other than the failure of the Tenant to pay the particular sum so accepted, regardless of Landlord's knowledge of such preceding default at the time of the acceptance of such sum.  In addition, no endorsement or statement on any check or any letter accompanying any payment shall be deemed an accord and satisfaction, and Landlord's right to recover the balance of such rent or pursue any other remedy provided herein or otherwise shall not be affected by such endorsement or statement or by the acceptance of such payment.

30.9    _Joint Obligation_.  If there is more than one Tenant, the obligations hereunder imposed shall be joint and several.

30.10    _Landlord's Liability_.  Anything in this Lease to the contrary notwithstanding, the covenants, undertakings and agreements herein made on the part of Landlord are made and intended not as personal covenants, undertakings and agreements for the purpose of binding Landlord personally or the assets of Landlord, but are made and intended for the purpose of binding only the Landlord's interest in the Leased Premises and the Shopping Center, as the same may from time to time be encumbered.  No personal liability or personal responsibility is assumed by, nor shall at any time be asserted or enforceable against Landlord or its partners or their respective heirs, legal representatives, successors, and assigns on account of the Lease or on account of any covenant, undertaking or agreement of Landlord in this Lease contained.  Therefore, in consideration of the benefits accruing

trust on the leasehold interest of Landlord in the event of foreclosure thereof.

30.13  _Prior Agreements_.  It is understood that there are no oral or written agreements or representations between Landlord and Tenant affecting this Lease and that this Lease supersedes and cancels any and all previous negotiations, arrangements, representations, brochures, displays, projections, estimates, agreements and understandings, if any, made by or between Landlord and Tenant with respect to the subject matter thereof, and none thereof shall be used to interpret, construe, supplement or contradict this Lease.  This Lease, and all mutually-executed, written amendments thereto, is and shall be considered to be the only agreement between Landlord and Tenant and their representatives and agents.  All negotiations and oral agreements acceptable to Landlord and Tenant have been merged into and are included in this Lease.  There are no other representations, covenants or warranties between Landlord and Tenant and all reliance with respect to representations is solely upon the express representations, covenants and warranties contained in this Lease.  Although the printed provisions of this Lease were drawn by Landlord, Landlord and Tenant agree that this circumstance shall not create any presumption, canon of construction, or implication favoring the position of either Landlord or Tenant.  Landlord and Tenant agree that the interlineation, obliteration or deletion of language from this Lease prior to its mutual execution by Landlord and Tenant shall not be construed to have any particular meaning or to raise any presumption, canon of construction, or implication, including, without limitation, any implication that Landlord or Tenant intended thereby to state the converse, obverse or opposite of the deleted language.  This Lease shall be read as if the obliterated or deleted language had never existed and the interlineated language had always existed.

30.14  _Inability to Perform_.  The obligations of either Landlord or Tenant hereunder, except for the obligations of Tenant to pay Minimum Rent, Percentage Rent, additional rent and Other Charges, shall be excused for a period equal to the time by which such performance is prevented or delayed due to strikes, labor disputes, acts of God, or any other causes beyond the reasonable control of the party obligated to perform.

30.15  _Transfer of Landlord's Interest_.  In the event of any transfer or transfers of Landlord's interest in the Leased Premises or the Shopping Center, other than a transfer for security purposes only, the transferor shall be automatically relieved of any and all obligations and liabilities on the part of Landlord accruing from and after the date of such transfer and Tenant agrees to attorn to such transferee.

30.16  <u>Reciprocal Easement Agreement</u>.  This Lease is subordinate to that certain Construction Operation and Reciprocal Easement Agreement (the "REA") entered into among Landlord and the major department store tenants of the Shopping Center, and any amendments or modifications thereto, recorded under King County Auditor's file number 8206170621.  Tenant shall execute and return to Landlord within ten (10) days after written request therefor by Landlord, agreement in recordable form, substantially in the form of <u>Exhibit G</u>, subordinating this Lease to the REA.

30.17  <u>No Light, Air or View Easement</u>.  Any diminution or shutting off of light, air or view by any structure which may be erected on or adjacent to the Shopping Center shall in no way affect this Lease or the obligation of Tenant hereunder nor impose any liability on Landlord.

30.18  <u>Captions</u>.  Any section or paragraph titles or captions are for convenience only and shall not be deemed to define, limit or otherwise modify the scope and intent of this Lease or any provision thereof.

30.19  <u>Name</u>.  Tenant shall not, without the prior written consent of Landlord, use the name of the building or project for any purpose other than as the address of the Leased Premises, and in any event, Tenant shall not acquire any rights in or to such names.

30.20  <u>Choice of Law-Venue</u>.  This Lease shall be governed by the laws of the State of Washington.  The venue for any action to enforce the terms of this Lease or collect any amounts owing by Tenant to Landlord shall be in the Superior Court for King County, Washington.

30.21  <u>Submission of Lease</u>.  This Lease shall not bind Landlord in any way until (i) Tenant has executed and delivered at least one original copy of the Lease to Landlord, and (ii) Landlord has executed and delivered at least one fully-signed copy to Tenant.

IN WITNESS WHEREOF, the parties hereto have executed this instrument the day and year first above set forth.

LANDLORD                           TENANT

BELLEVUE SQUARE MANAGERS, INC.     AZ3, INC.

By _____     By _____
F. Kemper Freeman, Jr.                President
President

By _____     By _____
Richard S. Sprague                    Secretary
Secretary

FMBSM002.LEA (01/12/95)
BCB.LEA (07/23/96)                 -59-

STATE OF WASHINGTON )
                    ) ss:
COUNTY OF KING      )

On this 23rd day of *August*, 1996, before me, the undersigned, a Notary Public in and for the State of Washington, duly commissioned and sworn, personally appeared F. KEMPER FREEMAN, JR., and RICHARD S. SPRAGUE, to me known to be the President and Secretary, respectively, of BELLEVUE SQUARE MANAGERS, INC., the corporation that executed the foregoing instrument, and acknowledged the said instrument to be the free and voluntary act and deed of said corporation, for the uses and purposes therein mentioned, and on oath stated that they were authorized to execute the said instrument.

WITNESS my hand and official seal hereto affixed the day and year first written above.

(SEAL)

Type Notary Name: Karen L. Berg
Notary Public in and for the State of Washington, residing at Redmond.
My commission expires 6/16/98.

STATE OF CALIFORNIA )
                    ) ss:
COUNTY OF _____ )

On this _____ day of _____, 1996, before me, a Notary Public in and for the State of California, duly commissioned and sworn, personally appeared _____ and _____, to me known to be the President and Secretary, respectively, of AZ3, INC., the corporation named in and which executed the foregoing instrument; and they acknowledged to me that they signed the same as the free and voluntary act and deed of said corporation for the uses and purposes therein mentioned, being authorized so to do.

WITNESS my hand and official seal the day and year in this certificate above written.

(SEAL)

Type Notary Name: _____
Notary Public in and for the State of California, residing at _____.
My commission expires _____.

FIRST LEASE ADDENDUM

THIS FIRST LEASE ADDENDUM is made and entered into this _23rd_ day of _August_, 1996, between BELLEVUE SQUARE MANAGERS, INC., a Washington corporation ("Landlord"), and AZ3, INC., a California corporation ("Tenant").

RECITALS

A.    Landlord and Tenant have entered into a non-residential lease (the "Lease") for certain space at Bellevue Square, Bellevue, Washington, which leased space is more specifically described in the Lease.

B.    Landlord and Tenant intend, by the execution and delivery of this Addendum, to amend and supplement the Lease in certain material respects.  The execution and delivery of the Lease and the execution and delivery of this Addendum are a single interrelated transaction.

C.    Unless otherwise noted, all capitalized terms herein have the same meanings as set forth in the Lease.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Landlord and Tenant hereby amend and supplement the Lease as follows:

1.    Current Tenant.  Tenant is aware that the Leased Premises are currently occupied by another tenant or tenants (collectively the "Current Tenant") and Landlord is in the process of negotiating an early termination of the Leased Premises currently occupied by the Current Tenant which shall require surrender and vacation of the Leased Premises on or before August 14, 1996.  Tenant is further aware the Current Tenant may fail or refuse to vacate the Leased Premises and relinquish all claims to the Leased Premises prior to August 14, 1996.  If the Current Tenant fails or refuses to vacate the Leased Premises by August 14, 1996, Tenant and Landlord agree that, notwithstanding anything in this Lease to the contrary, the Commencement, Opening and Expiration Dates shall be automatically extended for a period of time equal to the time the Current Tenant remains in possession of and claims an interest in the Leased Premises after August 14, 1996.  Landlord shall have no responsibility under this Lease to take any action to remove the Current Tenant and shall not be liable for any damages, injuries

or claims that may be suffered by Tenant relating to or arising out of, directly or indirectly, the Current Tenant's failure or refusal to vacate and release all interest in the Leased Premises; provided, however, if Landlord does not tender possession of the Leased Premises to Tenant on or before September 15, 1996, then Tenant may elect to terminate the lease by giving written notice thereof to Landlord on or before September 20, 1996.

