**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BCBG MAX AZRIA GLOBAL HOLDINGS, | ) | Case No. 17-10466 (SCC) |
| LLC, *et al.*,[1] | ) | |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

### INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO ASSUME THE AGENCY AGREEMENT, (II) APPROVING PROCEDURES FOR STORE CLOSING SALES AND, (III) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an interim order (this "Interim Order"), (a) authorizing the Debtors to assume the Agency Agreement, (b) authorizing and approving the Store Closing Procedures, with such sales to be free and clear of all liens, claims, and encumbrances, and (c) granting related relief; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012; and that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: BCBG Max Azria Global Holdings, LLC (6857); BCBG Max Azria Group, LLC (5942); BCBG Max Azria Intermediate Holdings, LLC (3673); Max Rave, LLC (9200); and MLA Multibrand Holdings, LLC (3854).  The location of the Debtors' service address is:  2761 Fruitland Avenue, Vernon, California 90058.

[2]     Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

the Motion were appropriate under the circumstances and no other notice need be provided; and

this Court having reviewed the Motion and having heard the statements in support of the relief

requested therein at a hearing before this Court (the "Hearing"); and this Court having

determined that the legal and factual bases set forth in the Motion and at the Hearing establish

just cause for the relief granted herein; and upon all of the proceedings had before this Court; and

after due deliberation and sufficient cause appearing therefor:

**THE COURT HEREBY FINDS AND DETERMINES THAT:**

1.    The findings and conclusions set forth herein constitute the Court's findings of

fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this

proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings

of fact constitute conclusions of law, they are adopted as such.  To the extent any of the

following conclusions of law constitute findings of fact, they are adopted as such.

2.    The Debtors have advanced sound business reasons for seeking to assume the

Agency Agreement and adopt the Store Closing Procedures, on an interim basis subject to the

Final Hearing, as set forth in the Motion and at the Hearing, and entering into the Agency

Agreement is a reasonable exercise of the Debtors' business judgment and in the best interests of

the Debtors and their estates.

3.    The conduct of the Store Closings in accordance with the Store Closing

Procedures will provide an efficient means for the Debtors to dispose of the Store Closure

Assets.

4.    The Agency Agreement was negotiated, proposed, and entered into by the Agent

and the Debtors without collusion, in good faith, and from arm's-length bargaining positions.

5.     The assumption of the Agency Agreement on an interim basis is a sound exercise of the Debtors' business judgment.

6.     The relief set forth herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates and the Debtors have demonstrated good, sufficient, and sound business purposes and justifications for the relief approved herein.

7.     The Store Closings are in the best interest of the Debtors' estates.

8.     The entry of this Interim Order is in the best interest of the Debtors and their estates, creditors, and interest holders and all other parties in interest herein.

**IT IS HEREBY ORDERED THAT:**

9.     The Motion is granted on an interim basis as provided herein.

10.    The final hearing (the "Final Hearing") on the Motion shall be held on March 28, 2017, at 3:00 p.m., prevailing Eastern Time.  Any objections or responses to entry of a final order on the Motion shall be filed on or before 4:00 p.m., prevailing Eastern Time, on March 21, 2017, and shall be served on:  (a) the Debtors, BCBG Max Azria Global Holdings, LLC, 2761 Fruitland Avenue, Vernon, California 90058, Attn: Erica Alterwitz-Meierhans; (b) proposed counsel to the Debtors, Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois 60654, Attn:  Benjamin M. Rhode and John R. Luze; (c) counsel to the agent under the Debtors' proposed asset-based lending revolving debtor-in-possession credit facility and the Debtors' prepetition asset-based lending revolving credit facility lenders, Morgan, Lewis & Bockius LLP, One Federal Street, Boston, Massachusetts 02110, Attn: Marc R. Leduc, Matthew F. Furlong; (d) counsel to the administrative agent under the Debtors' proposed debtor-in-possession term loan credit facility and the Debtors' prepetition tranche B term loan lenders, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn: Matt Barr;

3

(e) counsel to the Debtors' prepetition tranche A term loan lenders, Curtis, Mallet-Prevost, Colt & Mosle LLP, 101 Park Avenue, New York, New York 10178-0061, Attn: Steven J. Reisman; (f) counsel to the Debtors' prepetition new tranche A term loan lenders, Winston & Strawn LLP, 200 Park Avenue, New York, New York 10166-4193, Attn: Jordan S. Traister; (g) counsel to any statutory committee appointed in these cases; and (h) the Office of The United States Trustee, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, New York 10014, Attn:  Brian Masumoto, Esq.  In the event no objections to entry of a final order on the Motion are timely received, this Court may enter such final order without need for the Final Hearing.

11.     The Debtors are authorized and empowered to take any and all further actions as may be reasonably necessary or appropriate to give effect to this Interim Order.

12.     To the extent of any conflict between this Interim Order, the Store Closing Procedures, and the Agency Agreement, the terms of this Interim Order shall control over all other documents and the Store Closing Procedures shall control over the Agency Agreement.

13.     Notwithstanding Bankruptcy Rule 6004(h), this Interim Order shall take effect immediately upon its entry.

**I.     Authority to Assume the Agency Agreement.**

14.     The assumption of the Agency Agreement by the Debtors pursuant to section 365 of the Bankruptcy Code is approved on an interim basis.  The Debtors are authorized to act and perform in accordance with the terms of the Agency Agreement, including, making payments required by the Agency Agreement to the Agent without the need for any application of the Agent or a further order of the Court.

15.     Subject to the restrictions set forth in this Interim Order and the Store Closing Procedures, the Debtors and the Agent hereby are authorized to take any and all actions as may

4

be necessary or desirable to implement the Agency Agreement and the Store Closings; and each of the transactions contemplated by the Agency Agreement, and any actions taken by the Debtors and the Agent necessary or desirable to implement the Agency Agreement and/or the Store Closings prior to the date of this Interim Order, hereby are approved and ratified.

## II.    Authority to Engage in Store Closings.

16.    The Debtors are authorized, on an interim basis pending the Final Hearing, pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code, to immediately continue and conduct the Store Closings in accordance with this Interim Order, the Store Closing Procedures and the Agency Agreement.

17.    The Store Closing Procedures are approved in their entirety on an interim basis.

18.    The Debtors are authorized to discontinue operations at the Stores in accordance with this Interim Order and the Store Closing Procedures.

19.    All entities that are presently in possession of some or all of the Merchandise or FF&E in which the Debtors hold an interest that are or may be subject to the Agency Agreement or this Interim Order hereby are directed to surrender possession of such Merchandise or FF&E to the Debtors or the Agent.

20.    Neither the Debtors nor the Agent nor any of their officers, employees, or agents shall be required to obtain the approval of any third party, including (without limitation) any Governmental Unit (as defined in Bankruptcy Code section 101(27)) or landlord, to conduct the Sale and to take the related actions authorized herein.

## III.    Conduct of the Sale.

21.    All newspapers and other advertising media in which the Store Closings may be advertised and all landlords are directed to accept this Interim Order as binding authority so as to authorize the Debtors and the Agent to conduct the Sale and the sale of Merchandise and FF&E

pursuant to the Agency Agreement, including, without limitation, to conduct and advertise the sale of the Merchandise and FF&E in the manner contemplated by and in accordance with this Interim Order, the Store Closing Procedures, and the Agency Agreement.

22.    The Debtors and Agent are hereby authorized to take such actions as may be necessary and appropriate to implement the Agency Agreement and to conduct the Store Closings without necessity of further order of this Court as provided in the Agency Agreement or the Store Closing Procedures, including, but not limited to, advertising the sale as a "store closing sale", "sale on everything", "everything must go", or similar-themed sales through the posting of signs (including the use of exterior banners at non-enclosed mall closing locations, and at enclosed mall closing locations to the extent the applicable closing location entrance does not require entry into the enclosed mall common area), use of sign-walkers and street signage; *provided*, *however*, that only Merchant-approved terminology will be used at each Store in connection with the Store Closings.

23.    Notwithstanding anything herein to the contrary, and in view of the importance of the use of sign-walkers, banners, and other advertising to the sale of the Merchandise and FF&E, to the extent that, prior to the Final Hearing, disputes arise during the course of such sale regarding laws regulating the use of sign-walkers, banners, or other advertising and the Debtors and the Agent are unable to resolve the matter consensually, any party may request an immediate telephonic hearing with this Court pursuant to these provisions.  Such hearing will, to the extent practicable, be scheduled initially no later than the earlier of (i) the Final Hearing or (ii) within two business days of such request.  This scheduling shall not be deemed to preclude additional hearings for the presentation of evidence or arguments as necessary.

24.     Except as expressly provided in the Agency Agreement, the sale of the Merchandise and FF&E shall be conducted by the Debtors and the Agent notwithstanding any restrictive provision of any lease, sublease, or other agreement relative to occupancy affecting or purporting to restrict the conduct of the Sale, the rejection of leases, abandonment of assets, or "going dark" provisions.  The Debtors and landlords of the closing locations are authorized to enter into agreements ("Side Letters") between themselves modifying the Store Closing Procedures without further order of the Court, and such Side Letters shall be binding as among the Debtors and any such landlords.  In the event of any conflict between the Store Closing Procedures, this Interim Order, and any Side Letter, the terms of such Side Letter shall control.