    2.   <u>Landlord's Construction Allowance</u>.

       a.   Provided Tenant is not in default beyond any applicable cure period under the Lease, Landlord shall reimburse Tenant for up to Seventy-Five Thousand Dollars ($75,000.00) in actual out-of-pocket construction costs incurred by Tenant for Tenant's Additional Improvements in the Leased Premises ("Landlord's Contribution").

       b.   Prior to the commencement of Tenant's Additional Improvements, Tenant shall provide Landlord with a schedule of values for Tenant's Additional Improvements and shall meet with or confer with Landlord's Tenant Coordinator with respect thereto.  Promptly following the completion of Tenant's Additional Improvements, Tenant shall submit to Landlord such invoices, statements and such other back-up documentation as may be reasonably appropriate to establish and substantiate the costs for which Tenant seeks reimbursement hereunder.  Landlord shall have the right to offset any amount due hereunder against any amount due and owing by Tenant under the Lease.

       c.   Landlord shall pay Landlord's Contribution (or the balance thereof, if any, should any portion of Landlord's Contribution be used to remove any liens filed against the Leased Premises or Shopping Center arising out of Tenant's Additional Improvements) upon (i) the completion of Tenant's Additional Improvements, (ii) the submission to Landlord of the items set forth in Paragraph (b), above, and (iii) the expiration of the period of time during which liens may be filed arising out of the labor and materials provided in connection with Tenant's Additional Improvements, and provided no liens have actually been filed or threatened.  Notwithstanding anything herein to the contrary, (i) Landlord shall have no obligation to pay more than a total of Seventy-Five Thousand Dollars ($75,000.00) and (ii) no payments hereunder shall be made for any of Tenant's inventory, furniture, removable equipment or personal property.  Should any liens be filed against the Leased Premises or Shopping Center and said liens are not removed within five (5) business days of Landlord's demand for their removal, Landlord shall be entitled to pay whatever costs Landlord may consider appropriate to remove said liens and to offset said costs, including without limitation any attorneys fees and costs, against Landlord's Contribution.

d.    Tenant hereby warrants and represents the work to be performed and materials to be supplied by any person or entity other than Tenant's general contractor shall not exceed $75,000.00.

e.    If Tenant breaches or defaults under any of the terms and provisions of the Lease during the Lease Term and the Lease is terminated or rejected, then in addition to all other remedies of Landlord set forth in the Lease, Landlord may recover the unamortized portion of Landlord's Improvement Allowance. The period of amortization shall be the term of the Lease and such amortization shall be made on a straight-line basis. Landlord and Tenant specifically intend the recovery of Landlord's Improvement Allowance pursuant to the preceding sentence shall not be limited or impaired by Section 502 or other provision of the Bankruptcy Code.

3.    Section 2.3. Notwithstanding anything in Section 2.3 of the Lease to the contrary, if Landlord makes any repairs, alterations or additions in or about the Leased Premises or within a space adjoining the Leased Premises pursuant to the provisions of Section 2.3 of the Lease, Landlord shall use reasonable efforts to mitigate the material adverse impacts on Tenant's business in the Leased Premises, if any.

4.    Section 3.3. The reference in Section 3.3 of the Lease to "twice" the Minimum Rent is amended to read "one hundred fifty percent (150%) of" the Minimum Rent.

5.    Section 4.2(e). Notwithstanding anything in Section 4.2(e) of the Lease to the contrary, the following shall not be included within the definition of "Gross Sales:"

i.    catalog orders so long as such orders are not filled at or from the Leased Premises and provided further that such orders are neither for the purpose, nor have the effect, of defeating or excluding a sale which would otherwise be made at or from the Leased Premises; and

ii.    sales price of fixtures, equipment or property sold not in the ordinary course of business.

Notwithstanding the foregoing or anything in Section 4.2(e) of the Lease to the contrary, in the event Tenant fails to separately and accurately record and report any and all exclusions from Gross Sales, or does not do so in the ordinary course of Tenant's business, so that Landlord is advised of the amount of such exclusions in Tenant's monthly and annual statements of Gross Sales and can substantiate such deductions through conducting an audit or examination of Tenant's books and records as permitted in Section 4.2(f) of the Lease, then such

BCB10.1LA (07/23/96)                    3

exclusions shall be deemed void and Tenant shall be responsible for all Gross Sales as if the exclusions were not granted.

      6.    Section 4.2(f).

      i.   In the second sentence of Section 4.2(f) of the Lease, the phrase "any and all reasonable times" during regular business hours is amended to read "any and all reasonable times and upon reasonable notice" during regular business hours.

      ii.  The reference to "two percent (2%)" or more in Section 4.2(f) of the Lease is amended to read "three percent (3%)" or more.

      iii. The reference in the second to the last sentence and the last sentence of Section 4.2(f) of the Lease to "inaccuracy" is amended to read "understatement."

      7.    Section 4.2(j).  Section 4.2(j).  Section 4.2(j) of the Lease is amended in its entirety to read as follows:

      Right to Terminate.  If Tenant fails to achieve at least One Million and 00/100 Dollars ($1,000,000.00) in Gross Sales in the third full (twelve month) Lease Year, Landlord and Tenant shall each have the option for twenty (20) days after Tenant provides its annual Gross Sales statement to Landlord for the third full Lease Year, to terminate this Lease by written notice to the other party.  In the event Landlord or Tenant elects to terminate this Lease, the effective date of termination shall be sixty (60) days from the date either party provides its termination notice to the other, and Tenant shall continue to operate its business in the ordinary course of business during said sixty (60) day period.  If Tenant achieves Gross Sales of One Million and 00/100 Dollars ($1,000,000.00) or more in the third full (twelve month) Lease Year, neither Landlord nor Tenant shall have any right of termination hereunder.

      Notwithstanding the foregoing, if Tenant fails to comply with the provisions of Section 4.2(d) and (f), above, for third (3rd) full Lease Year, then Landlord's option to terminate the Lease may be exercised, at any time prior to the date on which Tenant's annual statement of Gross Sales is due following the third full Lease Year.  Any such termination notice shall specify an effective date of termination, which shall not be less than thirty (30) days or more than sixty (60) days from the date of the termination notice.  The termination shall operate as if it were the expiration date originally specified in the Lease, and all

            4

references in the Lease to the original Expiration Date shall refer to such earlier termination date.

The Termination Option may not be exercised by Tenant during any period in which Tenant is in default under any provisions of this Lease until said default has been cured.  In the event Tenant provides Landlord notice of termination pursuant to this paragraph 4.2(j) such that the effective date of termination occurs at any time in the months of November or December of any Lease Year, the effective date of termination shall be extended to January 1, if the notice of termination would have resulted in a December termination date, or October 31 if the notice of termination would have resulted in a November termination date.  Time is of the essence.  The Termination Option shall be personal to AZ3, Inc., and may not be exercised or be assigned, voluntarily or involuntarily, by or to any person or entity other than AZ3, Inc.

8.   _Section 4.5_.  Landlord agrees to waive one (1) late charge and interest payment described in Section 4.5 of the Lease incurred during any twelve (12) month period provided the payment to which such late charge and interest payment relates is paid within ten (10) days of the date when due and provided there are no more than four (4) such waivers during the Lease Term.

9.   _Section 5.5_.  The following sentence is added at the end of Section 5.5 of the Lease:

Nothing herein shall be construed to impose liability on Tenant for any contamination of the Leased Premises which occurred or was caused by Landlord's actions, or the actions of any previous owner or occupant, prior to the Commencement Date.

10.   _Section 6_.  The last sentence of Section 6 of the Lease is hereby deleted.