25.     Except as expressly provided for herein or in the Store Closing Procedures, no person or entity, including, but not limited to, any landlord, licensor, service providers, utilities, and creditor, shall take any action to directly or indirectly prevent, interfere with, or otherwise hinder consummation of the Sale, or the advertising and promotion (including the posting of signs and exterior banners or the use of sign-walkers) of such sales, and all such parties and persons of every nature and description, including, but not limited to, any landlord, licensor, service providers, utilities, and creditor and all those acting for or on behalf of such parties, are prohibited and enjoined from (i) interfering in any way with, obstructing, or otherwise impeding, the conduct of the Store Closings and/or (ii) instituting any action or proceeding in any court (other than in the Bankruptcy Court) or administrative body seeking an order or judgment against, among others, the Debtors, the Agent, or the landlords at the closing locations that might in any way directly or indirectly obstruct or otherwise interfere with or adversely affect the conduct of the Sale or other liquidation sales at the closing locations and/or seek to recover

damages for breach(es) of covenants or provisions in any lease, sublease, license, or contract based upon any relief authorized herein.

26.    In accordance with and subject to the terms and conditions of the Agency Agreement, the Agent shall have the right to use the Stores and all related Store services, furniture, fixtures, equipment, and other assets of the Debtors for the purpose of conducting the Sale, free of any interference from any entity or person, subject to compliance with the Store Closing Procedures and this Interim Order.

27.    All sales of Store Closure Assets shall be "as is" and final.  However, as to the Stores, all state and federal laws relating to implied warranties for latent defects shall be complied with and are not superseded by the sale of said goods or the use of the terms "as is" or "final sales."

28.    The Agent shall not be liable for sales taxes except as expressly provided in the Agency Agreement and the payment of any and all sales taxes is the responsibility of the Debtors.  The Debtors are directed to remit all taxes arising from the Sale to the applicable Governmental Units as and when due, provided that in the case of a bona fide dispute the Debtors are only directed to pay such taxes upon the resolution of the dispute, if and to the extent that the dispute is decided in favor of the applicable Governmental Unit.  For the avoidance of doubt, sales taxes collected and held in trust by the Debtors shall not be used to pay any creditor or any other party, other than the applicable Governmental Unit for which the sales taxes are collected.  The Agent shall collect, remit to the Debtors and account for sales taxes as and to the extent provided in the Agency Agreement.  This Interim Order does not enjoin, suspend, or restrain the assessment, levy or collection of any tax under state law, and does not constitute a declaratory judgment with respect to any party's liability for taxes under state law.

29.     Pursuant to section 363(f) of the Bankruptcy Code, the Agent, on behalf of the Debtors, is authorized to sell and all sales of Store Closure Assets, whether by the Agent or the Debtors, shall be free and clear of any and all of any liens, claims, encumbrances, and other interests; provided, however, that any such liens, claims, encumbrances, and other interests shall attach to the proceeds of the sale of the Store Closure Assets with the same validity, in the amount, with the same priority as, and to the same extent that any such liens, claims, and encumbrances have with respect to the Store Closure Assets, subject to any claims and defenses that the Debtors may possess with respect thereto and the Agent's fees and expenses (as provided in the Agency Agreement).

30.     To the extent that the Debtors propose to sell or abandon FF&E which may contain personal and/or confidential information about the Debtors' employees and/or customers (the "Confidential Information"), the Debtors shall remove the Confidential Information from such items of FF&E before such sale or abandonment.

31.     The Debtors and/or the Agent (as the case may be) are authorized and empowered to transfer Store Closure Assets among the Stores.  The Agent is authorized to sell the Debtors' FF&E and abandon the same, in each case, as provided for and in accordance with the terms of the Agency Agreement.

32.     Notwithstanding this or any other provision of this Order, nothing shall prevent or be construed to prevent the Agent (individually, as part of a joint venture, or otherwise) or any of its affiliates from bidding on the Debtors' assets not subject to the Agency Agreement pursuant to an agency agreement or otherwise ("Additional Assets").  The Agent is hereby authorized to bid on and guarantee or otherwise acquire such Additional Assets notwithstanding anything to

the contrary in the Bankruptcy Code or other applicable law, provided that such guarantee, transaction or acquisition is approved by separate order of this Court.

**IV.    Dispute Resolution Procedures with Governmental Units.**

33.    Nothing in this Order, the Agency Agreement or the Store Closing Procedures, releases, nullifies, or enjoins the enforcement of any liability to a governmental unit under environmental laws or regulations (or any associated liabilities for penalties, damages, cost recovery, or injunctive relief) to which any entity would be subject as the owner, lessor, lessee, or operator of the property after the date of entry of this Order.  Nothing contained in this Order, the Agency Agreement, or the Store Closing Procedures shall in any way (a) diminish the obligation of any entity to comply with environmental laws or (b) diminish the obligations of the Debtors to comply with environmental laws consistent with its rights and obligations as debtor in possession under the Bankruptcy Code.  The Store Closings shall not be exempt from laws of general applicability, including, without limitation, public health and safety, criminal, tax, labor, employment, environmental, antitrust, fair competition, traffic and consumer protection laws, including consumer laws regulating deceptive practices and false advertising (collectively, "General Laws").    Nothing in this Order, the Agency Agreement or the Store Closing Procedures, shall alter or affect obligations to comply with all applicable federal safety laws and regulations.  Nothing in this Order shall be deemed to bar any Governmental Unit (as such term is defined in section 101(47) of the Bankruptcy Code) from enforcing General Laws in the applicable non-bankruptcy forum, subject to the Debtors' rights to assert in that forum or before this Court that any such laws are not in fact General Laws or that such enforcement is impermissible under the Bankruptcy Code, this Order, or otherwise, pursuant to paragraph 31 herein.  Notwithstanding any other provision in this Order, no party waives any rights to argue any position with respect to whether the conduct was in compliance with this Order and/or any

applicable law, or that enforcement of such applicable law is preempted by the Bankruptcy Code. Nothing in this Order shall be deemed to have made any rulings on any such issues.

34.    To the extent that the sale of Store Closure Assets is subject to and Liquidation Sale Laws, including any federal, state, or local statute, ordinance, or rule, or licensing requirement directed at regulating "going out of business," "store closing," similar inventory liquidation sales, or bulk sale laws, including laws restricting safe, professional, and non-deceptive, customary advertising such as signs, banners, posting of signage, and use of sign-walkers solely in connection with the sale and including ordinances establishing license or permit requirements, waiting periods, time limits or bulk sale restrictions that would otherwise apply solely to the sale of the Store Closure Assets, the dispute resolution procedures in this section shall apply.

(i)    Provided that the Store Closings are conducted in accordance with the terms of this Order and the Store Closing Procedures, and in light of the provisions in the laws of many Governmental Units that exempt court-ordered sales from their provisions, the Debtors shall be presumed to be in compliance with any Liquidation Sale Laws and, subject to Paragraph 10 hereof, are authorized to conduct the Store Closings in accordance with the terms of this Order and the Sale Guidelines without the necessity of further showing compliance with any Liquidation Sale Laws.

(ii)    Within two business days after entry of this Order, the Debtor shall serve copies of this Order, the Agency Agreement and the Store Closing Procedures via email, facsimile, or regular mail, on the following: (i) the Attorney General's office for each state where the Store Closings are being held, (ii) the county consumer protection agency or similar agency for each county where the Store Closings will be held, (iii) the division of consumer protection for each state where the Store Closings will be held, (iv) the chief legal counsel for the local jurisdiction, and (v) the landlords for the Stores.

(iii)    To the extent there is a dispute arising from or relating to the Store Closings, this Order, the Agency Agreement, or the Store Closing Procedures, which dispute relates to any Liquidation Sale Laws (a "Reserved Dispute"), this Court shall retain exclusive jurisdiction to resolve the Reserved Dispute. Any time within ten days following entry of this Order, any Governmental Unit may assert that a Reserved Dispute exists by serving written notice of such Reserved Dispute to counsel for the Debtors so as to ensure delivery thereof within one business day

11

thereafter. If the Debtors and the Governmental Unit are unable to resolve the Reserved Dispute within 15 days after service of the notice, the aggrieved party may file a motion with this Court requesting that this Court resolve the Reserved Dispute (a "Dispute Resolution Motion").

(iv)     In the event a Dispute Resolution Motion is filed, nothing in this Order shall preclude the Debtors, a landlord, or other interested party from asserting (i) that the provisions of any Liquidation Sale Laws are preempted by the Bankruptcy Code, or (ii) that neither the terms of this Order nor the conduct of the Debtors pursuant to this Order, violates such Liquidation Sale Laws. Filing a Dispute Resolution Motion as set forth herein shall not be deemed to affect the finality of any Order or to limit or interfere with the Debtors' or the Agent's ability to conduct or to continue to conduct the Store Closings pursuant to this Order, absent further order of this Court. This Court grants authority for the Debtors and the Agent to conduct the Store Closings pursuant to the terms of this Order, the Agency Agreement, and/or the Store Closing Procedures and to take all actions reasonably related thereto or arising in connection therewith. The Governmental Unit shall be entitled to assert any jurisdictional, procedural, or substantive arguments it wishes with respect to the requirements of its Liquidation Sale Laws or the lack of any preemption of such Liquidation Sale Laws by the Bankruptcy Code. Nothing in this Order shall constitute a ruling with respect to any issues to be raised in any Dispute Resolution Motion.

(v)      If, at any time, a dispute arises between the Debtors and/or the Agent and a Governmental Unit as to whether a particular law is a Liquidation Sale Law, and subject to any provisions contained in this Order related to the Liquidation Sale Laws, then any party to that dispute may utilize the provisions of subparagraphs (b) and (c) hereunder by serving a notice to the other party and proceeding thereunder in accordance with those paragraphs. Any determination with respect to whether a particular law is a Liquidation Sale Law shall be made *de novo*.