11.   _Section 9.1_.  The first sentence of Section 9.1 of the Lease is amended to read as follows:

Subject to Section 5.5 of the Lease, Tenant has inspected the Leased Premises and accepts the same in their current condition and waives the right to make any claim against Landlord for any matter directly or indirectly arising out of the condition of the Leased Premises, appurtenances thereto, the improvements thereon and the equipment thereof.

the net worth of Tenant at the time this Lease is entered into by Landlord and Tenant;

iv.   The reference in the third paragraph, section (ii) in Section 12.1 of the Lease to "twenty-five percent (25%)" is amended to read "forty-nine percent (49%)".

v.   The next to the last sentence of the last paragraph of Section 12.1 is amended to read as follows:

If Landlord's consent is requested for an assignment, sublease or transfer of all or a portion of the Leased Premises, Landlord shall have the right to terminate this Lease with respect to that portion of the Leased Premises for which such consent is requested, at the proposed effective date of such assignment or sublease, and enter into the relationship of Landlord and Tenant with the proposed assignee, subtenant or transferee based on the rent (and/or other compensation) and term agreed to by such assignee, subtenant or transferee and otherwise upon the terms and conditions of this Lease unless Tenant agrees not to enter into the proposed assignment, sublease or transfer upon being advised by Landlord of Landlord's intention to terminate this Lease hereunder and so notifies Landlord in writing within five (5) business days of being advised by Landlord that Landlord intends to terminate this Lease hereunder.

vi.   For purpose of Section 12.1 of the Lease, transfers of stock between family members shall not constitute an assignment, provided such transfer does not result in a change in operational control of Tenant or a significant change in ownership of Tenant as such ownership existed at the time the Lease is entered into.

17.   Section 12.5.   Provided any assignment, sublease or other transfer proposed by Tenant does not require any material change in the terms of the Lease or protracted negotiations, the attorneys' fees to be reimbursed by Tenant pursuant to Section 12.5 shall not exceed One Thousand Five Hundred Dollars ($1,500.00).

18.   Section 14.1(a).   The first sentence in Section 14.1(a) of the Lease is amended to read as follows:

Landlord shall not be liable for the loss of or damage to any property (including property of Tenant and others) occurring in or about the Leased Premises from any cause whatsoever, with the exception of loss or damage resulting from the negligence of Landlord.

19.   Section 14.4.   The following language is added at the end of Section 14.4 of the Lease:

This Section 14.4 shall not be construed to release or relieve Landlord from any loss or damage to the extent the same may be caused by Landlord's negligence.

20.   Section 16.1(b).   The reference in Section 16.1(b) of the Lease to "three (3)" days is amended to read "five (5)" days.

21.   Section 16.1(c).   Section 16.1(c) of the Lease is hereby amended to change all references to "ten (10)" days to "twenty (20)" days.

22.   Section 16.1(e).   Section 16.1(e) of the Lease is amended to read as follows:

(e)   Repeated Defaults.   Tenant's failure to perform or observe any of Tenant's obligations under the Lease after Tenant has neglected or failed to perform or observe any of Tenant's obligations under the Lease (and for which Tenant was given written notice under this Section 16.1) at least twice previously within any twelve (12) month period (although Tenant shall have cured any such previous failure after notice from Landlord, and within the notice period).

23.   Section 18.3.   The second sentence of Section 18.3 of the Lease is amended to read as follows:

Unless due to Landlord's negligence, during any portion of the Lease Term, Landlord shall not be required to repair any injury or damage to or make any repairs or replacements of any leasehold improvements, fixtures, or  personal property of Tenant.

24.   Section 18.5.   Notwithstanding anything in Section 18.5 of the Lease to the contrary, if Landlord makes any repairs, restorations, alterations or improvements in or about the Leased Premises or within a space adjoining the Leased Premises pursuant to Article 18, Landlord shall use reasonable efforts to mitigate the materials adverse impacts on Tenant, if any, but Tenant understands and accepts the fact that some impacts may not be capable of mitigation or may be too costly or unreasonable to implement.

25.   Section 19.2.

i.   The references to "ten (10)" days in Section 19.2 of the Lease are amended to read "fifteen (15")" days.

retains Utopia Construction Company as its general contractor to
install Tenant's Additional Improvements, (ii) obtains an
unconditional lien waiver from its general contractor in the form
attached hereto as Exhibit H, and (iii) is not in default under
the Lease, Tenant shall not be obligated to provide either a
payment or a performance bond for Tenant's Additional
Improvements.

35. Remaining Provisions. All other provisions of the
Lease remain in full force and effect.

IN WITNESS WHEREOF, the parties hereto have executed
this instrument the day and year first above set forth.

LANDLORD                          TENANT

BELLEVUE SQUARE MANAGERS, INC.    AZ3, INC.

By _____        By _____
F. Kemper Freeman, Jr.               President
President

By _____        By _____
Richard S. Sprague                   Secretary
Secretary

STATE OF WASHINGTON )
                     )  ss:
COUNTY OF KING       )

On this _23rd_ day of _August_, 1996, before me, the undersigned, a Notary Public in and for the State of Washington, duly commissioned and sworn, personally appeared F. KEMPER FREEMAN, JR., and RICHARD S. SPRAGUE, to me known to be the President and Secretary, respectively, of BELLEVUE SQUARE MANAGERS, INC., the corporation that executed the foregoing instrument, and acknowledged the said instrument to be the free and voluntary act and deed of said corporation, for the uses and purposes therein mentioned, and on oath stated that they were authorized to execute the said instrument.

WITNESS my hand and official seal hereto affixed the day and year first written above.

(SEAL)

Type Notary Name: _Karen L. Berg_
Notary Public in and for the State of Washington, residing at _Redmond_.
My commission expires _6/16/98_.

STATE OF CALIFORNIA )
                     )  ss:
COUNTY OF _____   )

On this _____ day of _____, 1996, before me, a Notary Public in and for the State of California, duly commissioned and sworn, personally appeared _____ and _____, to me known to be the President and Secretary, respectively, of AZ3, INC., the corporation named in and which executed the foregoing instrument; and they acknowledged to me that they signed the same as the free and voluntary act and deed of said corporation for the uses and purposes therein mentioned, being authorized so to do.

WITNESS my hand and official seal the day and year in this certificate above written.

(SEAL)

Type Notary Name: _____
Notary Public in and for the State of California, residing at _____.
My commission expires _____.

*File Copy*
*True copy to Phillip*
*& Brooke*
*Copy to Paul*

## SECOND LEASE ADDENDUM

THIS SECOND LEASE ADDENDUM is made and entered into this 14th day of April____, 2004, between BELLEVUE SQUARE MANAGERS, INC., a Washington corporation ("Landlord"), and AZ3, INC., a California corporation ("Tenant").

### RECITALS

A.    Landlord and Tenant entered into a non-residential Lease and First Lease Addendum, each dated August 23, 1996 (collectively the "Lease"), Trade Name: B.C.B.G., for Space 122 Bellevue Square, Bellevue, Washington, which leased space is more specifically described in the Lease.

B.    Landlord and Tenant intend, by the execution and delivery of this Addendum, to amend and supplement the Lease in certain material respects which includes (i) extending the Lease Term for one year; (ii) extending the Expiration Date for one year; and (iii) revising Tenant's contribution to Merchants' Association.

C.    Unless otherwise noted, all capitalized terms herein have the same meanings as set forth in the Lease.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Landlord and Tenant hereby amend and supplement the Lease as follows:

1.    Section 1.1 Basic Lease Provisions.  The following paragraphs of Section 1.1 of the Lease are amended in their entirety to read as follows:

LEASE TERM:

One Hundred Eight (108) calendar months, which includes an additional Twelve (12) calendar months commencing November 1, 2004 through and including October 31, 2005.

EXPIRATION DATE:

October 31, 2005.

2.    Section 27.2 Tenant Contributions.  Section 27.2 of the Lease is amended in its entirety to read as follows:

As part of Tenant's obligation to be and remain a member in good standing of the Merchants' Association, and, without limiting the generality of Section 27.1 of the Lease, Tenant shall pay the following amounts to the Merchant's Association:

B.C.B.G. Second Lease Addendum
[/BA040760026.DOC]                                    - 1 -                                    04/06/04

(a)    Annual member dues, as determined by the Merchants' Association ("Tenant's Merchants' Association Dues"); provided; however, Tenant shall pay at least Three Hundred Dollars ($300.00) per calendar year to the Merchants' Association as and for Annual Member Dues.

(b)    A contribution, to be paid on a monthly or quarterly basis (or as Landlord may otherwise designate), toward the Merchants' Association's annual advertising and promotional expenses ("Tenant's Merchants' Association Contribution"). Tenant's Advertising Contribution shall be based upon the Floor Area in the Leased Premises. The amount to be paid by Tenant for each square foot of Floor Area shall be determined by the Merchants' Association and Tenant shall pay the amount as determined by the Merchants' Association from time to time; provided, however, in no event shall Tenant's Advertising Contribution for any calendar year be less than the amount determined by reference to the Floor Area as set forth in Section 1.1 above, multiplied by Two and 00/100 Dollars ($2.00); provided further that if the total number of square feet of Floor Area is less than one thousand (1,000), Tenant's Advertising Contribution shall in no event be less than Two Thousand Dollars ($2,000) per calendar year.