35.     Except as expressly provided for herein or in the Store Closing Procedures, and except with respect to any Governmental Unit (as to which paragraphs 33 and 34 shall apply), no person or entity, including but not limited to any landlord, licensor, or creditor, shall take any action to directly or indirectly prevent, interfere with, or otherwise hinder consummation of the Store Closings, or the advertising and promotion (including the posting of signs or the use of sign walkers) of the Store Closings, and all such parties and persons of every nature and description, including landlords, licensors, creditors and utility companies and all those acting for or on behalf of such parties, are prohibited and enjoined from (a) interfering in any way with,

12

or otherwise impeding, the conduct of the Store Closings and/or (b) instituting any action or proceeding in any court or administrative body seeking an order or judgment against, among others, the Debtors, Agent, or the landlords at the Stores that might in any way directly or indirectly obstruct or otherwise interfere with or adversely affect the conduct of the Store Closings and/or seek to recover damages for breach(es) of covenants or provisions in any lease, sublease or license based upon any relief authorized herein.

36.      Any restrictions in any lease agreement, restrictive covenant, or similar documents purporting to limit, condition, or impair the Debtors' ability to conduct the Store Closings shall not be enforceable in conjunction with the Store Closings, nor shall any breach of such provisions in these chapter 11 cases in conjunction with the Store Closings constitute a default under a lease or provide a basis to terminate the lease; provided, the Store Closings are conducted in accordance with the terms of this Order and the Store Closing Procedures.

37.      Subject to Paragraphs 33 and 34 above, each and every federal, state, or local agency, departmental or governmental unit with regulatory authority over the Store Closings and all newspapers and other advertising media in which the Store Closings are advertised shall consider this Order as binding authority that no further approval, license, or permit of any governmental unit shall be required, nor shall the Debtors be required to post any bond, to conduct the Store Closings.

**V.      Other Provisions.**

38.      The Agent shall not be liable for any claims against the Debtors, and the Debtors shall not be liable for any claims against Agent, in each case, other than as expressly provided for in the Agency Agreement.

39.      This Court shall retain exclusive jurisdiction with regard to all issues or disputes relating to this Interim Order or the Agency Agreement, including, but not limited to, (i) any

claim or issue relating to any efforts by any party or person to prohibit, restrict or in any way limit banner and sign-walker advertising, including with respect to any allegations that such advertising is not being conducted in a safe, professional, and non-deceptive manner, (ii) any claim of the Debtors, the landlords and/or the Agent for protection from interference with the Sale, (iii) any other disputes related to the Sale, and (iv) to protect the Debtors and/or the Agent against any assertions of of any liens, claims, encumbrances, and other interests.  No such parties or person shall take any action against the Debtors, the Agent, the landlords or the Sale until this Court has resolved such dispute.  This Court shall hear the request of such parties or persons with respect to any such disputes on an expedited basis, as may be appropriate under the circumstances.

New York, New York
Dated: March 2, 2017

 /S/ Shelley C. Chapman
 UNITED STATES BANKRUPTCY JUDGE

## <u>EXHIBIT 1</u>

**Agency Agreement**

  

February 1, 2017

*VIA EMAIL*
BCBG MAX AZRIA GROUP, LLC
c/o Holly Felder Etlin
Chief Restructuring Officer
2761 Fruitland Avenue
Vernon, CA 90058
+1.212.297.1594
Email:  hetlin@alixpartners.com

Re:    **Letter Agreement Governing Inventory Disposition**

Dear Holly:

By executing below, subject to section R hereof, this letter shall serve as an agreement ("Agreement") between Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC, on the one hand ( "Agent" or a "Party"), and BCBG MAX AZRIA GROUP, LLC, on the other hand ("Merchant" or a "Party" and together with the Agent, the "Parties"), under which Agent shall act as the exclusive agent for the purpose of conducting a sale of certain Merchandise (as defined below) at the Merchant's stores set forth on Exhibit A (each a "Store" and collectively, the "Stores") through a "Store Closing", "Everything Must Go", "Everything on Sale" or similar themed sale (the "Sale").  Only Merchant-approved Sale terminology will be utilized at each Store.

**A.**    **Merchandise**

For purposes hereof, "Merchandise" shall mean all goods, saleable in the ordinary course, located in the Stores on the Sale Commencement Date (defined below) and certain goods in the Merchant's distribution centers (the "Distribution Centers") to which Merchant and Agent mutually agree.  "Merchandise" does not mean and shall not include: (1) goods that belong to sublessees, licensees or concessionaires of Merchant or are leased or licensed from third parties by Merchant; (2) owned furnishings, trade fixtures, equipment and improvements to real property that are located in the Stores (collectively, "FF&E"), or any FF&E that is leased by Merchant located in the Stores; or (3) damaged or defective merchandise that cannot be sold.

**B.**    **Sale Term**

For each Store, the Sale shall commence on February 4, 2017 (the "**Sale Commencement Date**") and conclude no later than April 30, 2017 (the "**Sale Termination Date**"); provided, however, that the Parties may mutually agree in writing to extend or terminate the Sale at any Store prior to the Sale Termination Date.  The period between the Sale Commencement Date and the Sale Termination Date shall be referred to as the "**Sale Term**." At the conclusion of the Sale, Agent shall surrender the premises for each Store to Merchant in broom clean condition and in accordance with

the lease requirements for such premises; provided, however, Merchant shall bear all costs and expenses associated with surrendering the premises in accordance with the lease requirements for such premises to the extent such expenses were incurred by Agent in accordance to a budget mutually agreed to in writing between the Agent and Merchant. At the conclusion of the Sale at each Store, Agent shall photographically document the condition of each such Store, and provide such photographs to merchant within ten (10) days. Photographs shall reference with specificity each Store by number, name, and/or location.

C.    **Project Management**

    (i)    Agent's Undertakings

During the Sale Term, Agent shall, in collaboration with Merchant, (a) provide qualified supervisors (the "Supervisors") engaged by Agent and approved in advance by Merchant to oversee the management of the Stores; (b) determine appropriate point-of-sale and external advertising for the Stores, approved in advance by Merchant; (c) determine appropriate discounts of Merchandise, staffing levels for the Stores, and appropriate bonus and incentive programs, if any, for the Stores' employees, in each case approved in advance by Merchant; (d) oversee display of Merchandise for the Stores; (e) to the extent that information is available, evaluate sales of Merchandise by category and sales reporting and monitor expenses; (f) maintain the confidentiality of all proprietary or non-public information regarding Merchant in accordance with the provisions of the confidentiality agreement signed by the Parties; (g) assist Merchant in connection with managing and controlling loss prevention and employee relations matters; (h) to the extent necessary, assist Merchant in obtaining all required permits and governmental consents required to conduct the Sale; (i) ensure that all marketing, advertising and other communications provided by Merchant to Agent for distribution to customers are provided to customers by including same in bags along with purchased merchandise or through other similarly appropriate means; and (j) provide such other related services deemed necessary or appropriate by Merchant and Agent.

Without limiting the generality of the foregoing, all information of a business nature relating to the pricing, sales, promotions, marketing, assets, liabilities or other business affairs of Merchant, its customers, parent, subsidiary, or other affiliated entities (for purposes of this paragraph, all such entities are included within each reference to "Merchant") is Merchant's confidential, trade secret information ("Merchant Confidential Information"), which is and shall remain the exclusive intellectual property of Merchant. Except as may be required for Agent to perform its obligations under this Agreement in respect of the Sale, Agent shall not divulge, furnish, make available, or in any other manner disclose such information to any third party other than Agent's officers, employees, representatives, and agents. Agent shall take and shall cause its officers, employees, representatives, and agents to take such action as shall be reasonably necessary or advisable to preserve and protect the confidentiality of Merchant Confidential Information. Agent agrees to maintain strict confidentiality and agrees that it may use Merchant Confidential Information only as reasonably necessary to the performance of its obligations related to the Sale. If and to the extent the use or other handling of any Personal Information is necessary for Agent to perform its obligations hereunder, Agent shall comply with all Data Security Requirements and such other reasonable restrictions requested by Merchant. For purposes of this Agreement, "Personal Information" means any natural person's name, street address, telephone number, e-mail address, social security number, driver's license number, passport number, credit card number, or user or

2

account number, or any other piece of information that, individually or when combined with other information, allows the identification of a natural person or is otherwise considered personally identifiable information or personal data protected under any applicable Data Security Requirement. For purposes of this Agreement, "Data Security Requirements" means, collectively, all of the following to the extent relating to privacy, security, or security breach notification requirements: (i) Merchant's own rules, policies, and procedures; (ii) all applicable regulations; (iii) industry standards applicable to the industry in which the Merchant's business is conducted (including, as applicable, the Payment Card Industry Data Security Standard (PCI DSS)); and (iv) contracts into which Merchant has entered or by which it is otherwise bound, provided such contracts (or the requirements of such contracts) are provided to Agent.

The Parties expressly acknowledge and agree that Merchant shall have no liability to the Supervisors for wages, benefits, severance pay, termination pay, vacation pay, pay in lieu of notice of termination or any other liability arising from Agent's hiring or engagement of the Supervisors, and the Supervisors shall not be considered employees of Merchant.

      (ii)     <u>Merchant's Undertakings</u>

During the Sale Term, Merchant shall (a) be the employer of the Stores' employees, other than the Supervisors; (b) pay all taxes, costs, expenses, accounts payable, and other liabilities relating to the Stores, the Stores' employees and other representatives of Merchant; (c) prepare and process all tax forms and other documentation; (d) collect all sales taxes and pay them to the appropriate taxing authorities for the Stores; (e) use reasonable efforts to cause Merchant's employees to cooperate with Agent and the Supervisors; (f) execute all agreements mutually determined by the Merchant and Agent to be necessary or desirable for the operation of the Stores during the Sale; (g) arrange for the ordinary maintenance of all point-of-sale equipment required for the Stores; and (h) use reasonable efforts to ensure that Agent has quiet use and enjoyment of the Stores for the Sale Term in order to perform its obligations under this Agreement.