(c)    Any special assessments that may be approved by the Merchants' Association, specifically including, without limitation, the annual assessment for the "Community Benefit" function held each year in the Enclosed Mall. Notwithstanding anything herein to the contrary, Tenant shall pay at least $100.00 plus .034 per square foot of the Leased Premises each year to the Merchants' Association for the "Community Benefit" or other similar function.

(d)    Tenant's contributions to the Merchants' Association required by Section 27.2 shall be increased each calendar year or other fiscal year of the Merchants' Association by the greater of: (i) any increase adopted by the Merchants' Association as provided in Section 27.2; or (ii) by a percentage equal to the percentage increase in the United States Department of Labor, Bureau of Labor Statistics Consumer Price Index for All Urban Consumers for Seattle-Tacoma-Bremerton, Washington Subgroup "All items" (1982-84 = 100) (the "Index") over the base period Index. The Index, which may be a monthly, quarterly or other fiscal period Index that includes the calendar month of October 2003, shall be considered the "base period" Index. Such adjustment shall be made at any time there exists an increase of ten percent (10%) or more in the Index for a similar fiscal period from the base period Index and shall be effective for the calendar or other fiscal year of the Merchants' Association immediately following such adjustment. If at any time publication of the Consumer Price Index is discontinued, Landlord shall substitute any other index published by the Bureau of Labor Statistics, or successor or similar governmental agency or quasi-governmental or private entity providing similar information as may then be in existence and shall be most nearly equivalent thereto. Landlord's determination of such successor index shall be absolutely conclusive and binding.

3.    Remaining Provisions. All other provisions of the Lease remain in full force and effect.

IN WITNESS WHEREOF, the parties hereto have executed this instrument the day and year first above set forth.

LANDLORD                                    TENANT

BELLEVUE SQUARE MANAGERS, INC., AZ3, INC., a California corporation
a Washington corporation

By _____            By _____
    F. Kemper Freeman, Jr.                  ~~President~~ Senior VP. Real Estate
    President

By _____            By _____
    Richard S. Sprague                      _____
    Secretary                               Secretary

B.C.B.G. Second Lease Addendum
[/BA040760026.DOC]                          - 3 -                          04/06/04

STATE OF WASHINGTON )
                     ) ss:
COUNTY OF KING       )

On this _28th_ day of _April_, 2004, before me, the undersigned, a Notary Public in and for the State of Washington, duly commissioned and sworn, personally appeared F. KEMPER FREEMAN, JR. and RICHARD S. SPRAGUE, to me known to be the President and Secretary, respectively, of BELLEVUE SQUARE MANAGERS, INC., the corporation that executed the foregoing instrument, and acknowledged the said instrument to be the free and voluntary act and deed of said corporation, for the uses and purposes therein mentioned, and on oath stated that they were authorized to execute the said instrument.

WITNESS my hand and official seal hereto affixed the day and year first written above.

(SEAL)

Type Notary Name _Barbara J Catt_
Notary Public in and for the State
of Washington, residing at _Newcastle_
My commission expires: _2/15/2004_

STATE OF CALIFORNIA )
                     ) ss:
COUNTY OF _Los Angeles_ )

On this _21_ day of _April_, 2004, before me, a Notary Public in and for the State of California, duly commissioned and sworn, personally appeared _Danny Meizel_ and _____, to me known to be the President and Secretary, respectively, of AZ3, INC., a California corporation, the corporation named in and which executed the foregoing instrument; and they acknowledged to me that they signed the same as the free and voluntary act and deed of said corporation for the uses and purposes therein mentioned, being authorized so to do.

WITNESS my hand and official seal the day and year in this certificate above written.

JULIE LYNN OVERLOCK
Commission # 1324551
Notary Public - California
Los Angeles County
My Comm. Expires Oct 8, 2005

Type Notary Name _Julie Lynn Overlock_
Notary Public in and for the State
of California, residing at _Los Angeles_
My commission expires: _10/08/05_

B.C.B.G. Second Lease Addendum
[/BA040760026.DOC]                    - 4 -                    04/06/04

THIRD LEASE ADDENDUM

THIS THIRD LEASE ADDENDUM is made and entered into this _28th_ day of ~~March,~~ *April* 2006, between BELLEVUE SQUARE MANAGERS, INC., a Washington corporation ("Landlord"), and BCBG Max Azria Group, Inc., a California corporation (the "Tenant").

## RECITALS

A.    Landlord and Tenant entered into a non-residential Lease and First Lease Addendum, each dated August 23, 1996, and Second Lease Addendum dated April 14, 2004 (collectively referred to as the "Lease") for Space 122, under the Trade Name B.C.B.G., at Bellevue Square, Bellevue, Washington, which leased space is more specifically described in the Lease.

B.    Landlord and Tenant intend, by the execution and delivery of this Addendum, to amend and supplement the Lease in certain material respects which shall include (i) revising the Trade Name; (ii) extending the Lease Term and Expiration Date; (iii) revising the Minimum Rent, and (iv) providing for a remodel of the Leased Premises.

C.    Unless otherwise noted, all capitalized terms herein have the same meanings as set forth in the Lease.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Landlord and Tenant hereby amend and supplement the Lease as follows:

1.    Section 1.1. The following provisions of Section 1.1 of the Lease are hereby amended and/or added in their entirety to read as follows:

PERMITTED TRADE NAME:

BCBG Max Azria

LEASE TERM:

Two Hundred Four (204) calendar months, commencing November 1, 1996, which includes an additional Ninety-six (96) calendar months commencing November 1, 2005 and expiring on October 31, 2013.

EXPIRATION DATE:

October 31, 2013.

MINIMUM RENT:

(a)  The last paragraph of the Minimum Rent section of the Lease is amended in its entirety to read as follows:

From and including November 1, 2002, through and including (i) August 31, 2006 *or* (ii) upon completion of the Tenant's 2006 remodel of the Leased Premises, whichever shall first occur, Minimum Rent shall be Fifty-one and 00/100 Dollars ($51.00) per square foot per annum or Nine Thousand Seven Hundred Eighty-three and 50/100 Dollars ($9,783.50) per month.

(b)  The following paragraphs are hereby added to the end of the Minimum Rent section of the Lease to read as follows:

From and including (i) September 1, 2006 *or* (ii) upon completion of the Tenant's 2006 remodel of the Leased Premises, whichever shall first occur, through and including October 31, 2008, Minimum Rent shall be Fifty-five and 00/100 Dollars ($55.00) per square foot per annum or Ten Thousand Five Hundred Fifty and 83/100 Dollars ($10,550.83) per month.

From and including November 1, 2008, through and including October 31, 2010, Minimum Rent shall be Fifty-seven and 00/100 Dollars ($57.00) per square foot per annum or Ten Thousand Nine Hundred Thirty-four and 50/100 Dollars ($10,934.50) per month.

From and including November 1, 2010, through and including the Expiration Date above, Minimum Rent shall be Sixty and 00/100 Dollars ($60.00) per square foot per annum or Eleven Thousand Five Hundred Ten and 00/100 Dollars ($11,510.00) per month.

IMPROVEMENT ALLOWANCE:

(a)  Subject to Tenant's compliance with all of the terms and conditions of the Lease, Landlord agrees to contribute certain amounts toward the cost of Tenant's Improvements, including all sales and other applicable taxes but *not* including furniture, trade fixtures and equipment, which shall be Tenant's sole cost and responsibility (the "Improvement Allowance"). Landlord's Improvement Allowance shall be used exclusively for Tenant's Improvements and is limited to Thirty-one Thousand Seven Hundred and No/100 Dollars

maintained, serviced or cleaned by Landlord pursuant to Section 10.4 below) all HVAC and refrigeration equipment serving the Leased Premises including but not limited to all exhaust fans, make-up air units, grease exhaust fans, grease exhaust hoods and duct and return air grills, which HVAC-related work shall be pursuant to a service contract with a company approved in advance by Landlord; (viii) periodically clean all exhaust fans and ducting discharging grease laden vapors (the frequency of said cleaning to be determined by Landlord); (ix) maintain and service the chemical feed system serving fixtures, equipment and piping serving the Leased Premises where grease may be introduced into the sewage system, which maintenance and service work shall be performed by a company approved in advance by Landlord; (x) maintain at all times proper thermostat settings within the Leased Premises; and (xi) maintain all systems (such as electrical, lighting, heating and plumbing) or portions thereof that exclusively serve the Leased Premises, but are located outside the Leased Premises—, and (xii) ensure that the HVAC system serving the Leased Premises remains operational at all times during which the Leased Premises is required to be open to the public.