Merchant shall provide throughout the Sale Term central administrative services necessary for the Sale, including (without limitation) customary POS administration, sales audit, cash reconciliation, accounting, and payroll processing, as currently available through the Merchant's existing accounting and IT systems, all at no cost to Agent.

The Parties expressly acknowledge and agree that Agent shall have no liability to Merchant's employees for wages, benefits, severance pay, termination pay, vacation pay, pay in lieu of notice of termination or any other liability arising from Merchant's employment, hiring or retention of its employees, and such employees shall not be considered employees of Agent.

**D.**     **The Sale**

All sales of Merchandise shall be made on behalf of Merchant. Agent does not have, nor shall it have, any right, title or interest in the Merchandise. All sales of Merchandise shall be by cash, gift card, gift certificate, merchandise credit, or credit or debit card and, at Merchant's discretion, by check or otherwise in accordance with Merchant's policies, and shall be "final" with no returns accepted or allowed, unless otherwise directed by Merchant.

**E.**    **Agent Fee and Expenses in Connection with the Sale**

As used in this Agreement, the following terms shall have the following meanings:

(i)    "Gross Proceeds" shall mean the sum of the gross proceeds of all sales of Merchandise made in the Stores during the Sale Term using the "gross rings" method, net only of sales taxes.

(ii)    "Net Proceeds" shall mean aggregate Gross Proceeds, less Agent's actual expenses incurred pursuant to the Expense Budget.

In consideration of its services hereunder, Agent shall earn a fee equal to one and one half percent (1.5%) of the aggregate Net Proceeds.

Merchant shall be responsible for all expenses of the Sale, including (without limitation) all Store level operating expenses, all costs and expenses related to Merchant's other retail store operations, and Agent's other reasonable, documented out of pocket expenses. To control expenses of the Sale, Merchant and Agent have established an aggregate budget (the "Expense Budget") of certain delineated expenses, including (without limitation) payment of the costs of supervision (including (without limitation) Supervisors' wages, fees, travel, and deferred compensation) and advertising costs. The Expense Budget for the Sale is attached hereto as Exhibit C. The Expense Budget may only be modified by mutual written agreement of Agent and Merchant and Merchant may review, verify, and/or audit the expenses at any time, including any expense paid in advance by the Sale Expense Advance (as defined below). The costs of supervision set forth on Exhibit C include, among other things, industry standard deferred compensation. Notwithstanding anything herein to the contrary, unless otherwise agreed to by Merchant, Merchant shall not be obligated to pay costs of supervision and advertising costs that have not been included, or provided for, in the Expense Budget, as may be amended in accordance with this Agreement.

All accounting matters (including, without limitation, all fees, expenses, or other amounts reimbursable or payable to Agent) shall be reconciled on every Wednesday for the prior week and shall be paid within seven (7) days after each such weekly reconciliation. The Parties shall complete a final reconciliation and settlement of all amounts payable to Agent and contemplated by this Agreement (including, without limitation, Expense Budget items, and fees earned hereunder) no later than forty-five (45) days following the Sale Termination Date for the last Store (the "Final Reconciliation").

Upon execution of this Agreement, the Merchant shall pay by wire transfer to the Agent an advance payment of costs and expenses delineated in the Expense Budget of $390,000 (the "Sale Expense Advance") which shall be held by Agent and applied towards Expense Budget items as incurred. Any portion of the Sale Expense Advance not so used shall be returned to Merchant within three days following the final reconciliation.

**F.**    **Indemnification**

(i)    Merchant's Indemnification

4

Merchant shall indemnify, defend, and hold Agent and its consultants, members, managers, partners, officers, directors, employees, attorneys, advisors, representatives, lenders, potential co-investors, principals, affiliates, and Supervisors (collectively, "Agent Indemnified Parties") harmless from and against all liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from or related to: (a) the willful or negligent acts or omissions of Merchant or the Merchant Indemnified Parties (as defined below); (b) the material breach of any provision of this Agreement by Merchant; (c) any liability or other claims, including, without limitation, product liability claims, asserted by customers, any Store employees (under a collective bargaining agreement or otherwise), or any other person (excluding Agent Indemnified Parties) against Agent or an Agent Indemnified Party, except claims arising from Agent's negligence, willful misconduct, gross negligence, or unlawful behavior; (d) any harassment, discrimination or violation of any laws or regulations or any other unlawful, tortious or otherwise actionable treatment of Agent's Indemnified Parties or Merchant's customers by Merchant or Merchant's Indemnified Parties; and (e) Merchant's failure to pay over to the appropriate taxing authority any taxes required to be paid by Merchant during the Sale Term in accordance with applicable law.

     (ii)     Agent's Indemnification

Agent shall indemnify, defend and hold Merchant and its consultants, members, managers, partners, officers, directors, employees, attorneys, advisors, representatives, lenders, potential co-investors, principals, and affiliates (other than the Agent or the Agent Indemnified Parties) (collectively, "Merchant Indemnified Parties") harmless from and against all liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from or related to (a) the willful or negligent acts or omissions of Agent or the Agent Indemnified Parties; (b) the breach of any provision of, or the failure to perform any obligation under, this Agreement by Agent; (c) any liability or other claims made by Agent's Indemnified Parties or any other person (excluding Merchant Indemnified Parties) against a Merchant Indemnified Party arising out of or related to Agent's conduct of the Sale, except claims arising from Merchant's negligence, willful misconduct, gross negligence, or unlawful behavior; (d) any harassment, discrimination or violation of any laws or regulations or any other unlawful, tortious or otherwise actionable treatment of Merchant Indemnified Parties, or Merchant's customers by Agent or any of the Agent Indemnified Parties and (e) any claims made by any party engaged by Agent as an employee, agent, representative or independent contractor arising out of such engagement.

**G.**     **Insurance**

     (i)     Merchant's Insurance Obligations

Merchant shall maintain throughout the Sale Term, liability insurance policies (including, without limitation, products liability (to the extent currently provided), comprehensive public liability insurance and auto liability insurance) covering injuries to persons and property in or in connection with the Stores, and shall cause Agent to be named an additional insured with respect to all such policies. At Agent's request, Merchant shall provide Agent with a certificate or certificates evidencing the insurance coverage required hereunder and that Agent is an additional insured thereunder. In addition, Merchant shall maintain throughout the Sale Term, in such amounts as it

currently has in effect, workers' compensation insurance in compliance with all statutory requirements.

(ii)    Agent's Insurance Obligations

Agent shall maintain (at Agent's expense) throughout the Sale Term, liability insurance policies (including, without limitation, products liability/completed operations, contractual liability, comprehensive public liability and auto liability insurance) on an occurrence basis in an amount of at least Two Million dollars ($2,000,000) and an aggregate basis of at least five million dollars ($5,000,000) covering injuries to persons and property in or in connection with Agent's provision of services at the Stores.  Agent shall name Merchant as an additional insured and loss payee under such policy, and upon execution of this Agreement provide Merchant with a certificate or certificates evidencing the insurance coverage required hereunder.  In addition, Agent shall maintain throughout the Sale Term, workers' compensation insurance in compliance with all statutory requirements.  Further, should Agent employ or engage third parties to perform any of Agent's undertakings with regard to this Agreement, Agent will ensure that such third parties are covered by Agent's insurance or maintain all of the same insurance as Agent is required to maintain pursuant to this paragraph and name Merchant as an additional insured and loss payee under the policy for each such insurance.

## H.    **Representations, Warranties, Covenants and Agreements**

(i)    Merchant warrants, represents, covenants and agrees that (a) Merchant is a company duly organized, validly existing and in good standing under the laws of its state of organization, with full power and authority to execute and deliver this Agreement and to perform its obligations hereunder, and maintains its principal executive office at the address set forth herein, (b) the execution, delivery and performance of this Agreement has been duly authorized by all necessary actions of Merchant and this Agreement constitutes a valid and binding obligation of Merchant enforceable against Merchant in accordance with its terms and conditions, and the consent of no other entity or person is required for Merchant to fully perform all of its obligations herein, (c) all ticketing of Merchandise at the Stores has been and will be done in accordance with Merchant's customary ticketing practices; (d) all normal course hard markdowns on the Merchandise have been, and will be, taken consistent with Merchant's customary practices, and (e) the Stores will be operated in the ordinary course of business in all respects, other than those expressly agreed to by Merchant and Agent.

(ii)    Agent warrants, represents, covenants and agrees that (a) Agent is a company duly organized, validly existing and in good standing under the laws of its state of organization, with full power and authority to execute and deliver this Agreement and to perform the Agent's obligations hereunder, and maintains its principal executive office at the addresses set forth herein, (b) the execution, delivery and performance of this Agreement has been duly authorized by all necessary actions of Agent and this Agreement constitutes a valid and binding obligation of Agent enforceable against Agent in accordance with its terms and conditions, and the consent of no other entity or person is required for Agent to fully perform all of its obligations herein, (c) Agent shall comply with and act in accordance with any and all applicable state and local laws, rules, and regulations, and other legal obligations of all governmental authorities, (d) no non-emergency repairs or

6

maintenance in the Stores will be conducted without Merchant's prior written consent, and (e) Agent will not take any disciplinary action against any employee of Merchant.

## I.    Furniture, Fixtures and Equipment

Agent shall sell the FF&E in the Stores from the Stores themselves.  Merchant shall be responsible for all reasonable and documented costs and expenses incurred by Agent in connection with the sale of FF&E, which costs and expenses shall be incurred pursuant to a written budget or budgets to be established from time to time by mutual agreement of the Parties.  Agent shall have the right to abandon at the Stores any unsold FF&E.