      10.    Section 10.4 Maintenance and Repair by Tenant. Section 10.1 of the Lease is hereby amended to read as follows:

Landlord shall provide periodic maintenance, service, and repair for HVAC units serving the Leased Premises and Common Areas and Facilities of the Shopping Center. This shall include periodic filter changes; refrigerant refills; routine inspections; replacement or repair of belts, bearings, compressor and fan motors, dryer units, sight glasses, shives, cooling systems, condenser and evaporator coils, thermostats, and relay connections. The cost of such maintenance, service and repairs shall be included in the Other Charges described in Section 4.3 above. Landlord reserves the right to discontinue such service upon reasonable notice to Tenant, and thereafter, Tenant shall be responsible for the cost thereof.

      11.    Section 13.5 Rules and Regulations. Section 13.5 of the Lease is hereby amended to read as follows:

      13.5    Rules and Regulations.

      Tenant shall comply and cause Tenant's employees, agents, contractors and licensees to comply with the rules and regulations that Landlord may from time to time promulgate and/or modify regarding use and operation of the Common Areas and Facilities of the Shopping Center and the Leased Premises. A copy of the rules and regulations in effect as of the date of the Lease is being provided to Tenant at the time of execution of the Lease, and Tenant hereby acknowledges receipt of the same, which are incorporated herein by this reference. The parties recognize and acknowledge that, as circumstances and conditions at the Shopping Center change over time during the Lease Term, Landlord may determine, in its sole and complete discretion, that it is necessary or appropriate to modify the rules and regulations. Accordingly, the rules and regulations may be modified by Landlord from time to time hereafter

and, when so modified, shall become binding upon the parties hereto without further amendment of the Lease, upon delivery of a copy thereof to Tenant.  Landlord shall not be responsible to Tenant for the nonperformance of such rules and regulations by any other tenants or occupants of space in the Shopping Center.  Such rules and regulations shall not conflict with any of the provisions of the Lease.

        12.   <u>Section 24 Signs</u>.  Section 24 of the Lease is hereby amended to read as follows:

        24.   SIGNS.

Tenant shall not place or suffer to be placed on the exterior walls of the Leased Premises or upon the roof or any exterior door or wall or on or within 18 inches of the exterior or interior of any window thereof any sign, awning, canopy, marquee, advertising matter, decoration, letter or other thing of any kind (exclusive of the signs, if any, which may be provided for as part of Tenant's Additional Improvements and which have been approved by Landlord.)  The appearance of the Shopping Center and form and content of communication to customers and others at the Shopping Center being of concern both to Landlord and other tenants, Landlord hereby reserves the right to require Tenant to modify or remove the content of any sign, placard, poster, videotape image, audio recording or other means of verbal or aural communications that may be seen or heard (in the Common Area) by the public, that Tenant may place or cause or permit to be placed in or about the Leased Premises.  All signage in or about the Leased Premises is further subject to rules and regulations Landlord may from time to time promulgate and/or modify regarding use and operation of the Leased Premises, which rules and regulations are more specifically referred to in Section 13.5, of the Lease.

        13.   <u>Section 25 Displays</u>.  Section 25 of the Lease is hereby amended to read as follows:

        25.   DISPLAYS.

Tenant may not display or sell merchandise outside the defined exterior walls and permanent doorways of the Leased Premises, nor permit carts or racks or other similar devices within the control of Tenant to be placed or stored in such locations.  Tenant further agrees not to install any exterior lighting, amplifiers or similar devices or use in or about the Leased Premises, such as flashing lights, searchlights, loudspeakers, phonographs or radio broadcasts.  If music or any other audio transmission emanating from within the Leased Premises is objectionable or offensive (in the reasonable judgment of Landlord), Landlord may require Tenant to stop or decrease the volume of such sounds to a reasonable level, as determined by Landlord, and Tenant shall immediately comply therewith.  All signage in or about the Leased Premises is further subject to the rules and regulations Landlord may from time to time promulgate and/or modify regarding use and operation of the Leased Premises, which rules and

regulations are more specifically referred to in Section 13.5, of the Lease.

14.    <u>Section 26 No Auctions Or Distress Sales</u>.  Section 26 of the Lease is hereby amended to read as follows::

26.    <u>NO AUCTIONS OR DISTRESS SALES.</u>

Landlord and Tenant acknowledge that Tenant's use of the Leased Premises as a continuing business in compliance with the provisions of the Lease specifically including but not limited to the terms and provisions of Article 5 is an essential part of the bargained-for consideration of the Lease.  Tenant further acknowledges that its failure to comply with the terms of Article 5, including the failure to maintain the business within the Leased Premises as a going concern, will have a material adverse impact on Landlord and the other tenants of the Shopping Center. Therefore, it is an express condition and part of the consideration of the Lease that Tenant shall not conduct or permit to be conducted any sale by auction upon or from the Leased Premises, whether the auction is voluntary, involuntary, pursuant to any assignment for the payment of creditors, or pursuant to any bankruptcy or other insolvency proceeding. No distress sales of any nature may be conducted on the Leased Premises, such as for example but not limited to, "auction," "fire," "bankruptcy," "going out of business," "lost our lease," "moving," "store closing," "smoke (or other casualty) damage," sale. Additional but not exclusive examples of distress sales are discount sales or "entire store" sales.  Notwithstanding the above, Tenant may conduct no more than three (3) such discount or entire store sales (i.e., where the sales price of substantially all of the merchandise in the Leased Premises is discounted by fifty percent (50%) or more),within a calendar year, so long as such sales do not take place within thirty (30) days of each other, and the duration of which does not exceed fifteen (15) consecutive days.  Signs displayed in the Leased Premises, or radio, television, newspaper, or other advertising, of such distress sales to take place at the Leased Premises are prohibited.  Signs indicating the store or Leased Premises are for sale, assignment or subletting displayed in or on the Leased Premises are likewise prohibited.  The violation of this Section shall be a material breach of the Lease and shall immediately entitle Landlord to the rights and remedies set forth in Section 16.2.  Nothing herein shall be deemed to prevent Tenant from conducting the types of seasonal and promotional sales conducted in substantially all of Tenant's other retail stores so long as such sales are otherwise in compliance with this Section 26.

15.    <u>Section 30.7 Notices</u>.  The reference in Section 30.7 to "and if to Tenant, shall be delivered or mailed by registered or certified mail to Tenant at the Leased Premises" shall be revised to read "and if to Tenant, shall be delivered or mailed by registered or certified mail to Tenant at BCBG Max Azria Group, Inc., c/o Legal Department, 2761 Fruitland Avenue, Vernon, California, 90058, or at such other place as Tenant may in writing from time to time direct to Landlord."

16.   <u>Remaining Provisions</u>.  All other provisions of the Lease remain in full force and effect.

IN WITNESS WHEREOF, the parties hereto have executed this instrument the day and year first above set forth.

LANDLORD                                        TENANT

BELLEVUE SQUARE MANAGERS, INC.,                 BCBG Max Azria Group, Inc.,
a Washington corporation                        a California corporation

By _____                 By _____
~~R. Kemper Freeman, Jr.~~  *James E. Melby Vice President*    Brian Fleming
~~President~~                                    Its   C.F.O.

By _____                 By _____
    Richard S. Sprague                          _____
    Secretary                                   Its _____

STATE OF WASHINGTON )
                     ) ss:
COUNTY OF KING       )

On this ~28th~ day of ~April~ , 2006, before me, the undersigned, a Notary Public in and for the State of Washington, duly commissioned and sworn, personally appeared ~F.~ *James E. Melby* ~KEMPER FREEMAN, JR.~ and ~RICHARD S. SPRAGUE~, to me known to be the *Vice* President and ~Secretary, respectively,~ of BELLEVUE SQUARE MANAGERS, INC., the corporation that executed the foregoing instrument, and acknowledged the said instrument to be the free and voluntary act and deed of said corporation, for the uses and purposes therein mentioned, and on oath stated that they were authorized to execute the said instrument.

WITNESS my hand and official seal hereto affixed the day and year first written above.

(SEAL)

Type Notary Name *Catine L. Blumenthal*
Notary Public in and for the State
of Washington, residing at *Bellevue*
My commission expires: *3-29-08*

STATE OF ~CALIFORNIA~          )
                              ) ss:
COUNTY OF LOS ANGELES         )

On this 21 day of April , 2006, before me, a Notary Public in and for the State of California, duly commissioned and sworn, personally appeared Brian Fleming and _____, to me known to be the CFO and _____, respectively, of BCBG Max Azria Group, Inc., a California corporation, the corporation named in and which executed the foregoing instrument; and ~they~ *he* acknowledged to me that ~they~ signed the same as the free and voluntary act and deed of said corporation for the uses and purposes therein mentioned, being authorized so to do.

WITNESS my hand and official seal the day and year in this certificate above written.