Notwithstanding the foregoing, Merchant has informed Agent that it intends to remove certain POS systems from the closing stores.  Merchant will provide a list of equipment and store location to Agent shortly after the Sale Commencement Date, and will remove the equipment at the conculsion of the Sale.  Agent will make all commercially reasonable efforts to ensure that the designated equipment remains in good, working condition throughout the Sale.

In consideration for providing the services set forth in this section I, Agent shall be entitled to a commission from the sale of the FF&E equal to fifteen percent (15%) of the Gross Proceeds of the sale of the FF&E.

Agent shall remit to Merchant all Gross Proceeds from the sale of FF&E.  During each weekly reconciliation described in section E above, Agent's FF&E fee shall be calculated, and Agent's calculated FF&E fee and all FF&E costs and expenses then incurred shall paid within seven (7) days after each such weekly reconciliation.

## J.    Termination

The following shall constitute "Termination Events" hereunder:

(a)    Merchant's or Agent's failure to perform any of their respective material obligations hereunder, which failure shall continue uncured seven (7) days after receipt of written notice thereof to the defaulting Party;

(b)    Any representation or warranty made by Merchant or Agent is untrue in any material respect as of the date made or at any time and throughout the Sale Term (other than with respect to the representations and warranties of Merchant set forth in section H(i)(d) and H(i)(e), which representations and warranties are made solely as of the date hereof); or

(c)    the Sale is terminated or materially interrupted or impaired for any reason other than an event of default by Agent or Merchant.

If a Termination Event occurs, the non-defaulting Party (in the case of an event of default) or either Party (if the Sale is otherwise terminated or materially interrupted or impaired) may, in its discretion, elect to terminate this Agreement by providing seven (7) business days' written notice thereof to the other Party and, in the case of an event of default, in addition to terminating this

7

Agreement, pursue any and all rights and remedies and damages resulting from such default. If this Agreement is terminated, Merchant shall be obligated to pay Agent all amounts due and owing by Merchant to Agent under this Agreement through and including the termination date.

**K.**     **Notices**

All notices, certificates, approvals, and payments provided for herein shall be sent by fax or by recognized overnight delivery service as follows: (a) To Merchant: at the address listed above, with a copy to Kirkland & Ellis LLP, 601 Lexington Ave, New York, NY 10022, Attn: Joshua Sussberg and Kirkland & Ellis LLP, 300 North LaSalle, Chicago, IL 60654, Attn: Benjamin Rhode; (b) To Agent: c/o Hilco Merchant Resources, LLC, One Northbrook Place, 5 Revere Drive, Suite 206, Northbrook, IL 60062, Fax: 847- 849-0859, Attn: Ian S. Fredericks; and c/o Gordon Brothers Retail Partners, LLC, 800 Boylston Street, 27th Floor, Boston, MA 02199, Fax: 617-531-7906, Attention, Michael Chartock; or (c) such other address as may be designated in writing by Merchant or Agent.

**L.**     **Independent Consultant**

Agent's relationship to Merchant is that of an independent contractor without the capacity to bind Merchant in any respect. No employer/employee, principal/agent, joint venture or other such relationship is created by this Agreement. Merchant shall have no control over the hours that Agent or its employees or assistants or the Supervisors work or the means or manner in which the services that will be provided are performed and Agent is not authorized to enter into any contracts or agreements on behalf of Merchant or to otherwise create any obligations of Merchant to third parties, unless authorized in writing to do so by Merchant.

**M.**     **Non-Assignment**

Neither this Agreement nor any of the rights hereunder may be transferred or assigned by either Party without the prior written consent of the other Party. No modification, amendment or waiver of any of the provisions contained in this Agreement, or any future representation, promise or condition in connection with the subject matter of this Agreement, shall be binding upon any Party to this Agreement unless made in writing and signed by a duly authorized representative or agent of such Party. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective heirs, legal representatives, successors and permitted assigns.

**N.**     **Severability**

If any term or provision of this Agreement, as applied to either Party or any circumstance, for any reason shall be declared by a court of competent jurisdiction to be invalid, illegal, unenforceable, inoperative or otherwise ineffective, that provision shall be limited or eliminated to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect and enforceable. If the surviving portions of the Agreement fail to retain the essential understanding of the Parties, the Agreement may be terminated by mutual consent of the Parties.

**O.**     **Governing Law, Venue, Jurisdiction and Jury Waiver**

This Agreement, and its validity, construction and effect, shall be governed by and enforced in accordance with the internal laws of the State of Illinois (without reference to the conflicts of laws provisions therein). Merchant and Agent waive their respective rights to trial by jury of any cause of action, claim, counterclaim or cross-complaint in any action, proceeding and/or hearing brought by either Agent against Merchant or Merchant against Agent on any matter whatsoever arising out of, or in any way connected with, this Agreement, the relationship between Merchant and Agent, any claim of injury or damage or the enforcement of any remedy under any law, statute or regulation, emergency or otherwise, now or hereafter in effect.

**P.    Entire Agreement**

This Agreement, together with all additional schedules and exhibits attached hereto, constitutes a single, integrated written contract expressing the entire agreement of the Parties concerning the subject matter hereof. No covenants, agreements, representations or warranties of any kind whatsoever have been made by any Party except as specifically set forth in this Agreement. All prior agreements, discussions and negotiations are entirely superseded by this Agreement.

**Q.    Execution**

This Agreement may be executed simultaneously in counterparts (including by means of electronic mail, facsimile or portable document format (pdf) signature pages), any one of which need not contain the signatures of more than one party, but all such counterparts taken together shall constitute one and the same instrument. This Agreement, and any amendments hereto, to the extent signed and delivered by means of electronic mail, a facsimile machine or electronic transmission in portable document format (pdf), shall be treated in all manner and respects as an original thereof and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.

**R.    Bankruptcy**

If Merchant commences a case under Chapter 11 of title 11, United States Code (the "Bankruptcy Code"), with a bankruptcy court (the "Bankruptcy Court"), Merchant shall promptly file a motion to assume this Agreement under section 365 of the Bankruptcy Code, and utilize its commercially reasonable efforts to ensure that such motion is approved by an order (the "Approval Order") that provides, among other things, as follows:  (i) the payment of all fees and reimbursement of expenses hereunder to Agent is approved without further order of the court and shall be free and clear of all liens, claims and encumbrances; (ii) all such payments of fees and reimbursement of expenses shall be made on a weekly basis without further order of the Bankruptcy Court and otherwise in accordance with this Agreement; (iii) approval of the transaction contemplated hereby; (iv) authorizing the Sale without the necessity of complying with state and local rules, laws, ordinances and regulations, including, without limitation, permitting and licensing requirements, that could otherwise govern the Sale; (v) authorizing the Sale notwithstanding restrictions in leases, reciprocal easement agreements or other contracts that purport to restrict the Sale or the necessity of obtaining any third party consents; and (vi) take all further actions as are necessary or appropriate to carry out the terms and conditions of this Agreement. In such event, any legal action, suit or proceeding arising in connection with this Agreement shall be submitted to the

9

exclusive jurisdiction of the Bankruptcy Court having jurisdiction over Merchant, and each Party hereby waives any defenses or objections based on lack of jurisdiction, improper venue, and/or forum non conveniens. From and after entry of the Approval Order, Agent shall conduct the Sale in accordance with the terms of the Approval Order in all material respects.

*        *        *

If this Agreement is acceptable to you, kindly execute a copy in the space provided, and return a countersigned version to the undersigned. Thank you again for this opportunity -- we look forward to working with you.