(SEAL)

JULIE OVERLOCK
Commission # 1616666
Notary Public - California
Los Angeles County
My Comm. Expires Oct 28, 2009

Type Notary Name *Julie Overlock*
Notary Public in and for the State
of California, residing at 2105 Huntman lane
*R.B., CA 90278*
My commission expires: 10/28/2009

BCBG Third Lease Addendum
[33120-0022-000000/BCBG.doc]

- 13 -

3/31/06

621

FOURTH LEASE ADDENDUM

THIS FOURTH LEASE ADDENDUM (the "Addendum") is made and entered into this __11__ day of ___July___, 2013, between BELLEVUE SQUARE, LLC, a Washington limited liability company, ("Landlord"), successor in interest to BELLEVUE SQUARE MANAGERS, INC., a Washington corporation ("BSM"), and BCBG MAX AZRIA GROUP, INC., a California corporation ("Tenant").

RECITALS

A.    BSM and Tenant entered into a non-residential Lease and First Lease Addendum, each dated August 23, 1996, a Second Lease Addendum dated April 14, 2004, and a Third Lease Addendum dated April 28, 2006 (collectively referred to as the "Lease"), for Space 122 at Bellevue Square, Bellevue, Washington, which leased space is more specifically described in the Lease.

B.    On or about January 1, 2008, BSM assigned all of its interest in the Lease to Landlord, and BSM was automatically relieved of any and all obligations and liabilities under the Lease pursuant to Section 30.15 thereof.

C.    Landlord and Tenant intend, by the execution and delivery of this Addendum, to amend and supplement the Lease in certain material respects which shall include but not be limited to (i) relocating Tenant from Space 122 to Space 163; (ii) extending the Lease Term and providing for a new Expiration Date; (iii) revising the Minimum Rent for the extended Lease Term; and (iv) providing for certain tenant improvements.

D.    Unless otherwise noted, all capitalized terms herein have the same meanings as set forth in the Lease.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Landlord and Tenant hereby amend and supplement the Lease as follows:

1.    Section 1.1. Basic Lease Provisions.  The following provisions of Section 1.1 of the Lease are hereby amended, replaced, and/or added in their entirety to read as follows:

LANDLORD:

Bellevue Square, LLC, a Washington limited liability company

LEASED PREMISES:

Space 122 containing Two Thousand Three Hundred Two (2,302) square feet of Floor Area within the Shopping Center, from the Commencement Date through and including the day prior to the Rent Commencement Date for Space 163.

Space 163 containing Three Thousand Five Hundred Ninety-eight (3,598) square feet of Floor Area within the Shopping Center from the Possession Date for Space 163 through and including the Expiration Date below.

LEASE TERM:

From the Commencement Date of the Lease through and including the Expiration Date below.

EXPIRATION DATE:

October 31, 2023.

POSSESSION DATE FOR SPACE 163:

August 1, 2013.

RENT COMMENCEMENT DATE FOR SPACE 163:

The earlier of: (i) ninety (90) days following the Possession Date; or (ii) upon Tenant's opening for public business in Space 163.

MINIMUM RENT:

(a)  The reference to "Expiration Date" in the last paragraph of the Minimum Rent section of the Lease is hereby amended to read "the day prior to the Rent Commencement Date For Space 163".

(b)  The following paragraphs are hereby added at the end of the Minimum Rent section of the Lease to read as follows:  [Based on 3,598 square feet]

From and including the Rent Commencement Date for Space 163 through and including October 31, 2014, Minimum Rent for Space 163 shall be Sixty-eight and 00/100 Dollars ($68.00) per square foot per annum or Twenty Thousand Three Hundred Eighty-eight and 67/100 Dollars ($20,388.67) per month.

From and including November 1, 2014 through and including October 31, 2015, Minimum Rent for Space 163 shall be Seventy and 04/100 Dollars ($70.04) per square foot per annum or Twenty-one Thousand and 33/100 Dollars ($21,000.33) per month.

From and including November 1, 2015 through and including October 31, 2016, Minimum Rent for Space 163 shall be Seventy-two and 14/100 Dollars ($72.14) per square foot per annum or Twenty-one Thousand Six Hundred Twenty-nine and 98/100 Dollars ($21,629.98) per month.

From and including November 1, 2016 through and including October 31, 2017, Minimum Rent for Space 163 shall be Seventy-four and 30/100 Dollars ($74.30) per square foot per annum or Twenty-two Thousand Two Hundred Seventy-seven and 62/100 Dollars ($22,277.62) per month.

From and including November 1, 2017 through and including October 31, 2018, Minimum Rent for Space 163 shall be Seventy-six and 53/100 Dollars ($76.53) per square foot per annum or Twenty-two Thousand Nine Hundred Forty-six and 25/100 Dollars ($22,946.25) per month.

From and including November 1, 2018 through and including October 31, 2019, Minimum Rent for Space 163 shall be Seventy-eight and 83/100 Dollars ($78.83) per square foot per annum or Twenty-three Thousand Six Hundred Thirty-five and 86/100 Dollars ($23,635.86) per month.

From and including November 1, 2019 through and including October 31, 2020, Minimum Rent for Space 163 shall be Eighty-one and 19/100 Dollars ($81.19) per square foot per annum or Twenty-four Thousand Three Hundred Forty-three and 47/100 Dollars ($24,343.47) per month.

From and including November 1, 2020 through and including October 31, 2021, Minimum Rent for Space 163 shall be Eighty-three and 63/100 Dollars ($83.63) per square foot per annum or Twenty-five Thousand Seventy-five and 06/100 Dollars ($25,075.06) per month.

From and including November 1, 2021 through and including October 31, 2022, Minimum Rent for Space 163 shall be Eighty-six and 14/100 Dollars ($86.14) per square foot per annum or Twenty-five Thousand Eight Hundred Twenty-seven and 64/100 Dollars ($25,827.64) per month.

From and including November 1, 2022 through and including the Expiration Date, Minimum Rent for Space 163 shall be Eighty-eight and 72/100 Dollars ($88.72) per square foot per annum or Twenty-six Thousand Six Hundred One and 21/100 Dollars ($26,601.21) per month.

(vi)  If Tenant breaches or defaults under any of the terms and provisions of the Lease during the Lease Term and the Lease is terminated or rejected, then in addition to all other remedies of Landlord set forth in the Lease, Landlord may recover the unamortized portion of Landlord's Contribution.  The period of amortization shall be the term of the Lease and such amortization shall be made on a straight-line basis.  Landlord and Tenant specifically intend the recovery of Landlord's Contribution pursuant to the preceding sentence shall not be limited or impaired by Section 502 or other provision of the Bankruptcy Code.  The foregoing shall be deemed to be a financial accommodation of the type referenced in 11 USC §365(c)(2) and a material and substantial part of this lease transaction.

5.    Current Space 122.  Notwithstanding anything in the Lease to the contrary, Tenant shall continue to occupy Space 122 through and including the day prior to the Rent Commencement Date For Space 163, at which time Tenant shall vacate and surrender Space 122 in the condition required under the Lease.

6.    Current Tenant.  Tenant is aware that Space 163 is currently occupied by another tenant or tenants (the "Current Tenant") and the Current Tenant may fail or refuse to vacate the Leased Premises and relinquish all claims to the Leased Premises prior to the Possession Date. Notwithstanding the foregoing, Landlord shall use diligent good faith efforts to ensure that the Current Tenant vacates Space 163 no later than the Possession Date.  If the Current Tenant fails to vacate Space 163 by the Possession Date, Landlord shall not be liable for any damages, injuries or claims that may be suffered by Tenant relating to or rising out of directly or indirectly, the Current Tenant's failure or refusal to vacate and release all interest in the Leased Premises.

7.    Remaining Provisions.  Except as expressly modified in this Addendum, all other provisions of the Lease remain in full force and effect.  In the event of a conflict between the terms of this Addendum and the Lease, the terms of this Addendum shall control.

IN WITNESS WHEREOF, the parties hereto have executed this instrument the day and year first above set forth.

LANDLORD

BELLEVUE SQUARE, LLC,
a Washington limited liability company

By KEMPER DEVELOPMENT
    COMPANY, a Washington corporation,
Its Manager

By _____
    James E. Melby
    President

TENANT

BCBG MAX AZRIA GROUP, INC.,
a California corporation

By _____
Its _SVP, Real Estate_____


By _____
Its _____

STATE OF WASHINGTON )
                         ) ss:

COUNTY OF KING        )

       On this _11th_ day of _July_, 2013, before me, the undersigned, a Notary Public in and for the State of Washington, duly commissioned and sworn, personally appeared JAMES E. MELBY, to me known to be the President of KEMPER DEVELOPMENT COMPANY, a Washington corporation, as the Manager of BELLEVUE SQUARE, LLC, a Washington limited liability company, the limited liability company that executed the foregoing instrument, and acknowledged the said instrument to be the free and voluntary act and deed of said limited liability company, for the uses and purposes therein mentioned, and on oath stated that he was authorized to execute the said instrument.