Very truly yours,

HILCO MERCHANT RESOURCES, LLC

By:    Ian S. Fredericks
Its:    SVP & CLO

GORDON BROTHERS RETAIL PARTNERS, LLC

By:    Michael Chartock
Its:    Gen Coun

**AGREED AND ACCEPTED** as of the ___ day of February __, 2017:

BCBG MAX AZRIA GROUP, LLC

By:    Holly Etlin
Its:    CRO

BCBG
Exhibit A

Store List

| Store # | Concept | Location Type | Name | Address | Address2 | City | State | Zip | Open Date | Lease End Date | Selling Sq. Ft. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 53 | Herve Leger | Street | HL, Rodeo/Giorgio | 439 N. Rodeo Drive | | Beverly Hills | CA | 90210 | 02/02/02 | 04/30/25 | 964 |
| 56 | Herve Leger | Inside Mall | HL, The Venetian | 3377 Las Vegas Blvd. South | Spc#2245 | Las Vegas | NV | 89109 | 02/17/10 | 04/30/20 | 3,103 |
| 60 | Herve Leger | Inside Mall | HL, Lenox | 3393 Peachtree Rd | Spc#3029B | Atlanta | GA | 30326 | 11/03/10 | 04/30/26 | 1,187 |
| 81 | Generation | Inside Mall | GEN, Garden State Plaza | One Garden State Plaza | Spc#2106 | Paramus | NJ | 07652 | 03/10/10 | 01/31/19 | 1,600 |
| 85 | Generation | Inside Mall | GEN, Dallas Galleria | 13350 Dallas Parkway | Spc#1100 | Dallas | TX | 75240 | 02/28/10 | 04/30/25 | 1,903 |
| 88 | Generation | Inside Mall | GEN, Wellington | 10300 W. Forest Hill Blvd | Spc#259 | Wellington | FL | 33414 | 10/14/10 | 01/31/20 | 3,500 |
| 91 | Generation | Inside Mall | GEN, Plaza Las Americas | 525 FD Roosevelt Ave | Spc#437 | San Juan | PR | 00918 | 10/25/10 | 06/30/21 | 2,586 |
| 92 | Generation | Inside Mall | GEN, Glendale Galleria | 2104 Glendale Galleria | Spc#G1001 | Glendale | CA | 91210 | 13/06/10 | 01/31/21 | 1,796 |
| 94 | Generation | Outdoor Outlet | GEN, Scottsdale | 400 S. Baldwin Ave. | Spc#211 | Scottsdale | AZ | 91200 | 06/22/12 | 01/31/22 | 1,769 |
| 95 | Generation | Inside Mall | GEN, Mall of America | 60 E. Broadway | Spc#N221 | Bloomington | MN | 55425 | 11/22/13 | 10/31/20 | 3,016 |
| 96 | Generation | Inside Mall | GEN, Miracle Mile | 3663 Las Vegas Blvd. South | Spc#80 | Las Vegas | NV | 89109 | 11/22/13 | 09/30/20 | 1,556 |
| 372 | Herve Leger | Street | HL, Worth Avenue | 237 Worth Avenue | | Palm Beach | FL | 33480 | 10/16/06 | 11/30/24 | 944 |
| 383 | Herve Leger | Inside Mall | HL, Somerset | 2801 W. Big Beaver Road | Spc#E-148 | Troy | MI | 48084 | 06/06/08 | 05/31/18 | 1,200 |
| 386 | Herve Leger | Inside Mall | HL, Aventura | 19501 Biscayne Blvd. | Spc#223 | Aventura | FL | 33180 | 12/11/08 | 01/31/22 | 1,851 |
| 387 | Herve Leger | Inside Mall | HL, San Juan | 1000 Mall of San Juan Blvd. | Spc#223 41 | San Juan | PR | 00923 | 03/26/15 | 01/31/25 | 1,470 |
| 388 | Herve Leger | Inside Mall | HL, International Marketplace | 2330 Kalakaua Ave. | Spc#879 | Honolulu | HI | 96815 | 01/00/00 | 01/31/27 | 3,987 |
| 402 | Factory | Outdoor Outlet | FTY, Napa Valley | 881 Factory Stores Drive | | Napa | CA | 94558 | 06/03/95 | 06/30/20 | 3,800 |
| 407 | Factory | Outdoor Outlet | FTY, Dawsonville | 800 Highway 400 | Spc#445 | Dawsonville | GA | 30534 | 05/16/96 | 05/31/18 | 3,109 |
| 408 | Factory | Outdoor Outlet | FTY, Clinton Crossing | 20 Killingworth Turnpike | Spc#260 | Clinton | CT | 06413 | 08/16/96 | 08/31/18 | 4,702 |
| 418 | Factory | Indoor Outlet | FTY, Philadelphia Mills | 1651 Franklin Mills Circle | Spc#217 | Philadelphia | PA | 19154 | 04/18/05 | 09/30/19 | 5,047 |
| 419 | Factory | Indoor Outlet | FTY, Milpitas | 447 Great Mall Dr. | Spc#250 | Milpitas | CA | 95035 | 12/16/99 | 08/31/19 | 5,162 |
| 422 | Factory | Outdoor Outlet | FTY, Wrentham Village | 1 Premium Outlets Blvd. | Spc#120 | Wrentham | MA | 2093 | 10/26/00 | 06/30/19 | 3,325 |
| 426 | Factory | Outdoor Outlet | FTY, Leesburg Premium | 241 Fort Evans Rd. | Spc#419 | Leesburg | VA | 20176 | 11/24/01 | 09/30/18 | 2,777 |
| 434 | Factory | Outdoor Outlet | FTY, Grove City | 1911 Leesburg Rd. | Spc#155 | Grove City | PA | 16127 | 02/11/00 | 01/31/18 | 2,880 |
| 435 | Factory | Outdoor Outlet | FTY, Birch Run | 12150 S. Beyer Rd. | Spc#F040 | Birch Run | MI | 48415 | 12/21/01 | 02/28/23 | 5,500 |
| 436 | Factory | Outdoor Outlet | FTY, Pleasant Prairie | 11601 108th St. | Spc#587 | Pleasant Prairie | WI | 53158 | 04/14/06 | 10/31/19 | 2,128 |
| 437 | Factory | Outdoor Outlet | FTY, Folsom | 13000 Folsom Blvd. | Spc#203 | Folsom | CA | 95630 | 02/13/02 | 02/28/18 | 3,562 |
| 438 | Factory | Outdoor Outlet | FTY, Osage Beach | 4540 Osage Beach Parkway | Spc#B87 | Osage Beach | MO | 65065 | 12/19/01 | 10/31/18 | 4,495 |
| 441 | Factory | Indoor Outlet | FTY, St. Augustine | 500 Outlet Mall Blvd. | Spc#1055 | St. Augustine | FL | 32084 | 06/23/06 | 07/31/19 | 5,200 |
| 442 | Factory | Outdoor Outlet | FTY, Gilroy | 8375 Arroyo Circle | Spc#A048 | Gilroy | CA | 95020 | 12/19/01 | 12/31/25 | 3,000 |
| 444 | Factory | Outdoor Outlet | FTY, Ellenton | 5999 Factory Shops Blvd. | Spc#38 | Ellenton | FL | 34222 | 05/03/08 | 03/14/18 | 4,543 |
| 445 | Factory | Outdoor Outlet | FTY, Houston Premium | 29300 Hempstead Rd. | Spc#416 | Houston | TX | 77433 | 03/27/08 | 06/30/19 | 4,778 |
| 446 | Factory | Outdoor Outlet | FTY, Lighthouse Place | 601 Wabash St. | Spc#709 | Michigan City | IN | 46360 | 12/22/02 | 12/31/22 | 3,360 |
| 447 | Factory | Outdoor Outlet | FTY, Miromar | 10801 Corkscrew Rd. | Spc#182 | Estero | FL | 33928 | 12/07/02 | 01/31/18 | 2,750 |
| 453 | Factory | Outdoor Outlet | FTY, Vero Beach | 1832 94th Drive | Spc#B110 | Vero Beach | FL | 32966 | 02/02/06 | 01/31/18 | 4,808 |
| 454 | Factory | Outdoor Outlet | FTY, Williamsburg | 5625 Richmond Road | Spc#F130 | Williamsburg | VA | 23188 | 10/01/04 | 04/30/18 | 2,500 |
| 456 | Factory | Outdoor Outlet | FTY, Chicago Premium | 1650 Premium Outlets Blvd. | Spc#D43 | Aurora | IL | 60502 | 07/02/04 | 01/31/18 | 2,452 |
| 457 | Factory | Outdoor Outlet | FTY, Tannersville | 1000 Route 611 | Spc#08 | Tannersville | PA | 18372 | 04/28/05 | 01/31/21 | 3,701 |
| 458 | Factory | Outdoor Outlet | FTY, Puerto Rico | 18400 State Road 3 | Spc#188 | San Juan | PR | 00729 | 04/21/05 | 04/30/17 | 3,400 |
| 460 | Factory | Indoor Outlet | FTY, Albertville | 6501 Labeaux Ave NE | Spc#G070 | Albertville | MN | 55301 | 05/05/05 | 01/31/19 | 3,584 |
| 461 | Factory | Outdoor Outlet | FTY, Seattle Premium | 10600 Quil Ceda Blvd. | Spc#422 | Seattle | WA | 98271 | 05/05/05 | 09/30/25 | 3,000 |
| 462 | Factory | Outdoor Outlet | FTY, Vacaville | 368 Nut Tree Road | Spc#358 | Vacaville | CA | 95687 | 09/24/09 | 09/30/19 | 4,500 |
| 464 | Factory | Outdoor Outlet | FTY, Deer Park | 152 The Arches Circle | Spc#1407 | Deer Park | NY | 11729 | 10/23/08 | 01/31/18 | 3,500 |
| 466 | Factory | Outdoor Outlet | FTY, Mercedes | 5001 E. Expressway 83 | Spc#51 | Mercedes | TX | 78570 | 11/02/06 | 11/30/18 | 3,300 |
| 467 | Factory | Outdoor Outlet | FTY, Manchester | 321 Depot Street | Spc#42 | Manchester | VT | 05255 | 03/24/06 | 03/31/19 | 3,255 |
| 470 | Factory | Indoor Outlet | FTY, Arundel Mills | 7000 Arundel Mills Circle | Spc#427 | Hanover | MD | 21076 | 11/17/06 | 11/30/16 | 2,762 |
| 475 | Factory | Indoor Outlet | FTY, The Walk at Atlantic City | 117 N. Arkansas | Spc#320-322 | Atlantic City | NJ | 08401 | 06/08/07 | 06/30/17 | 6,082 |
| 483 | Factory | Outdoor Outlet | FTY, Phoenix/Anthem | 4250 W. Anthem Way | Spc#120 | Phoenix | AZ | 85086 | 11/14/08 | 01/31/19 | 3,507 |
| 484 | Factory | Outdoor Outlet | FTY, Gulfport | 10840 Factory Shops Blvd. | Spc#840 | Gulfport | MS | 39503 | 04/12/07 | 05/31/17 | 2,694 |
| 485 | Factory | Outdoor Outlet | FTY, Philadelphia | 18 Lightcap Rd. Space | Spc#1119 | Limerick Township | PA | 19464 | 05/17/07 | 11/30/17 | 3,737 |
| 486 | Factory | Outdoor Outlet | FTY, Barceloneta | PR 620 | Spc#920 | Barceloneta | PR | 00617 | 11/14/08 | 11/30/18 | 4,541 |
| 487 | Factory | Outdoor Outlet | FTY, Sun Valley | 705 S. Desert Blvd. | Spc#D710 | Canutillo | TX | 79835 | 10/10/07 | 10/31/17 | 3,596 |
| 495 | Factory | Indoor Outlet | FTY, Potomac Mills | 2700 Potomac Mills Circle | Spc#795 | Woodbridge | VA | 22192 | 11/24/07 | 09/30/19 | 2,794 |
| 497 | Factory | Outdoor Outlet | FTY, Jersey Shore | One Prime Outlets Blvd. | Spc#399 | Tinton Falls | NJ | 07753 | 11/11/08 | 11/30/18 | 5,973 |