       WITNESS my hand and official seal hereto affixed the day and year first written above.

Type Notary Name _Barbara Catt_
Notary Public in and for the State
(SEAL)                of Washington, residing at _Newcastle_
My commission expires: _4/10/14_

STATE OF CALIFORNIA         )
                              ) ss:

COUNTY OF LOS ANGELES   )

       On this _3rd_ day of _July_, 2013, before me, a Notary Public in and for the State of California, duly commissioned and sworn, personally appeared _Danny Moizel_ and _____, to me known to be the _SVP, Real Estate_ and _____, respectively, of BCBG MAX AZRIA GROUP, INC., a California corporation, the corporation named in and which executed the foregoing instrument; and they acknowledged to me that they signed the same as their free and voluntary act and deed of said corporation for the uses and purposes therein mentioned, being authorized so to do.

       WITNESS my hand and official seal the day and year in this certificate above written.

Type Notary Name _F. Lopez-Garcia_
Notary Public in and for the State
(SEAL)                of California, residing at _Los Angeles_
My commission expires: _July 21, 2013_

F. LOPEZ-GARCIA
Commission # 1855376
Notary Public - California
Los Angeles County
My Comm. Expires Jul 21, 2013

BCBG Fourth Lease Addendum
33120-0022/LEGAL26039351.1

-9-

# ACKNOWLEDGMENT

State of California
County of _____ Los Angeles _____ )

On __July 3, 2013__ before me, _F. Lopez-Garcia, Notary Public_
(insert name and title of the officer)

personally appeared __Danny Moizel__,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____    **(Seal)**

F. LOPEZ-GARCIA
Commission # 1855376
Notary Public - California
Los Angeles County
My Comm. Expires Jul 21, 2013

# FIFTH LEASE ADDENDUM

THIS FIFTH LEASE ADDENDUM (the "Addendum") is made and entered into this _28_ day of _March_, 2014, between BELLEVUE SQUARE, LLC, a Washington limited liability company, ("Landlord"), and BCBG MAX AZRIA GROUP, LLC, a Delaware limited liability company ("Tenant"), successor in interest to BCBG MAX AZRIA GROUP, INC., a California corporation.

## RECITALS

A.    Bellevue Square Managers, Inc., Landlord's predecessor in interest, and Tenant's predecessor in interest entered into a non-residential Lease and First Lease Addendum, each dated August 23, 1996, a Second Lease Addendum dated April 14, 2004, and a Third Lease Addendum dated April 28, 2006; and Landlord and Tenant's predecessor in interest entered into a Fourth Lease Addendum dated July 11, 2013, and, together with Tenant, an Assignment, Assumption, and Amendment of Lease dated March 18, 2014 (collectively referred to as the "Lease"), for Space 163 at Bellevue Square, Bellevue, Washington, which leased space is more specifically described in the Lease.

B.    Landlord and Tenant intend, by the execution and delivery of this Addendum, to amend and supplement the Lease in certain material respects which shall include, but not be limited to, revising the Expiration Date.

C.    Unless otherwise noted, all capitalized terms herein have the same meanings as set forth in the Lease.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Landlord and Tenant hereby amend and supplement the Lease as follows:

1.    Section 1.1. Basic Lease Provisions.  The following provision of Section 1.1 of the Lease is hereby amended in its entirety to read as follows:

EXPIRATION DATE:

January 31, 2024.

2.    Remaining Provisions.  All other provisions of the Lease remain in full force and effect.

BCBG Fifth Lease Addendum
33120-0022/LEGAL29678568.1                           - 1 -

IN WITNESS WHEREOF, the parties hereto have executed this instrument the day and year first above set forth.

LANDLORD

BELLEVUE SQUARE, LLC,
a Washington limited liability company

By KEMPER DEVELOPMENT
   COMPANY, a Washington corporation,
Its Manager

By _____
   James E. Melby
   President

TENANT

BCBG MAX AZRIA GROUP, LLC, a
Delaware limited liability company

By _____
   Danny Moizel
Its Sr.Vice President, Real Estate

By _____

Its _____

STATE OF WASHINGTON )
                         ) ss:
COUNTY OF KING     )

      On this 28 day of March, 2014, before me, the undersigned, a Notary Public in and for the State of Washington, duly commissioned and sworn, personally appeared JAMES E. MELBY, to me known to be the President of KEMPER DEVELOPMENT COMPANY, a Washington corporation, as the Manager of BELLEVUE SQUARE, LLC, a Washington limited liability company, the limited liability company that executed the foregoing instrument, and acknowledged the said instrument to be the free and voluntary act and deed of said limited liability company, for the uses and purposes therein mentioned, and on oath stated that he was authorized to execute the said instrument.

      WITNESS my hand and official seal hereto affixed the day and year first written above.

(SEAL)

Type Notary Name _Katherine Kirkness_
Notary Public in and for the State
of Washington, residing at _Shoreline_
My commission expires: _9-20-17_

STATE OF CALIFORNIA       )
                              ) ss:
COUNTY OF LOS ANGELES   )

      On this 25th day of March, 2014, before me, a Notary Public in and for the State of California, duly commissioned and sworn, personally appeared Danny Moizel and ——————, to me known to be the SVP Real Estate and ——————, respectively, of BCBG MAX AZRIA GROUP, LLC, a Delaware limited liability company, the limited liability company named in and which executed the foregoing instrument; and they acknowledged to me that they signed the same as their free and voluntary act and deed of said limited liability company for the uses and purposes therein mentioned, being authorized so to do.

      WITNESS my hand and official seal the day and year in this certificate above written.

F. LOPEZ-GARCIA
Commission # 2030713
Notary Public - California
Los Angeles County
My Comm. Expires Jul 21, 2017

Type Notary Name _F. Lopez-Garcia_
Notary Public in and for the State
of California, residing at _Los Angeles_
My commission expires: _July 21, 2014_

# ACKNOWLEDGMENT

State of California
County of _____ Los Angeles _____ )

On __March 25, 2014_____ before me, __F. Lopez-Garcia, Notary Public_____

(insert name and title of the officer)

personally appeared ___Danny Moizel_____

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____    **(Seal)**

F. LOPEZ-GARCIA
Commission # 2030713
Notary Public - California
Los Angeles County
My Comm. Expires Jul 21, 2017

# EXHIBIT B

**FILED**

17 FEB 03 AM 10:15

KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE NUMBER: 17-2-02483-0 SEA

1

2

3

4

5

6
IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF KING

7
BELLEVUE SQUARE, LLC, a Washington
limited liability company,

8

NO 17-2-02483-0 SEA

9
Plaintiff,

DECLARATION OF SERVICE

10
vs.

11
BCBG MAX AZRIA GROUP, LLC, a
Delaware limited liability company,

12
Defendants.

13
    I, Megan Folsom, hereby declare under then penalty of perjury under the laws of the State of

14
Washington that I have served the foregoing document:

15
    1.    **NOTICE OF LEASE DEFAULT** on BCBG Max Azria, on January 23, 2017 at

16
        approximately 11:30 A.M. at the location of Bellevue Square, Space 163, Bellevue, WA

17
        98004.  A true and correct copy of this document is attached as Exhibit A.

        2.    The person I served identified himself as Walter Torres, the BCBG Store Manager, and

18
        was the highest ranked professional available at the store. He was approximately 5'11",

19
        190 pounds, had brown hair, and was of Hispanic descent.

20
    3.    I have mailed true and correct copies of the document via U.S. Postal Service First Class

        Mail and via Federal Express Overnight Delivery upon the following individual(s) listed

21
        by the following means:

22

23

24

25

DECLARATION OF SERVICE - 1

NOLD ♦ MUCHINSKY PLLC
10500 NE 8th Street, Suite 930
Bellevue, WA  98004
Tel (425) 289-5555
Fax (425) 289-6666

Copy to:
BCBG
163 Bellevue Square
Bellevue, WA 98004

[x] U.S. Postal Service (First Class Mail)
[ ] Facsimile to _____
[ ] Federal Express (Overnight Delivery)
[ ] Hand Delivery
[ ] Legal Messenger for service by
[ ] E-Filed
[ ] E-Service

Copy to:
BCBG Max Azria Group, LLC
2761 Fruitland Avenue
Vernon, California 90058

[x] U.S. Postal Service (First Class, Certified)
[ ] Facsimile to _____
[ ] Federal Express (Overnight Delivery)
[ ] Hand Delivery
[ ] Legal Messenger for service by
[ ] E-Filed
[ ] E-Service

I am over the age of 18, competent to testify, not a party to this action, and employed by
NOLD MUCHINSKY.