BCBG
Exhibit A

Store List

| Store # | Concept | Location Type | Name | Address | Address2 | City | State | Zip | Open Date | Lease End Date | Selling Sq. Ft. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 498 | Factory | Outdoor Outlet | FTY_Monroe | 616 Premium Outlets Drive | Spc#636 | Monroe | OH | 45050 | 08/06/09 | 08/31/19 | 4,606 |
| 499 | Factory | Indoor Outlet | FTY_Niagara Falls | 1836 Military Rd. | Spc#44 | Niagara Falls | NY | 14304 | 11/24/09 | 01/31/20 | 6,220 |
| 504 | Factory | Outdoor Outlet | FTY_Las Vegas Outlets | 7400 Las Vegas Blvd. South | Spc#247A | Las Vegas | NV | 89123 | 11/20/11 | 10/31/18 | 5,063 |
| 505 | Factory | Indoor Outlet | FTY_Destiny | 306 Hiawatha Blvd. West | Spc#M-100 | Syracuse | NY | 13204 | 06/29/12 | 01/31/23 | 4,722 |
| 506 | Factory | Outdoor Outlet | FTY_Charleston | 4840 Tanger Outlet Blvd. | Spc#855 | Charleston | SC | 29418 | 05/27/11 | 01/31/18 | 2,463 |
| 509 | Factory | Outdoor Outlet | FTY_Grand Prairie | 2950 West Interstate 20 | Spc#302 | Grand Prairie | TX | 75052 | 08/16/12 | 08/31/22 | 2,715 |
| 513 | Factory | Outdoor Outlet | FTY_Phoenix Premium Outlets | 4976 Premium Outlet Way | Spc#450 | Chandler | AZ | 85226 | 04/04/13 | 04/30/23 | 3,135 |
| 516 | Factory | Indoor Outlet | FTY_Rosemont Fashion Outlets HL | 5220 Fashion Outlet Way | Spc#2020 | Rosemont | IL | 60018 | 8/1/2013 | 12/31/23 | 1,222 |
| 517 | Factory | Outdoor Outlet | FTY_St. Louis Premium Outlets | 18517 Outlet Blvd | Spc#206 | Chesterfield | MO | 63005 | 08/22/13 | 08/31/23 | 3,000 |
| 518 | Factory | Outdoor Outlet | FTY_Mississippi | 200 Bass Pro Drive | Spc#496 | Pearl | MS | 30208 | 11/14/13 | 11/30/24 | 3,000 |
| 597 | Final Cut | Outdoor Outlet | FC_Folsom | 13000 Folsom Blvd. | Spc#204 | Folsom | CA | 95630 | 11/07/09 | 10/31/19 | 2,860 |
| 601 | BCBG | Inside Mall | Westside Pavilion | 10800 W. Pico Blvd. | Spc#186 | West Los Angeles | CA | 90064 | 10/01/93 | 01/31/19 | 1,886 |
| 603 | BCBG | Street | Madison | 770 Madison Ave | | New York | NY | 10065 | 02/15/02 | 12/31/17 | 5,963 |
| 608 | BCBG | Inside Mall | Northpark | 8687 North Central Expressway | Spc#1424 | Dallas | TX | 75225 | 08/10/95 | 04/30/21 | 4,116 |
| 621 | BCBG | Inside Mall | Bellevue | 122 Bellevue Square | Spc#163 | Bellevue | WA | 98004 | 11/27/96 | 01/31/24 | 3,598 |
| 622 | BCBG | Inside Mall | Pioneer Place | 700 SW 5th Ave. | Spc#3015 | Portland | OR | 97204 | 09/05/97 | 05/31/23 | 3,736 |
| 623 | BCBG | Inside Mall | Horton Plaza | 170 Horton Plaza | Spc#133 | San Diego | CA | 92101 | 06/05/95 | 01/31/18 | 4,078 |
| 626 | BCBG | Inside Mall | Northbrook | 1136 Northbrook Court | | Northbrook | IL | 60062 | 11/19/97 | 10/31/17 | 3,384 |
| 630 | BCBG | Inside Mall | Perimeter Mall | 4400 Ashford Dunwoody Rd. | Spc#1455 | Atlanta | GA | 30346 | 03/01/98 | 01/31/18 | 2,885 |
| 631 | BCBG | Inside Mall | Palisades Center | 1630 Palisades Center Dr. | Spc#B-114 | West Nyack | NY | 10994 | 04/04/98 | 01/31/19 | 3,000 |
| 634 | BCBG | Street | Beverly Hills | 443 N. Rodeo Dr. | | Beverly Hills | CA | 90210 | 06/05/07 | 04/30/24 | 5,043 |
| 635 | BCBG | Inside Mall | Pacific Place | 600 Pine St. | Spc#115 | Seattle | WA | 98101 | 10/28/98 | 01/31/21 | 3,772 |
| 639 | BCBG | Street | Union Square | 331 Powell St. | | San Francisco | CA | 94102 | 10/15/99 | 03/31/19 | 10,986 |
| 642 | BCBG | Inside Mall | Mission Viejo | 104 The Shops at Mission Viejo | Spc#10A | Mission Viejo | CA | 92691 | 11/13/99 | 12/31/24 | 3,623 |
| 646 | BCBG | Outside Mall | City Place | 701 S. Rosemary Ave. | Spc#A-14 | West Palm Beach | FL | 33401 | 10/27/00 | 04/30/17 | 4,121 |
| 647 | BCBG | Street | Oak Street | 113 E. Oak Street | | Chicago | IL | 60611 | 09/08/00 | 12/31/17 | 4,700 |
| 656 | BCBG | Street | Country Club Plaza | 422 Nicholas Rd | | Kansas City | MO | 64112 | 08/23/01 | 08/31/16 | 4,610 |
| 662 | BCBG | Outside Mall | Paseo Colorado | 300 E. Colorado Blvd. | Suite 114 | Pasadena | CA | 91101 | 09/28/01 | 01/31/19 | 3,651 |
| 668 | BCBG | Street | Santana Row | 333 Santana Row | Spc#1020 | San Jose | CA | 95128 | 11/07/02 | 07/31/17 | 4,332 |
| 671 | BCBG | Inside Mall | Plaza Frontenac | 1701 S. Lindbergh | Spc#70 | St. Louis | MO | 63131 | 12/20/03 | 01/31/18 | 4,231 |
| 673 | BCBG | Street | Lincoln Park | 2140 North Halsted | | Chicago | IL | 60614 | 10/29/04 | 01/31/19 | 1,850 |
| 677 | BCBG | Inside Mall | Galleria Fort Lauderdale | 2414 E. Sunrise Blvd | Spc#2162 | Fort Lauderdale | FL | 33304 | 10/28/05 | 01/31/20 | 3,449 |
| 682 | BCBG | Outside Mall | Biltmore Fashion Park | 2502 E. Camelback Road | Spc#177 | Scottsdale | AZ | 85016 | 07/06/09 | 01/31/18 | 3,952 |
| 685 | BCBG | Lifestyle | Southside Works | 2708 Sidney Street | Spc#C-135 | Pittsburgh | PA | 15203 | 06/02/05 | 10/31/18 | 3,488 |
| 687 | BCBG | Inside Mall | Walt Whitman | 160 Walt Whitman Road | Spc#1014 | Huntington Station | NY | 11746 | 03/27/08 | 03/31/18 | 4,840 |
| 688 | BCBG | Inside Mall | Bridgewater Commons | 400 Commons Way | Spc#2060 | Bridgewater | NJ | 8807 | 11/21/07 | 11/30/17 | 3,641 |
| 692 | BCBG | Lifestyle | Waterside | 5415 Tamiami Trail N | Spc#A-9 | Naples | FL | 34108 | 03/16/06 | 07/31/16 | 3,000 |
| 694 | BCBG | Inside Mall | Mall at Green Hills | 2126 Abbott Martin Road | Spc#272 | Nashville | TN | 37215 | 07/21/06 | 01/31/20 | 4,722 |
| 704 | BCBG | Inside Mall | Keystone Crossing | 8701 Keystone Crossing | Spc#FA | Indianapolis | IN | 46240 | 11/06/08 | 06/30/16 | 4,441 |
| 709 | BCBG | Inside Mall | Towson Town Center | 825 Dulaney Valley Road | Spc#2112 | Towson | MD | 21204 | 07/28/06 | 09/30/18 | 2,568 |
| 714 | BCBG | Inside Mall | South Park | 4400 Sharon Road | Spc#N-14 | Charlotte | NC | 28211 | 04/06/07 | 02/28/17 | 2,100 |
| 718 | BCBG | Street | Third Avenue | 1290 Third Avenue | | New York | NY | 10021 | 08/31/06 | 01/31/18 | 3,370 |
| 724 | BCBG | Street | Broadway | 2003 Broadway | | New York | NY | 10023 | 10/26/07 | 10/31/17 | 4,400 |
| 731 | BCBG | Lifestyle | St. John | 4812 River City Dr. | Spc#M01 | Jacksonville | FL | 32246 | 07/02/09 | 01/31/20 | 3,572 |
| 736 | BCBG | Street | Wisconsin Place | 5402 Wisconsin Avenue | Spc#B | Chevy Chase | MD | 20815 | 11/22/08 | 01/31/19 | 3,500 |
| 739 | BCBG | Outside Mall | La Cumbre | 121 S. Hope Avenue | Spc#225 | Santa Barbara | CA | 93105 | 11/06/08 | 01/31/18 | 4,104 |
| 742 | BCBG | Street | Houston Pavilions | 1201 Fannin St. | | Houston | TX | 77002 | 11/01/07 | 11/30/17 | 4,124 |
| 743 | BCBG | Street | Damen Avenue | 1714 N. Damen Avenue | Spc#1245A | Chicago | IL | 60647 | 08/27/09 | 08/31/24 | 2,200 |
| 745 | BCBG | Inside Mall | Menlo Park | 100 Menlo Park | Spc#A08B | Edison | NJ | 08837 | 11/20/08 | 11/30/18 | 4,273 |
| 747 | BCBG | Inside Mall | Barton Creek | 2901 S Capital of Texas Hwy | | Austin | TX | 78746 | 11/13/08 | 08/31/18 | 4,250 |
| 751 | BCBG | Street | Armitage | 853 West Armitage | Spc#1087A | Chicago | IL | 60614 | 10/23/09 | 07/31/19 | 4,313 |
| 755 | BCBG | Inside Mall | Burlington Mall | 75 Middlesex Turnpike | Spc#C031 | Burlington | MA | 01803 | 04/29/10 | 01/31/19 | 2,870 |
| 757 | BCBG | Outside Mall | Old Orchard | 4999 Old Orchard Center | Spc#133 | Skokie | IL | 60077 | 06/17/10 | 01/31/20 | 4,104 |
| 759 | BCBG | Outside Mall | Stony Point | 9200 Stony Pt. Parkway | | Richmond | VA | 23235 | 06/24/10 | 01/31/20 | 2,979 |
| 760 | BCBG | Inside Mall | Fair Oaks | 11750 Fair Oaks Mall | Spc#1136 | Fairfax | VA | 22033 | 06/24/10 | 01/31/20 | 3,600 |