DATE: 1/23/2017

By: _Megan Folsom_
Name: Megan Folsom
Title: Paralegal

DECLARATION OF SERVICE - 2

**NOLD ♦ MUCHINSKY PLLC**
10500 NE 8th Street, Suite 930
Bellevue, WA 98004
Tel (425) 289-5555
Fax (425) 289-6666

# NOLD ♦ MUCHINSKY PLLC
### Attorneys at Law

David A. Nold
dnold@noldmuchlaw.com

Bellevue Place, Suite 930
10500 NE 8th Street
Bellevue, Washington  98004

TEL: 425-289-5555
FAX: 425-289-6666

January 23, 2017

**SERVED AND/OR CONSPICUOUSLY POSTED AT PREMISES
AND VIA FIRST CLASS MAIL**

BCBG
163 Bellevue Square
Bellevue, WA 98004

**VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED**

BCBG Max Azria Group, LLC
2761 Fruitland Avenue
Vernon, California 90058

Re:    Notice of Lease Default – Bellevue Square

Ladies and Gentlemen:

This firm represents Bellevue Square, LLC and the Bellevue Square Merchants Association (collectively "Landlord"). Landlord hereby provides this Notice with respect to the lease dated August 23, 1996, as amended and assigned ("Lease") between parties-in-interest Landlord and BCBG Max Azria Group, LLC, a Delaware limited liability company ("Tenant"), as to its tenancy of premises commonly known as Bellevue Square, Space 163, Bellevue, Washington, 98004 ("Leased Premises"), under the trade name "BCBG".

Tenant is hereby notified that it is in monetary default of its obligations pursuant to the Lease. Tenant has not paid the following sums due and owing for January 2017:

| | |
|---|---|
| Amount Due to Bellevue Square, LLC: | $66,138.35 |
| Amount Due to Bellevue Square Merchants Association: | $2,055.30 |
| Attorney Fees and Costs (payable to Bellevue Square, LLC): | $620.00 |
| Total: | $68,813.65 |

BCBG Max Azria Group, LLC
January 23, 2017
Page 2

The foregoing monetary default constitutes a default under the Lease pursuant to Section 16.1(b). In order to cure the monetary default, Tenant is hereby directed to tender the foregoing sums within five (5) days of Tenant's receipt of this Notice. In the alternative, Tenant may vacate the Leased Premises within that time. Vacation of the Leased Premises does not relieve Tenant from its obligations pursuant to the Lease; including, by way of example and not by way of limitation, liability for past and future rent and other monetary amounts due pursuant to the Lease.

If these defaults are not addressed within the timeframe set forth above, Landlord will elect among its remedies set forth in Section 16.2 of the Lease; including, by way of example and not by way of limitation, the commencement of an unlawful detainer action to restore possession of the Leased Premises to Landlord. Landlord does not waive any rights under the Lease or Washington law not enumerated herein.

This notice is executed and served in accordance with RCW 59.12, which provides that a tenant is in unlawful detainer of real property if the tenant fails to comply with the demands of a notice such as this. A commercial tenant who is found to be unlawfully detaining real property after nonpayment of rent is liable for double the amount of damages occasioned to the plaintiff because of such unlawful detainer. In addition, pursuant to Paragraph 16.3 of the Lease, you will liable for all attorneys' fees and costs incurred as a result of the necessity to refer this matter to an attorney for the enforcement of lease terms and conditions.

Very truly yours,

David A. Nold

cc:     Bellevue Square, LLC

# EXHIBIT C

# NOLD ♦ MUCHINSKY PLLC

## Attorneys at Law

David A. Nold
dnold@noldmuchlaw.com

Bellevue Place, Suite 930
10500 NE 8th Street
Bellevue, Washington  98004

TEL: 425-289-5555
FAX: 425-289-6666

January 30, 2017

**VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED
AND VIA FEDERAL EXPRESS, OVERNIGHT DELIVERY**

BCBG Max Azria Group, LLC
c/o Legal Department
2761 Fruitland Avenue
Vernon, California 90058

RE:    Termination of Lease – Bellevue Square Shopping Center, Bellevue, Washington

Dear Ladies and Gentlemen:

This firm represents Bellevue Square, LLC and Bellevue Square Merchants Association (collectively "Landlord"). Landlord hereby provides this Notice with respect to the lease dated August 23, 1996, as amended and assigned ("Lease") between parties-in-interest Landlord and BCBG Max Azria Group, LLC, a Delaware limited liability company ("Tenant"), as to its tenancy of premises commonly known as Bellevue Square, Space 163, Bellevue, Washington ("Leased Premises"), under the trade name "BCBG".

Tenant was served with a Notice of Default on January 23, 2017, demanding either the payment of past due Lease charges or the vacation of the Leased Premises. Tenant has neither cured nor vacated within the period provided. This constitutes a material breach of Section 16.1(b) of the Lease. Pursuant to Section 16.2, Landlord has exercised its right to terminate this Lease effective **January 30, 2017**.

This termination does not relieve Tenant of its Lease obligations to pay past due rent and all other charges and damages as set forth in the Lease, nor does this notice constitute a waiver of any of Landlord's other rights contained in the Lease.

Very truly yours,

David A. Nold

cc:    Bellevue Square, LLC

# EXHIBIT D

FILED

17 FEB -3 AM 11:03

CERTIFIED COPY

EXP01

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF KING

BELLEVUE SQUARE, LLC, a Washington
limited liability company,

                Plaintiff,

    v.

BCBG MAX AZRIA GROUP, INC., a
California corporation,

                Defendant.

NO.  17-2-02483-0 SEA

TEMPORARY RESTRAINING ORDER
AND ORDER SETTING BOND AMOUNT

(CLERK'S ACTION REQUIRED)

    THIS MATTER having come before the Court upon the motion of the Plaintiff in the above-entitled action for a Temporary Restraining Order; and it appearing from the Complaint, the Motion for a Temporary Restraining Order, the Declaration of Robert Dallain, and the Declaration of Brian Muchinsky that there are reasonable grounds for the granting of such relief, that clear and irreparable harm will result if the instant relief is not granted, that Plaintiff has demonstrated a substantial likelihood of prevailing on the merits, and that reasonable notice under the circumstances was given of this hearing; now, therefore, it is hereby ORDERED AS FOLLOWS:

    1.  Defendant is hereby restrained from displaying any signs advertising or otherwise communicating a distress/store closing sale in violation of Section 26 of the Lease, or which otherwise violate Section 24 of the Lease governing signage.  The signs demonstrated on the photographs presented to the Court violate both of the foregoing provisions.  Defendant shall

ORDER TO SHOW CAUSE WHY JUDGMENT AND WRIT OF
RESTITUTION SHOULD NOT ISSUE -- 1

**Nold ♦ Muchinsky PLLC**
Bellevue Place, Suite 930
10500 NE 8th Street
Bellevue, WA 98004
425.289.5555 FAX 425.289.6666

1  remove all non-compliant signage within two hours of service of this order on the highest

2  ranking agent of Defendant at the Leased Premises. A copy of this order will also be provided to

3  Michael Jerbich in a manner reasonable calculated to effectuate immediate actual notice.

4  Defendant shall not advertise any distress sale as defined by the Lease. Breach of any of these

5  obligations shall constitute contempt of court and subject Defendant and any agent responsible

6  (including, but not limited to, A&G Realty Partners, LLC) to an order of contempt.

7      2.   Defendant may challenge this Order by separate motion, or may otherwise challenge it at

8  the show cause hearing set in this matter on February 17, 2017, at which time Defendant's right

9  to possession is also being adjudicated as set forth in a separate order.

10      3.   The relief ordered herein is conditioned on Plaintiff posting a TRO bond in the amount of

11  $5,000. $25,000 ①

12      DONE IN OPEN COURT this _____ day of February, 2017 at 2/3/ a.m./p.m.

13

14

15  JUDGE/COURT COMMISSIONER

16  Presented by:

17  NOLD MUCHINSKY PLLC

18  /s/ Brian M. Muchinsky

19  David A. Nold, WSBA #19009
    Brian M. Muchinsky, WSBA #31860
20  Attorneys for Plaintiff

21

22

23

24

25

ORDER TO SHOW CAUSE WHY JUDGMENT AND WRIT OF
RESTITUTION SHOULD NOT ISSUE – 2

I BARBARA MINER Clerk of the Superior Court of the State of Washington
for King County do hereby certify that this copy is a true and perfect transcript
of said original as it appears on file and of record in my office and of the whole
thereof IN TESTIMONY WHEREOF I have affixed this seal of said Superior
Court at my office at Seattle on this date

FEB 0 3 2017

BARBARA MINER Superior Court Clerk

By A. GALLARDO

Deputy Clerk