BCBG
Exhibit A

Store List

| Store # | Concept | Location Type | Name | Address | Address2 | City | State | Zip | Open Date | Lease End Date | Selling Sq. Ft. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 767 | BCBG | Inside Mall | Westfarms | 1500 New Britain Ave | SPC#H211 | W Hartford | CT | 06110 | 05/02/14 | 01/31/24 | 4,000 |
| 768 | BCBG | Inside Mall | Glendale Galleria | 2224 Galleria Way | SPC#B006 | Glendale | CA | 91210 | 11/05/13 | 10/31/23 | 3,000 |
| 769 | BCBG | Inside Mall | University Town Center | 140 University Town Center Dr. | SPC#273 | Sarasota | FL | 34243 | 10/15/14 | 01/31/24 | 3,774 |
| 770 | BCBG | Lifestyle | Avalon | 5155 Avalon Blvd. | SPC#5155 | Alpharetta | GA | 30009 | 11/23/14 | 10/31/24 | 3,382 |
| 771 | BCBG | Inside Mall | South Shore Plaza | 250 Granite Street | SPC#1360 | Braintree | MA | 02184 | 08/29/14 | 08/31/20 | 2,600 |
| 772 | BCBG | Street | Delray | 411 E. Atlantic Ave. | . | Delray Beach | FL | 33483 | 12/16/14 | 04/30/24 | 2,408 |
| 773 | BCBG | Lifestyle | Summerlin | 1985 Festival Plaza Drive | SPC#1400 | Las Vegas | NV | 89135 | 10/09/14 | 01/31/25 | 3,301 |
| 774 | BCBG | Inside Mall | San Juan | 1000 Mall of San Juan Blvd. | Spc#245 | San Juan | PR | 00923 | 04/02/15 | 01/31/25 | 4,098 |
| 775 | BCBG | Inside Mall | Mall of America | 60 E. Broadway | Spc#S140 | Bloomington | MN | 55425 | 05/02/15 | 04/30/25 | 3,222 |
| 776 | BCBG | Inside Mall | Del Amo | 3525 W Carson St | Spc#421 | Torrance | CA | 90503 | 10/09/15 | 10/31/25 | 3,118 |
| **120** | | | | | | | | | | | **3,539** |

# BCBG
## Exhibit B

| Expense Budget |
| --- |

**Advertising**

| | |
| --- | --- |
| Media | 25,000 |
| Signs | 183,900 |
| Sign Walkers | - |
| Subtotal Advertising | 208,900 |

**Supervision**

| | |
| --- | --- |
| Fees / Wages / Expenses (1) | 840,780 |
| Subtotal Supervision | 840,780 |

| | |
| --- | --- |
| Total Expenses | 1,049,680 |

*Note(s):*
*1. Includes Deferred Compensation and Insurance.*

## **EXHIBIT 2**

**Store Closing Procedures**

## Store Closing Procedures[1]

1.     The Store Closings will be conducted during normal business hours or such hours as otherwise permitted by the applicable unexpired lease.

2.     The Store Closings will be conducted in accordance with applicable state and local "Blue Laws," and thus, where such a law is applicable, no Store Closings will be conducted on Sunday unless the Debtors have been operating such stores on Sundays.

3.     On "shopping center" property, neither the Debtors nor the Agent shall distribute handbills, leaflets, or other written materials to customers outside of any Stores' premises, unless permitted by the applicable lease or if distribution is customary in the "shopping center" in which such Store is located; *provided* that the Debtors and the Agent may solicit customers in the Stores themselves.   On "shopping center" property, neither the Debtors nor the Agent shall use any flashing lights or amplified sound to advertise the Store Closings or solicit customers, except as permitted under the applicable lease or agreed in writing by the landlord.

4.     The Debtors and the Agent shall have the right to use and sell the FF&E.   The Debtors and the Agent may advertise the sale of the FF&E in a manner consistent with these Store Closing Procedures. The purchasers of any FF&E sold during the Store Closings shall be permitted to remove the FF&E either through the back or alternative shipping areas at any time, or through other areas after Store business hours; provided, however, that the foregoing shall not apply to de minimis FF&E sales made whereby the item can be carried out of the Store in a shopping bag.

5.     The Debtors and the Agent may, but are not required to, advertise all of the Store Closings as "store closing," "sale on everything," "everything must go," or similarly themed sales.   The Debtors and the Agent may also have a "countdown to closing" sign prominently displayed in a manner consistent with these Store Closing Procedures.

6.     The Debtors and the Agent shall be permitted to utilize sign walkers, display, hanging signs, and interior banners in connection with the Store Closings; *provided* that such sign walkers, display, hanging signs, and interior banners shall be professionally produced and hung in a professional manner.   Neither the Debtors nor the Agent shall use neon or day-glo on its sign walkers, display, hanging signs, or interior banners if prohibited by the applicable lease or applicable law. Furthermore, with respect to enclosed mall locations, no exterior signs or signs in common areas of a mall shall be used unless otherwise expressly permitted in these Store Closing Procedures.   In addition, the Debtors and the Agent shall be permitted to utilize exterior banners at (a) non-enclosed mall Stores and (b) enclosed mall Stores to the extent the entrance to the applicable Store does not require entry into the enclosed mall common area; provided, however, that such banners shall be located or hung so as to make clear

---

[1]    Capitalized terms used but note defined in these Store Closing Procedures have the meanings given to them in the Interim Order to which these Store Closing Procedures are attached as **Exhibit 1** or the Motion to which the Interim Order is attached as **Exhibit A**, as applicable.

that the Store Closing is being conducted only at the affected Store, and shall not be wider than the storefront of the Store. In addition, the Debtors shall be permitted to utilize sign walkers in a safe and professional manner. Nothing contained in these Store Closing Procedures shall be construed to create or impose upon the Debtors or the Agent any additional restrictions not contained in the applicable lease agreement.

7.      Neither the Debtors nor the Agent shall make any alterations to the storefront, roof, or exterior walls of any Stores or shopping centers, or to interior or exterior store lighting, except as authorized by the applicable lease.  The hanging of in-Store signage shall not constitute an alteration to a Store.

8.      Affected landlords will have the ability to negotiate with the Debtors, or at the Debtors' direction, the Agent, any particular modifications to the Store Closing Procedures. The Debtors and the landlord of any Store are authorized to enter into Side Letters without further order of the Court, provided that such agreements do not have a material adverse effect on the Debtors or their estates.

9.      Conspicuous signs will be posted in each of the affected stores to the effect that all sales are "final."

10.     The Debtors will keep store premises and surrounding areas clear and orderly, consistent with past practices.

11.     An unexpired nonresidential real property lease will not be deemed rejected by reason of a Store Closing or the adoption of these Store Closing Procedures.

12.     The rights of landlords against the Debtors for any damages to a Store shall be reserved in accordance with the provisions of the applicable lease.

13.     If and to the extent that the landlord of any Store contends that the Debtors or the Agent is in breach of or default under these Store Closing Procedures, such landlord shall provide at least five (5) days' written notice, served by email or overnight delivery, on:

        If to the Debtors:

        BCBG Max Azria Global Holdings, LLC
        2761 Fruitland Avenue,
        Vernon, California 90058
        Attention:  Erica Alterwitz Meierhans
        E-mail address:  Erica.Alterwitz-Meierhans@bcbg.com

        with copies (which shall not constitute notice) to:

        Kirkland & Ellis LLP
        300 North LaSalle
        Chicago, Illinois 60654
        Attention:  Benjamin M. Rhode

2

E-mail address:  benjamin.rhode@kirkland.com

If to the Agent:

Hilco Merchant Resources, LLC
5 Revere Drive, Suite 206
Northbrook, IL 60062
Attention:  Ian Fredericks
E-mail address:  ifredericks@hilcoglobal.com

with copies (which shall not constitute notice) to:

Malfitano Partners
747 Third Avenue, 2nd Floor
New York, NY 10017
Attention:  Joseph Malfitano
E-mail address:  jm@malfitanopartners.com

If the parties are unable to resolve the dispute, either the landlord or the Debtors shall have the right to schedule a hearing before the Court on no less than five (5) days' written notice to the other party, served by email or overnight delivery.