**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BCBG MAX AZRIA GLOBAL HOLDINGS, LLC, *et al.*,[1] | ) | Case No. 17-10466 (SCC) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## NOTICE OF FILING OF PLAN SUPPLEMENT

**PLEASE TAKE NOTICE THAT** on June 23, 2017, the United States Bankruptcy Court for the Southern District of New York (the "Court") entered an order (the "Disclosure Statement Order"), (a) authorizing BCBG Max Azria Global Holdings, LLC and its affiliated debtors and debtors in possession (collectively, the "Debtors"), to solicit acceptances for the *Amended Joint Plan of Reorganization of BCBG Max Azria Global Holdings, LLC and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (as modified, amended, or supplemented from time to time, the "Plan");[2] (b) approving the *Disclosure Statement Relating to the Amended Joint Plan of Reorganization of BCBG Max Azria Global Holdings, LLC and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages; and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** as contemplated by the Plan and the Disclosure Statement Order approving the Disclosure Statement, the Debtors filed the Plan Supplement with the Court on July 12, 2017.  The Plan Supplement will include the following materials in connection with confirmation (each as defined in the Plan):  (a) Schedule of Assumed Executory Contracts and Unexpired Leases; (b) Schedule of Retained Causes of Action; (c) the identity and terms of compensation of the Plan Administrator; (d) the Royalty Sharing Agreement; (e) the Wind Down Budget; and (f) the transition services agreement between the OpCo Purchaser and the Post-Effective Date Debtors.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: BCBG Max Azria Global Holdings, LLC (6857); BCBG Max Azria Group, LLC (5942); BCBG Max Azria Intermediate Holdings, LLC (3673); Max Rave, LLC (9200); and MLA Multibrand Holdings, LLC (3854).  The location of the Debtors' service address is:  2761 Fruitland Avenue, Vernon, California 90058.

[2]    Capitalized terms not otherwise defined herein shall have the same meanings set forth in the Disclosure Statement.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider Confirmation of the Plan (the "Confirmation Hearing") will commence on **July 25, 2017, at 9:00 a.m.** prevailing Eastern Time, before the Honorable Shelley C. Chapman, in the United States Bankruptcy Court for the Southern District of New York, located at One Bowling Green, New York, New York 10004-1408.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the Plan is **July 17, 2017, at 4:00 p.m.** prevailing Eastern Time (the "Plan Objection Deadline"). Any objection to the Plan **must**:  (a) be in writing; (b) conform to the Bankruptcy Rules, the Local Rules, and any orders of the Court; (c) state, with particularity, the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (d) be filed with the Court (contemporaneously with a proof of service) and served upon the following parties so as to be **actually received** on or before **July 17, 2017, at 4:00 p.m.** prevailing Eastern Time:

| Debtors | Counsel to the Debtors |
|---|---|
| BCBG Max Azria Global Holdings, LLC<br>2761 Fruitland Avenue,<br>Vernon, California 90058<br>Attn:  Erica Alterwitz Meierhans | Kirkland & Ellis LLP<br>300 North LaSalle<br>Chicago, Illinois  60654<br>Attn:   Benjamin M. Rhode<br>        John R. Luze |
| **United States Trustee** | **Counsel to the Committee** |
| Office of the United States Trustee for the<br>Southern District of New York<br>201 Varick Street, Suite 1006<br>New York, New York 10014<br>Attn:   Brian Masumoto | Pachulski Stang Ziehl & Jones LLP<br>780 Third Avenue, 34th Floor<br>New York, New York 10017-2024<br>Attn:   Bradford Sandler<br>        Robert Feinstein |
| **Administrative agent under the Debtors' prepetition and postpetition asset-based revolving credit facilities** | **Administrative agent under the Debtors' prepetition and postpetition term loan credit facility** |
| Morgan, Lewis & Bockius LLP<br>One Federal Street<br>Boston, Massachusetts 02110<br>Attn:   Julia Frost-Davies<br>        Christopher L. Carter | Weil, Gotshal & Manges LLP<br>767 Fifth Avenue<br>New York, New York 10153<br>Attn:   Matt Barr |

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you should contact Donlin, Recano & Company, Inc., the voting and claims agent retained by the Debtors in these chapter 11 cases (the "Voting and Claims Agent"), by: (a) calling the Debtors' restructuring hotline at (866) 406-2290; (b) visiting the Debtors' restructuring website at: https://www.donlinrecano.com/bcbg; and/or (c) writing to Donlin, Recano & Company, Inc.,

Attn: BCBG Max Azria Global Holdings, LLC Ballot Processing, c/o Donlin, Recano & Company, Inc., 6201 15th Avenue, Brooklyn, NY 11219. You may also obtain copies of any pleadings filed in these chapter 11 cases for a fee via PACER at: http://www.nysb.uscourts.gov.

---

**Article VIII** of the Plan contains Release, Exculpation, and Injunction Provisions, and **Article VIII.D contains a Third-Party Release.** Thus, you are advised to review and consider the Plan carefully because your rights might be affected thereunder.

**This Notice is being sent to you for informational purposes only. If you have questions with respect to your rights under the Plan or about anything stated herein or if you would like to obtain additional information, contact the Voting and Claims Agent.**

---

Dated:  July 12, 2017

*/s/ Joshua A. Sussberg*

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

- and -

James H.M. Sprayregen, P.C.
Benjamin M. Rhode (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

## Exhibit A

### Schedule of Assumed Executory Contracts and Unexpired Leases

This schedule includes Executory Contracts and Unexpired Leases the Debtors currently contemplate assuming (or assuming and assigning) pursuant to Article V.A of the Plan.  The Debtors' review and analysis remains ongoing and they reserve the right to amend this schedule as set forth in Article V of the Plan.

| | Counterparty / Counterparties | Description of Contract | Amount Required to Cure Default Thereunder, If Any | Assignee (if Applicable) |
|---|---|---|---|---|
| 1 | Clear Vision Optical Company, Inc. | Second Renewal of and Amendment to the Manufacturing Licensing Agreement dated as of January 1, 2013 | $ - | Marquee Brands, LLC |
| 2 | SBBG, LLC, Signal Brands, LLC | License Agreement, dated as of February 17, 2017 | $ - | Marquee Brands, LLC |
| 3 | GBG USA Inc. | License Agreement dated as of March 30, 2017 | $ - | Marquee Brands, LLC |
| 4 | Fashion Funding, LLC, GLAC Holdings, LLC, and the Members and Stockholders party thereto | Contribution Agreement dated as of January 26, 2015 | $ - | Marquee Brands, LLC |
| 5 | 2761 Fruitland Avenue, L.L.C. | Real Property Lease (Corporate Offices) | $ 207,924 | GBG USA INC. |
| 6 | 4701 Santa Fe Avenue, L.L.C. | Real Property Lease (Distribution Center) | $ 154,206 | GBG USA INC. |
| 7 | Judith Halevi d/b/a Halevi Ventures | Real Property Lease (Store 373, New York, NY) | $ 81,464 | GBG USA INC. |
| 8 | CPG Partners, L.P. | Real Property Lease (Store 415, Central Valley, NY) | $ 51,022 | GBG USA INC. |
| 9 | The Irvine Company LLC | Real Property Lease (Store 611, Newport Beach, CA) | $ - | GBG USA INC. |
| 10 | The Retail Property Trust | Real Property Lease (Store 616, Atlanta, GA) | $ 54,064 | GBG USA INC. |
| 11 | Somerset Collection Limited Partnership | Real Property Lease (Store 617, Troy MI) | $ 75,832 | GBG USA INC. |
| 12 | Fashion Valley Mall, LLC | Real Property Lease (Store 624, San Diego, CA) | $ 54,617 | GBG USA INC. |
| 13 | Beachwood Place Mall, LLC | Real Property Lease (Store 627, Beachwood, OH) | $ 334 | GBG USA INC. |
| 14 | HG Galleria I, II, III L.P. | Real Property Lease (Store 628, Houston, TX) | $ 41,327 | GBG USA INC. |
| 15 | The Shops and Garage at Canal Place L.L.C. | Real Property Lease (Store 633, New Orleans, LA) | $ - | GBG USA INC. |
| 16 | Forbes Taubman Orlando, L.L.C. | Real Property Lease (Store 667, Orlando, FL) | $ 51,904 | GBG USA INC. |
| 17 | Sherman Oaks Fashion Associates, LP | Real Property Lease (Store 672, Sherman Oaks, CA) | $ - | GBG USA INC. |
| 18 | 738 Lincoln Road, LLC | Real Property Lease (Store 676, Miami Beach, FL) | $ 73,649 | GBG USA INC. |
| 19 | Westfield Topanga Owner LLC | Real Property Lease (Store 705, Canoga Park, CA) | $ 26,518 | GBG USA INC. |
| 20 | Aventura Mall Venture | Real Property Lease (Store 707, Aventura, FL) | $ 76,820 | GBG USA INC. |
| 21 | PES Partners, LLC | Real Property Lease (Store 715, El Segundo, CA) | $ 22,792 | GBG USA INC. |
| 22 | JRA HHF VENTURE, LLC | Real Property Lease (Store 727, Pembroke Pines, FL) | $ - | GBG USA INC. |
| 23 | Green 461 Fifth Lessee LLC | Real Property Lease (Store 735, New York, NY) | $ - | GBG USA INC. |
| 24 | Tampa Westshore Associates Limited Partnership | Real Property Lease (Store 761, Tampa, FL) | $ 40,020 | GBG USA INC. |
| 25 | Twelve Oaks Mall, LLC | Real Property Lease (Store 762, Novi, MI) | $ 24,126 | GBG USA INC. |
| 26 | CP Commercial Delaware, LLC | Real Property Lease (Store 765, Westlake, OH) | $ 13,663 | GBG USA INC. |
| 27 | CPG Partners, L.P. | Real Property Lease (Store 401, Cabazon, CA) | $ - | GBG USA INC. |
| 28 | CPG Partners, L.P. | Real Property Lease (Store 405, Camarillo, CA) | $ - | GBG USA INC. |
| 29 | San Marcos Premium Outlets II | Real Property Lease (Store 414, San Marcos, TX) | $ - | GBG USA INC. |
| 30 | Chelsea Orlando Development, LP | Real Property Lease (Store 421, Orlando, FL) | $ - | GBG USA INC. |
| 31 | Chelsea Allen Development, L.P. | Real Property Lease (Store 425, Allen, TX) | $ - | GBG USA INC. |
| 32 | Orlando Outlet Owner, LLC | Real Property Lease (Store 448, Orlando, FL) | $ - | GBG USA INC. |
| 33 | International Gateway Associates, LLC | Real Property Lease (Store 452, San Ysidro, CA) | $ - | GBG USA INC. |
| 34 | Sunrise Mills (MLP), LP | Real Property Lease (Store 474, Sunrise, FL) | $ - | GBG USA INC. |
| 35 | Simon/Chelsea Las Vegas Development, LLC | Real Property Lease (Store 489, Las Vegas, NV) | $ - | GBG USA INC. |
| 36 | Livermore Premium Outlets, LLC | Real Property Lease (Store 512, Livermore, CA) | $ - | GBG USA INC. |
| 37 | Westchester Mall, LLC | Real Property Lease (Store 607, White Plains, NY) | $ - | GBG USA INC. |
| 38 | King of Prussia Associates | Real Property Lease (Store 610, King of Prussia, PA) | $ - | GBG USA INC. |
| 39 | Galleria Mall Investors, LP | Real Property Lease (Store 614, Dallas, TX) | $ - | GBG USA INC. |
| 40 | The Retail Property Trust | Real Property Lease (Store 620, Garden City, NY) | $ - | GBG USA INC. |
| 41 | The Town Center at Boca Raton Trust | Real Property Lease (Store 649, Boca Raton, FL) | $ - | GBG USA INC. |
| 42 | SPG Center, LLC | Real Property Lease (Store 664, Palo Alto, CA) | $ - | GBG USA INC. |
| 43 | The Domain Shopping Center LP | Real Property Lease (Store 712, Auston, TX) | $ - | GBG USA INC. |
| 44 | ABQ Uptown, LLC | Real Property Lease (Store 716, Albuquerque, NM) | $ - | GBG USA INC. |
| 45 | Forum Shops, LLC | Real Property Lease (Store 748, Las Vegas, NV) | $ - | GBG USA INC. |
| 46 | Simon Property Group (Texas), LP | Real Property Lease (Store 749, McAllen, TX) | $ - | GBG USA INC. |
| 47 | SDG Fashion Mall LP | Real Property Lease (Store 702, Indianapolis, IN) | $ - | GBG USA INC. |
| 48 | Shopping Center Associates | Real Property Lease (Store 743, Edison, NJ) | $ - | GBG USA INC. |
| 49 | La Cienega Partners, LP | Real Property Lease (Store 764, Los Angeles, CA) | $ 73,813 | GBG USA INC. |

| | Counterparty / Counterparties | Description of Contract | Amount Required to Cure Default Thereunder, If Any | Assignee (if Applicable) |
|---|---|---|---|---|
| 50 | Bloomingdale's Inc. | Department License Agreement dated as of July 19, 2004, as amended by that certain Amendment to Department License Agreement dated as of September 18, 2008, as further amended by that certain Second Amendment to Department License Agreement dated as of May 13, 2009, as further amended by that certain Third Amendment to Department License Agreement dated as of February 27, 2012, as further amended by that certain Fourth Amendment to Department License Agreement dated as of February 5, 2013, as further amended by that certain Fifth Amendment to Department License Agreement dated as of June 17, 2013, as further amended by that certain Sixth Amendment to Department License Agreement dated as of September 24, 2013, as supplemented by that certain Letter Agreement dated as of December 19, 2013, as further amended by that certain Seventh Amendment to Department License Agreement dated as of May 21, 2014, as further amended by that certain Eighth Amendment to Department License Agreement dated as of August 2014, as further amended by that certain Ninth Amendment to Department License Agreement dated as of November 24, 2015, and as further amended by that certain Tenth Amendment to Department License Agreement dated as of October 12, 2016. (Partnershop Agreement) | $ - | GBG USA INC. |
| 51 | The Higbee Company, Dillard's Inc., Dillard Store Services, Inc., Dillard's Dollars, Inc., Dillard Tennessee Operating Limited Partnership, Dillard Texas, LLC, SI Shopping Center Lessors, L.P., Condev Nevada, Inc., Dillard International, Inc., D-Serf Company, LLC, U.S. Alpha, Inc., Dillard Investment Co., Inc., Construction Developers, Incorporated | Restated Master License Agreement dated as of May 3, 2009, as amended December 26, 2013. (Partnershop Agreement) | $ - | GBG USA INC. |
| 52 | Lord & Taylor, LLC | Lord & Taylor Licensed Department Agreement, dated as of 2004, as amended by that Addendum to Licensed Department Agreement (Agreement for Internet Sales), dated May 2010, and as further amended by that Amendment to Lord & Taylor Licensed Department Agreement, dated June 1, 2010. (Partnershop Agreement) | $ - | GBG USA INC. |
| 53 | Macy's Retail Holdings, Inc. | Department License Agreement, dated as of October 3, 2003, as amended on November 25, 2005, as further amended June 28, 2010, as further amended October 10, 2012, as further amended April 22, 2013, as further amended February 23, 2015, as further amended June 19, 2015, and as further amended January 21, 2016. (Partnershop Agreement) | $ 125,215 | GBG USA INC. |
| 54 | Hudson's Bay Company | Licensed Department Agreement , dated as of October 1, 2012. (Partnershop Agreement) | $ - | GBG USA INC. |
| 55 | Attitude Concept Group, S.A. de C.V. | Distribution and Retail License Agreement, dated as of July 1, 2007, as amended July 30, 2009, July 14, 2010, February 1, 2012 and August 31, 2014. (Licensing and Distribution Agreement) | $ - | GBG USA INC. |
| 56 | Attitude Concept Group, S.A. de C.V. | Distribution and Retail License Agreement (BCBGeneration), dated as of February 1, 2011, as amended February 1, 2012 and March 2, 2016. | $ - | GBG USA INC. |
| 57 | Vinds Trading and Services Limited Liability Company | Distribution and Retail License Agreement, dated as of February 1, 2015, as amended September 28, 2016. | $ - | GBG USA INC. |
| 58 | Concept Development Trading | Retail License Agreement – Second Renewal and Amendment, dated as of February 1, 2012 | $ - | GBG USA INC. |
| 59 | Concept Development Trading | Retail License Agreement – Third Renewal and Amendment, dated as of February 1, 2016 | $ - | GBG USA INC. |
| 60 | Lineargroup Phils., Inc. | Retail License Agreement, dated as of February 1, 2012, as amended October 1, 2014 | $ - | GBG USA INC. |
| 61 | Los Tres S.A. | Retail License Agreement, dated as of April 25, 2014, as amended December 9, 2015 and July 20, 2016 | $ - | GBG USA INC. |
| 62 | Pribrand Group, S.A. | First Renewal of Retail License Agreement, dated February 1, 2013, as amended February 26, 2015 and November 1, 2016 | $ - | GBG USA INC. |

| | Counterparty / Counterparties | Description of Contract | Amount Required to Cure Default Thereunder, If Any | Assignee (if Applicable) |
|---|---|---|---|---|
| 63 | PT Mitra Adiperkasa | Distribution and Retail License Agreement, dated August 1, 2010, as amended December 18, 2014 and October 30, 2015 | $ - | GBG USA INC. |
| 64 | Reliance Brands Ltd. | Retail License Agreement, dated April 3, 2013, as amended June 8, 2015 | $ - | GBG USA INC. |
| 65 | Reliance Brands Ltd. | Retail License Agreement (BCBGeneration), dated March 2013, as amended May 2014 and November 4, 2016 | $ - | GBG USA INC. |
| 66 | Retail Affair SAL | First Renewal of Retail License Agreement, dated February 1, 2016 | $ - | GBG USA INC. |
| 67 | RSH (Middle East) LLC | Retail License Agreement, dated September 2012, as amended September 22, 2016 | $ - | GBG USA INC. |
| 68 | Wing Tai Fashion SDN BHD (f/k/a DNP Fashion Sdn. Bhd.) | Retail License Agreement, dated February 1, 2011, as amended September 27, 2011, October 13, 2014, and July 19, 2016 | $ - | GBG USA INC. |
| 69 | Wing Tai Clothing Pte Ltd | Retail License Agreement, dated February 1, 2011, as amended July 19, 2016 | $ - | GBG USA INC. |
| 70 | West Coast Distribution, Inc. | Warehousing and Distribution Agreement, dated as of June 6, 2016 (Other) | $ - | GBG USA INC. |
| 71 | Climatec LLC | Avigilon Electronic Security and Safety System Statement of Work, dated September 8, 2015 (Other) | $ - | GBG USA INC. |
| 72 | 2Link | Agreement to provide services (E-Commerce Agreement) | $ - | GBG USA INC. |
| 73 | Atlassian | Agreement to provide services (E-Commerce Agreement) | $ - | GBG USA INC. |
| 74 | Bluecore, Inc. | Statement of Work, dated as of March 31, 2017 (E-Commerce Agreement) | $ - | GBG USA INC. |
| 75 | Borderfree, Inc. | Services Agreement, dated as of December 31, 2013 (E-Commerce Agreement) | $ 511 | GBG USA INC. |
| 76 | Demandware, Inc. | Master Subscription and Services Agreement, dated as of March 11, 2015, as amended and supplemented (E-Commerce Agreement) | $ 518,886 | GBG USA INC. |
| 77 | Fonts.com | Agreement to provide services (E-Commerce Agreement) | $ - | GBG USA INC. |
| 78 | Narvar Software | Renewal to Software as Services Agreement, dated April 1, 2017 (E-Commerce Agreement) | $ 30,000 | GBG USA INC. |
| 79 | PowerReviews, Inc. | Master Agreement and Service Order dated September 21, 2015 (E-Commerce Agreement) | $ 33,750 | GBG USA INC. |
| 80 | Priority Fulfillment Services, Inc. | Transaction Management Services Agreement, dated as of May 16, 2012, as supplemented and amended (E-Commerce Agreement) | $ - | GBG USA INC. |
| 81 | Qubit Inc. | Qubit Sales Order Form, dated as of March 31, 2016, as amended March 30, 2017 | $ 53,941 | GBG USA INC. |
| 82 | Rakuten Marketing LLC | Master Services Agreement, dated as of April 4, 2017 (E-Commerce Agreement) | $ - | GBG USA INC. |
| 83 | Shoprunner, Inc. | Participation Agreement, dated April 15, 2016 | $ 65,030 | GBG USA INC. |
| 84 | Tealium, Inc. | Service Order, dated as of April 24, 2017 (E-Commerce Agreement) | $ 10,125 | GBG USA INC. |
| 85 | Yext, Inc. | Master Subscription Agreement, dated as of April 28, 2017 (E-Commerce Agreement) | $ - | GBG USA INC. |
| 86 | Adobe | Annual services - no contract (IT Agreement) | $ - | GBG USA INC. |
| 87 | Aptos, Inc. | Master Agreement, dated as of July 20, 2015, as amended (IT Agreement) | $ 36,000 | GBG USA INC. |
| 88 | Comm Vault Systems | Agreement to provide services - no contract (IT Agreement) | $ - | GBG USA INC. |
| 89 | Concrete Media Limited | Customer Agreement, dated as of June 1, 2014 (IT Agreement) | $ 32,000 | GBG USA INC. |
| 90 | Dropbox | Order Form, dated April 5, 2017 (IT Agreement) | $ - | GBG USA INC. |
| 91 | Fortinet (Optiv) | Subscription to Fortigate Threat Management - non contract (IT Agreement) | $ - | GBG USA INC. |
| 92 | Gerber Technology | Service Agreement, dated as of March 9, 2011 (IT Agreement) | $ 57,901 | GBG USA INC. |
| 93 | Gerber Technology | Software Loan Agreement, dated as of November 27, 2012 (IT Agreement) | included above | GBG USA INC. |
| 94 | GS1 US, Inc. | Agreement to provide services - no contract (IT Agreement) | $ - | GBG USA INC. |
| 95 | Industry Retail Group | Monthly services - no contract (IT Agreement) | $ - | GBG USA INC. |
| 96 | Intercall (West) | Agreement to provide services - no contract (IT Agreement) | $ - | GBG USA INC. |

| | Counterparty / Counterparties | Description of Contract | Amount Required to Cure Default Thereunder, If Any | Assignee (if Applicable) |
|---|---|---|---|---|
| 97 | Iron Mountain Records Management, Inc. | Records Management and Service Agreement, dated as of December 14, 2000 (IT Agreement) | $ 227,363 | GBG USA INC. |
| 98 | Key Information Systems, Inc. | Agreement to provide services - no contract (IT Agreement) | $ - | GBG USA INC. |
| 99 | Login Consulting Services, Inc. | Agreement to provide services - no contract (IT Agreement) | $ - | GBG USA INC. |
| 100 | Microsoft Corporation | Enterprise Enrollment, by and between BCBG Max Azria Group, LLC (IT Agreement) | $ 14,080 | GBG USA INC. |
| 101 | Microsoft Corporation | SQL server subscription - no contract (IT Agreement) | $ - | GBG USA INC. |
| 102 | NuOrder | Custom Development for Integration, dated April 12, 2006 (IT Agreement) | $ 19,867 | GBG USA INC. |
| 103 | NuOrder | SOW - Custom Development for Integration, dated as of September 15, 2016 (IT Agreement) | included above | GBG USA INC. |
| 104 | Open Text | Monthly subscription services - no contract (IT Agreement) | $ - | GBG USA INC. |
| 105 | Oracle America | Statement of Work, dated as of December 9, 2014 (IT Agreement) | $ 225,108 | GBG USA INC. |
| 106 | Pinnacle Systems | Agreement to provide services - no contract (IT Agreement) | $ 4,785 | GBG USA INC. |
| 107 | Processweaver, Inc. | Software License and Maintenance Agreement, dated as of September 10, 2013 (IT Agreement) | $ 14,300 | GBG USA INC. |
| 108 | Quantum Corporation | Agreement to provide services - no contract (IT Agreement) | $ 2,832 | GBG USA INC. |
| 109 | Qwest Communications Company (Centurylink) | Total Advantage Agreement, dated May 1, 2015, as subsequently amended from time to time and renamed Centurylink Total Advantage Agreement (IT Agreement) | $ 194,512 | GBG USA INC. |
| 110 | SAP Retail, Inc. and SAP Industries, Inc. | Software License Agreement, dated August 16, 2007, as supplemented (IT Agreement) | $ - | GBG USA INC. |
| 111 | Symantec (Optiv) | Agreement to provide services - no contract (IT Agreement) | $ - | GBG USA INC. |
| 112 | Unicom | Temporary license - no contract (IT Agreement) | $ - | GBG USA INC. |
| 113 | Velocity Technology Solutions, Inc. | Master Agreement, dated May 22, 2015 (IT Agreement) | $ 83,572 | GBG USA INC. |
| 114 | Velocity Technology Solutions, Inc. | Amended and Restated Master Agreement, dated June 12, 2015 (IT Agreement) | included above | GBG USA INC. |
| 115 | Velocity Technology Solutions, Inc. | Mutual Non-disclosure Agreement, dated December 19, 2014 (IT Agreement) | included above | GBG USA INC. |
| 116 | Velocity Technology Solutions, Inc. | Mutual Non-disclosure Agreement, dated July 13, 2015 (IT Agreement) | included above | GBG USA INC. |
| 117 | Velocity Technology Solutions, Inc. | Service Description 005, dated May 22, 2015 (IT Agreement) | included above | GBG USA INC. |
| 118 | Verizon Business Services | Master Service Order Form to the US Services Agreement, dated as of April 24, 2015 (IT Agreement) | $ 11,385 | GBG USA INC. |
| 119 | Verizon Wireless | Agreement to provide services (Multiple Retail store data lines) no contract (IT Agreement) | $ 23,676 | GBG USA INC. |
| 120 | Zones, Inc. | Statement of Work, dated July 27, 2016 (IT Agreement) | $ - | GBG USA INC. |
| 121 | Zones, Inc. | Statement of Work, dated September 16, 2014 (IT Agreement) | $ - | GBG USA INC. |

**<u>Exhibit B</u>**

**Schedule of Retained Causes of Action**

**List of Retained Causes of Action**

Article IV.N of the *Amended Joint Chapter 11 Plan of Reorganization of BCBG Max Azria Global Holdings, LLC* [Docket No. 461] (the "Plan"),[1] provides as follows:

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof, the Post-Effective Date Debtors, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Post-Effective Date Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII. The Post-Effective Date Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Post-Effective Date Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Post-Effective Date Debtors, as applicable, will not pursue any and all available Causes of Action against it. The Debtors or the Post-Effective Date Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article VIII of the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Post-Effective Date Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Post-Effective Date Debtors reserve and shall retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Post-Effective Date Debtors, except as otherwise expressly provided in the Plan, including Article VIII of the Plan. The applicable Post-Effective Date Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Post-Effective Date Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file,

---

[1]    Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan. This Exhibit B and any schedules attached hereto remain subject to continuing review and revision by the Debtors. The Debtors expressly reserve the right to alter, modify, amend, remove, augment, or supplement this list at any time in accordance with the Plan.

prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

Notwithstanding and without limiting the generality of Article IV.N of the Plan, the following **Exhibits B-1** through **B-7** includes specific types of Causes of Actions expressly preserved by the Debtors or the Post-Effective Date Debtors, as applicable, subject to the terms of the Plan and the information provided in this **Exhibit B**.

The Debtors reserve all rights to amend, revise, or supplement this **Exhibit B** to the Plan Supplement, and any of the documents and dsignations contained herein, at any time before the Effective Date of the Plan, or any such date as may be provided for by the Plan or by order of the Bankruptcy Court.

## Schedule B-1

### Claims Related to Contracts and Leases

Unless otherwise released by the Plan, the Debtors and Post-Effective Date Debtors, as applicable, expressly reserve Causes of Action based in whole or in part on any and all contracts and leases to which any of the Debtors or Post-Effective Date Debtors is a party or pursuant to which any of the Debtors or Post-Effective Date Debtors has any rights whatsoever, including without limitation all contracts and leases that are assumed pursuant to the Plan or were previously assumed by the Debtors.  The claims and Causes of Action reserved include Causes of Action against vendors, suppliers of goods and services, or any other parties:  (a) for overpayments, back charges, duplicate payments, improper holdbacks, deductions owing or improper deductions taken, deposits, warranties, guarantees, indemnities, recoupment, or setoff; (b) for wrongful or improper termination, suspension of services or supply of goods, or failure to meet other contractual or regulatory obligations; (c) for failure to fully perform or to condition performance on additional requirements under contracts with any one or more of the Debtors before the assumption or rejection, if applicable, of such contracts; (d) for payments, deposits, holdbacks, reserves or other amounts owed by any creditor, utility, supplier, vendor, insurer, surety, factor, lender, bondholder, lessor or other party; (e) for any liens, including mechanics', artisans', materialmens', possessory or statutory liens held by any one or more of the Debtors; (f) arising out of environmental or contaminant exposure matters against landlords, lessors, environmental consultants, environmental agencies or suppliers of environmental services or goods; (g) for counter-claims and defenses related to any contractual obligations; (h) for any turnover actions arising under section 542 or 543 of the Bankruptcy Code; and (i) for unfair competition, interference with contract or potential business advantage, breach of contract, infringement of intellectual property or any business tort claims.

## **Schedule B-2**

### Claims Related to Insurance Policies

Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action based in whole or in part upon any and all insurance contracts and insurance policies to which any Debtor or Post-Effective Date Debtor is a party or pursuant to which any Debtor or Post-Effective Date Debtor has any rights whatsoever, including Causes of Action against insurance carriers, reinsurance carriers, insurance brokers, underwriters, occurrence carriers, or surety bond issuers relating to coverage, indemnity, contribution, reimbursement, or any other matters.

## **Schedule B-3**

Claims Related to Deposits, Adequate Assurance Postings, and Other Collateral Postings

Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action based in whole or in part upon any and all postings of a security deposit, adequate assurance payment, or any other type of deposit or collateral, regardless of whether such posting of security deposit, adequate assurance payment, or any other type of deposit or collateral is included herein.

## **Schedule B-4**

### Claims Related to Liens

Unless otherwise released by the Plan or the Bankruptcy Court's Final Order authorizing the Debtors' use of cash collateral and postpetition financing,[2] the Debtors expressly reserve all Causes of Action based in whole or in part upon any and all liens, regardless of whether such lien is included herein.

---

[2]    *See* Docket No. 228.

**Schedule B-5**

Claims, Defenses, Cross-Claims and Counter-Claims Related to Litigation and Potential
Litigation

Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action against or related to all Entities that are party to or that may in the future become party to litigation, arbitration, or any other type of adversarial proceeding or dispute resolution proceeding, whether formal or informal or judicial or non-judicial, regardless of whether such Entity is included herein, including any Causes of Action against the Azria Parties and any Causes of Action against any of Global Holdings' direct or indirect non-Debtor subsidiaries.

## **Schedule B-6**

### Claims Related to Accounts Receivable and Accounts Payable

      Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action against or related to all Entities that owe or that may in the future owe money to the Debtors or Post-Effective Date Debtors.  Furthermore, the Debtors expressly reserve all Causes of Action against or related to all Entities who assert or may assert that the Debtors or Post-Effective Date Debtors, as applicable, owe money to them.

## **Schedule B-7**

Claims Related to Tax Refunds

Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action against or related to all Entities that owe or that may in the future owe money related to tax refunds to the Debtors or Post-Effective Date Debtors.    Furthermore, the Debtors expressly reserve all Causes of Action against or related to all Entities who assert or may assert that the Debtors or Post-Effective Date Debtors owe taxes to them.

## Exhibit C

**Identity and Terms of Compensation of the Plan Administrator[1]**

---

[1]    The Debtors have not included the identity and terms of compensation of the Plan Administrator in this Plan Supplement filing.  Under Article IV.E.1 of the Plan, the parties in interest with authority to appoint the Plan Administrator will depend on whether Class 6 Unsecured Claims vote as a Class to accept or reject the Plan, which will not be known until after the Voting Deadline.  The Debtors will amend the Plan Supplement to include the identity and terms of compensation of the Plan Administrator at or prior to the Confirmation Hearing.

## **Exhibit D**

**Royalty Sharing Agreement**

**ROYALTY AGREEMENT**

This ROYALTY AGREEMENT ("**Agreement**") is entered into as of July 31, 2017 (the "**Effective Date**") by and between *[BCBG IP Co]* ("**BCBG IP Co**") and Allerton Funding, LLC ("**Allerton**"). BCBG IP Co and Allerton shall each be referred to herein as a "**Party**" and collectively as the "**Parties**".

WHEREAS, Allerton is a lender pursuant to that certain Fifth Amended and Restated Credit and Guaranty Agreement dated as of August 12, 2016 (the "**Prepetition Term Loan Agreement**") by and among BCBG Max Azria Group, LLC ("BCBG Group"), as a borrower, BCBG Max Azria Global Holdings, LLC ("Holdings"), BCBG Max Azria Intermediate Holdings, LLC ("Intermediate Holdings"), Max Rave, LLC ("Max Rave"), and MLA Multibrand Holdings, LLC ("MLA" and with Holdings, Intermediate Holdings, and Max Rave, each a "Guarantor" and collectively, the "Guarantors" and with BCBG Group, each a "Debtor" and collectively the "Debtors"), Guggenheim Corporate Funding, LLC, as agent, and the lenders from time to time party thereto (the "Prepetition Lenders"), whereby the Prepetition Lenders extended certain term loans to the BCBG Group (the "Prepetition Term Loans");

WHEREAS, pursuant to the terms of the Prepetition Term Loan Agreement, the Prepetition Lenders were granted liens on substantially all of the Debtors' real and personal property assets (including, without limitation, the Intellectual Property, defined below);

WHEREAS, as of the date hereof, (i) Allerton holds or controls100% of the Tranche A-1 and Tranche A-2 Prepetition Term Loans (the "Allerton Loans") (and this Agreement relates solely to the Allerton Loans);

WHEREAS, the Debtors filed a voluntary petitions under Chapter 11 of the United States Bankruptcy Code on February 28, 2017, which are currently being jointly administered in Case No. 17-10466 in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Case**");

WHEREAS, as part of the Bankruptcy Case, BCBG IP Co acquired certain rights in intellectual property (the "**Intellectual Property**") and Allerton consented to BCBG IP Co acquiring such rights (the "**Acquisition**"); and

WHEREAS, in consideration for Allerton's agreement to accept the treatment of its claims against the Debtors as set forth in the Plan of Reorganization (including consent to the Acquisition), BCBG IP Co has agreed to pay certain royalties to Allerton based upon its use of the Intellectual Property and Allerton wishes to receive such certain royalties from BCBG IP Co, in each case, subject to the terms of this Agreement.

NOW THEREFORE, in consideration of the mutual obligations set forth herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1. **DEFINITIONS.** Terms with initial capital letters have the meaning set forth below or in the section that defines them, whether used in the plural or singular, in any tense or part of speech, and regardless of gender. The term "including" means "including, but not limited to"; "or" includes "and/or"; "days" means

calendar days unless otherwise noted.

1.1. "**Bankruptcy Payments**" shall mean any cash payments received by Allerton in the Bankruptcy Case in respect of its claims against the Debtors.

1.2. "**Eligible Royalties**" shall mean any royalties earned and received by BCBG IP Co from licenses it grants to third parties to use the Intellectual Property less applicable credits, withholding taxes, adjustments and marketing contributions.

1.3. "**Initial Debt**" shall mean fifty-five million U.S. dollars *[($55,000,000)]*.   *[NTD – TO BE ESTABLISHED BASED ON ALLERTON'S BANKRUPTCY CLAIM]*

1.4. "**PIK Interest**" shall mean an amount equal to ten percent (10%) per annum on the Maximum Royalty Amount beginning on the Effective Date, compounded annually beginning on January 1, 2018.

1.5. "**Sharing Percentage**" shall mean thirty-five percent (35%).

2. **ROYALTIES.**

2.1. <u>Junior Royalty Payments.</u>

(a) Beginning on January 1, 2018 and lasting during the Term (as defined below), BCBG IP Co shall owe to Allerton royalty amounts equal to the Sharing Percentage *multiplied by* the applicable annual Royalty Base ("**Junior Royalty Payments**"), which shall be payable as set forth in Section 2.1(c) below.

(b) As used herein, the term "**Royalty Base**" shall mean, for any calendar year, the Eligible Royalties received by BCBG IP Co during such calendar year *minus* the Sharing Threshold for such calendar year, as set forth below:

| Calendar Year | Sharing Threshold |
|---|---|
| 2018 | $20,000,000 |
| 2019 | $25,000,000 |
| 2020 | $27,000,000 |
| 2021 | $29,000,000 |
| 2022 | $31,000,000 |
| 2023 | $33,000,000 |
| 2024 – 2027 | $35,000,000 |
| Thereafter (if needed) | 103% of the prior calendar year's Sharing Threshold |

(c) Within sixty (60) days from the end of any calendar year, BCBG IP Co shall pay the previous calendar year's Junior Royalty Payment to Allerton, and shall send such payment along with a report that includes sufficient detail to enable Allerton to reasonably determine how BCBG IP Co calculated the amount of such Junior Royalty Payment (each, a "**Report**").

(d) BCBG IP Co represents and warrants that in establishing the Threshold Amounts, none of the expected applicable credits, withholding taxes, adjustments or marketing contributions were taken into consideration.

2.2. <u>Maximum Royalty Amount</u>.

(a) As used herein, the "**Maximum Royalty Amount**" shall mean the value that is calculated as set forth below:

Initial Debt, *plus*

Any unpaid PIK Interest after the application of any Junior Royalty Payments to the PIK Interest accrued through the date of such Junior Royalty Payments, *minus*

any Bankruptcy Payments, *minus*

any remaining portions of the Junior Royalty Payments that were not otherwise applied to the outstanding PIK Interest.

(b) BCBG IP Co shall have no further obligation to pay any Junior Royalty Payments once the Maximum Royalty Amount equals zero dollars ($0.00).

3. **REPRESENTATIONS AND WARRANTIES.**

3.1. <u>By BCBG IP Co</u>.  BCBG IP Co represents and warrants that (a) it has the authority to enter into this Agreement and (b) its performance under this Agreement will not violate or conflict with any other contract to which it is a party or any other obligation.

3.2. <u>By Allerton</u>.  Allerton represents and warrants that (a) it has the authority to enter into this Agreement and (b) its performance under this Agreement will not violate or conflict with any other contract to which it is a party or any other obligation.

3.3. <u>Disclaimer</u>.  EXCEPT AS EXPRESSLY SET FORTH IN HEREIN, NEITHER PARTY NOR ITS AFFILIATES, LICENSORS, SHAREHOLDERS, DIRECTORS, OFFICERS, EMPLOYEES, REPRESENTATIVES, SUBCONTRACTORS, AND AGENTS MAKES ANY WARRANTIES AND THEY HEREBY DISCLAIM ANY OTHER WARRANTIES, EXPRESS OR IMPLIED, WRITTEN OR ORAL, STATUTORY OR OTHERWISE, ARISING FROM OR RELATED TO THIS AGREEMENT AND THE TRANSACTION CONTEMPLATED HEREIN.

4. **CONFIDENTIALITY.**

4.1. <u>Restrictions on Disclosure</u>. All confidential or otherwise non-public information and materials, all of the contents of this Agreement, all information relating to the business, operations and personnel of BCBG IP Co or any of its affiliates, in all cases, that Allerton learns or has learned during or prior to the Term of this Agreement, including all financial information and business plans relating to the business of BCBG IP Co or any of its affiliates, the Reports, and other all confidential or otherwise

non-public information and materials, creative concepts, and plans that BCBG IP Co provides to Allerton, if any, ("**BCBG IP Co Confidential Information**") are BCBG IP Co's valuable property. Allerton acknowledges the need to preserve the confidentiality and secrecy of the BCBG IP Co Confidential Information.  During the Term of this Agreement and thereafter, Allerton shall not use or disclose any of the BCBG IP Co Confidential Information, except for such use by or on behalf of Allerton that is necessary to exercise its rights under this Agreement.  Allerton shall take all necessary steps to ensure that any use by it and those acting on its behalf in connection herewith, its agents, independent contractors and suppliers, shall preserve the confidentiality and secrecy of the BCBG IP Co Confidential Information.  Allerton shall indemnify BCBG IP Co and its Affiliates against any damage that may be suffered by any of them as a result of any breach by Allerton or anyone acting on its behalf in connection herewith of the provisions of this Section 4.1.  The provisions of and the obligations of Allerton under this Section 4.1 shall survive Termination.

4.2. <u>Exceptions</u>.  BCBG IP Co Confidential Information shall not include any information that: (a) is identical to information which can be shown by clear and convincing written evidence to have been developed by Allerton or in Allerton's possession prior to receipt of the same for BCBG IP Co; (b) now is or hereafter becomes publicly known through no fault of Allerton; or (c) otherwise becomes available to Allerton from a third party that is not under any obligation of confidentiality to BCBG IP Co.

## 5.  **TERM AND TERMINATION.**

5.1. <u>Term</u>.  The term of this Agreement shall begin on the Effective Date and shall extend until the earlier of: (a) the Maximum Royalty Amount equaling zero dollars ($0.00), and (b) the mutual agreement of the Parties (the "**Term**"). This Agreement may not be terminated except a set forth in this Section 5.1.

## 6.  **LIMITATION OF LIABILITY**.  NEITHER PARTY WILL BE LIABLE TO THE OTHER PARTY, OR TO ANY THIRD PARTY, FOR ANY CONSEQUENTIAL, INDIRECT, SPECIAL, INCIDENTAL OR EXEMPLARY DAMAGES, WHETHER FORESEEABLE OR UNFORESEEABLE, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, ARISING OUT OF OR RELATING TO THIS AGREEMENT. BCBG IP CO IS NOT A GUARANTOR OF ANY AMOUNT OWED TO ALLERTON BY ANY OTHER ENTITY, INCLUDING WITHOUT LIMITATION, BCBG.

## 7.  **NEGATIVE COVENANTS.**

7.1. <u>Liens</u>.  BCBG IP Co shall not grant any third party a lien or other encumbrance on the Intellectual Property or enter into any agreement that would condition or prohibit the payment of the Junior Royalty Payments; provided, however, that, for purposes of clarification, the terms of licensing agreements entered into in the ordinary course of business such as indemnification provisions and other customary provisions shall not be deemed to directly limit the making of the Junior Royalty Payment.

7.2. <u>Transfers of Intellectual Property</u>.  BCBG IP Co must obtain the consent of Allerton to any transfer all or substantially all the Intellectual Property unless such sale is consummated in connection with a bona fide third party sale to a party capable of (or with licensing or related contracts with parties capable

of) operating the Intellectual Property in the manner operated by BCBG IP Co (or its licensees and operators) and provided that the transferee agrees to assume the obligations under this Agreement.

7.3. <u>Transactions with Affiliates</u>. BCBG IP Co shall not enter into any transaction concerning the Intellectual Property with any affiliate of BCBG IP Co or any entity in which Marque has an economic interest without the written consent of Allerton other than arm's length sales.

8. **GENERAL.**

8.1. <u>Arbitration; Court Actions</u>.

(a) Except for injunctive relief sought by either Party, all disputes, controversies and claims arising out of or relating to this Agreement shall be referred to and finally resolved by arbitration in New York City before a Commercial Panel of three arbitrators conducted in accordance with and pursuant to the then existing Commercial Arbitration Rules of the American Arbitration Association, which shall administer the arbitration. The arbitrators, in their discretion, may award specific performance or injunctive relief (but not punitive damages) and costs and reasonable attorneys' fees and expenses to any party in any arbitration and the courts also may do so with regard to Court Actions. However, in any arbitration proceeding, the arbitrators may not change, modify or alter any express condition, term or provision hereof, and to that extent the scope of their authority is expressly limited. The arbitration award shall be final and binding upon the parties and judgment may be entered thereon in any court having jurisdiction.

(b) Court actions (to the extent permitted by this Agreement) shall be brought by BCBG IP Co or Allerton in any Federal or state court located in New York City. Each Party irrevocably submits to the jurisdiction of the Federal and state courts located in New York City with respect to any such court action and waives any claim or defense of inconvenient forum or lack of personal jurisdiction in such forum under any applicable law or decision or otherwise.

(c) EACH PARTY HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY CLAIM, DEMAND, ACTION, CAUSE OF ACTION OR LITIGATION BASED ON, ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT, ANY OF THE TRANSACTIONS OR ANY RELATED DEALINGS OF ANY OF THE PARTIES, IN ANY CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER IN CONTRACT, TORT, EQUITY, OR OTHERWISE. THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE PARTIES TO ENTER INTO THIS AGREEMENT. EACH PARTY HEREBY AGREES THAT ANY SUCH CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION WILL BE DECIDED, IF BY A TRIAL, BY A COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

8.2. <u>Entire Agreement</u>.  This Agreement and its exhibits constitute the entire understanding and agreement of the Parties with respect to the subject matter and supersede all prior and contemporaneous agreements or understandings, whether written or oral, between the Parties with respect to subject matter hereof.

8.3. <u>Relationship Between the Parties</u>.  This Agreement will not establish any relationship of partnership, joint venture or agency between Allerton and BCBG IP Co.

8.4. <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which will be deemed an original, but which collectively shall constitute one and the same instrument.

8.5. <u>Interpretation</u>.  The unenforceability of any provision of this Agreement shall not impair the enforceability of any other part of this Agreement.  If any provision of this Agreement shall be deemed invalid or unenforceable, in whole or in part, this Agreement shall be deemed amended to delete or modify, as necessary, the invalid or unenforceable provision to render it valid, enforceable and, insofar as possible, consistent with the original intent of the Parties.

8.6. <u>Waiver</u>.  The failure of a Party at any time to require performance of any obligations of the other Party shall not be deemed a waiver and shall not affect its right to enforce any provision of this Agreement at a subsequent time.  Written agreement by both Parties is required to waive the observance of any term of this Agreement.

8.7. <u>Headings</u>.  The section titles in the Agreement are for convenience only and have no legal or contractual effect.

8.8. <u>Assignment</u>.  This Agreement shall be binding upon, and inure to the benefit of, the permitted successors and assigns of the Parties.  Each party must obtain the other party's written consent prior to assigning this Agreement to any third party, provided that no consent of Allerton shall be required in connection with a transfer of this Agreement in a transaction for a sale or transfer of all or substantially all of the Intellectual Property made in accordance with Section 7.2 hereof.

8.9. <u>Obligations Unsecured</u>.  BCBG IP Co's obligations under this Agreement shall and remain unsecured obligations throughout the Term.

8.10. <u>Amendment</u>.  Written agreement by both Parties is required to amend any term or provision of this Agreement.

*[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK. SIGNATURES APPEAR ON THE FOLLOWING PAGE]*

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

**[BCBG IP Co]**                                **ALLERTON FUNDING, LLC**


Signature: _____          Signature: _____

Name: _____               Name: _____

Title: _____              Title: _____

Date: _____               Date: _____

## **Exhibit E**

**Wind Down Budget**[1]

---

[1]    The Debtors have not included this document in this Plan Supplement filing as it remains subject to ongoing negotiation between the Debtors and the New Tranche A Lenders. The Debtors will amend the Plan Supplement to include the form of this document as soon as reasonably practicable if and when agreement is reached.

## Exhibit F

**The Transition Services Agreement Between the
OpCo Purchaser and the Post-Effective Date Debtors**[1]

---

[1] This document is filed in draft form only. It remains subject to ongoing review and revision by the Debtors and the OpCo Purchaser and, therefore, remains subject to material change. The Debtors will amend the Plan Supplement to include any revised form of this document as soon as reasonably practicable if and when agreement is reached.

**DRAFT**

## TRANSITION SERVICES AGREEMENT

This TRANSITION SERVICES AGREEMENT (this "**Agreement**"), dated as of July [•], 2017, is entered into by and between BCBG Max Azria Global Holdings, LLC, a Delaware limited liability company, on behalf of itself and the other Seller Parties under the Asset Purchase Agreement (other than CA Seller) (collectively, "**BCBG**") and GBG USA Inc., a Delaware corporation ("**Buyer**").  Buyer and BCBG are sometimes referred to herein individually as a "**Party**" and collectively as the "**Parties**".  Capitalized terms used herein and not otherwise defined shall have the meanings as set forth in the Asset Purchase Agreement (as defined below).

WHEREAS, Buyer and BCBG entered into an Asset Purchase Agreement, dated as of June 9, 2017 (the "**Asset Purchase Agreement**"), pursuant to which BCBG  agreed to sell and assign to Buyer, and Buyer agreed to purchase and assume from BCBG, the Acquired Assets and Assumed Liabilities; and

WHEREAS, in order to assist in the transition of the Purchased Assets to Buyer and as a condition to consummating the transactions contemplated by the Asset Purchase Agreement, Buyer and BCBG have agreed to enter into this Agreement, pursuant to which BCBG agrees to provide Buyer with certain services on a transitional basis and subject to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual agreements and covenants hereinafter set forth, Buyer and BCBG hereby agree as follows.

**Section 1.        Transition Services.**

(a)        Prior to the Closing Date, Buyer shall provide to BCBG (i) a schedule of the Employees (as defined below) that Buyer will hire (such Employees, the "**Hired Employees**"), (ii) a schedule of the Employees that Buyer will not be hiring but whose services Buyer will need to provide transition services as contemplated hereunder (the "**Transition Employees**") and (iii) an indication as to whether Buyer will need BCBG's Chief Financial Officer (who is a contractor for BCBG) to provide Transition Services (such CFO, if so indicated, together with the Hired Employees and the Transition Employees, the "**TSA Personnel**").  BCBG may rely on the fact that Buyer will not be hiring any Employees that are not Hired Employees and proceed accordingly (including terminating, at BCBG's discretion, any Employees that are not TSA Employees).  Prior to September 30, 2017, Buyer will hire the Hired Employees and will put the Hired Employees on its payroll and enroll them in Buyer's benefit plans.  During the Transition Period, until such time as Buyer is able to put the Hired Employees on its payroll and enroll them in Buyer's benefits plans, Buyer shall pay all Employee Costs as contemplated in <u>Section 1(b)</u> below.

(b)        From the date hereof until September 30, 2017 (or such shorter period as determined by Buyer by providing BCBG with at least [ten (10)] Business Days' prior written notice; <u>provided</u> that in no event will such period be shorter than the date on which all Hired Employees are actually hired by Buyer and actually put on its payroll and enrolled in Buyer's benefit plans) (such period of time, the "**Transition Period**"), prior to the date on which payroll

is to be paid by, or deducted from, BCBG to the payroll service provider for any weekly (or other) payroll period, Buyer shall pay directly to BCBG's payroll service provider (or such other Person designated by BCBG) an amount in cash equal to all TSA Personnel-related costs and expenses for such payroll period, including, but not limited to, all compensation, benefits (including, but not limited to, health and welfare benefits), workers' compensation insurance, withholding and other (whether employer or employee) Taxes, employer and employee contributions, as well as all other employment-related obligations and the fees and expenses of such payroll service provider or other applicable third parties, as applicable (collectively, the "**Employee Costs**").  BCBG shall provide to Buyer wire instructions, the date payment by Buyer of Employee Costs for the applicable payroll period is due and the estimated amount of such Employee Costs for such payroll period to:

David Lewis (davidlewis@globalbrandsgroup.com); and

Brandon Carrey (brandoncarrey@globalbrandsgroup.com)

by electronic mail at least two (2) Business Days prior to the date on which any such payment by Buyer is due.  If the estimated Employee Costs for any payroll period are greater or less than the actual Employee Costs for such payroll period, then such excess or shortage shall be deducted from or added to, as applicable, the Employee Costs payment amount to be made by Buyer to BCBG for the subsequent payroll period.

(c)    Buyer shall be responsible for and shall pay (or shall reimburse BCBG) for all costs and expenses relating to or arising out of any health and welfare plans covering any Employees (including any dependents or beneficiaries thereof), including any COBRA Participants (collectively the "**H&W Participants**") during the Transition Period in accordance with Annex I and following termination of the applicable health or welfare plans of BCBG, Buyer will be responsible for all COBRA obligations related thereto.  For purposes of this Agreement, the term COBRA Participant shall mean each Employee (and any dependent or beneficiary thereof) who incurs a COBRA qualifying event after the date hereof and is entitled to COBRA continuation coverage under the BCBG health and welfare plans.

(d)    Schedule 1(d) sets forth, as of the date indicated therein, a list of all BCBG employees, listed by their employee ID number (on a no-name basis) (other than those retail employees that do not work at any of the Acquired Retail Stores) (the "**Employees**") and indicates each employee's service date (in accordance with BCBG policy and past practice), whether such employee is salary or hourly, hourly base compensation rate, vacation accrual rate, vacation and accrual balance as of [_____], and location of employment.

(e)    During the Transition Period, BCBG will make the TSA Personnel available to Buyer to provide the services that they currently provide to the Business or such other services as Buyer may reasonably request.

(f)    During the Transition Period, the TSA Personnel will work at the direction of Buyer.  Buyer will indemnify, defend and hold harmless BCBG, its Subsidiaries, and their officers, directors, employees (except for the TSA Personnel), agents and representatives against any and all claims, causes of action, demands, penalties, losses, liabilities, damages or other

obligations, including, without limitation, reasonable attorneys' fees and expenses, for any and all acts of the TSA Personnel.

(g)    During the Transition Period, BCBG shall not, without the prior consent of Buyer (not to be unreasonably withheld, delayed or conditioned), (i) increase the rate of compensation for any TSA Personnel except for merit raises, cost of living increases or otherwise, in each case, in accordance with BCBG's past practice, (ii) alter any employment agreement with any TSA Personnel, (iii) adopt or amend any employee benefit plan, bonus plan or severance plan affecting the TSA Personnel or (iv) hire or offer to hire any individual that would be required to be listed on Schedule 1(d) if such individual had been hired prior to the date of Schedule 1(d); provided that if any such individual is hired with Buyer's consent, such individual shall be deemed to be a Hired Employee or Transition Employee, as applicable, for all purposes hereunder.

(h)    At any time during the Transition Period, Buyer shall have the option to offer employment to any and/or all of the Employees on terms and conditions which, in the aggregate, are comparable to the terms and conditions of such Employee's employment with BCBG as of the date hereof (such offers not to be lower than such Employee's current overall compensation); provided, however, Buyer is under no obligation to offer employment to any Employee.  Offers made by Buyer shall be subject to such Employees providing documentary evidence that they are legally authorized to work in the jurisdiction where they are employed (such as proof of residency or citizenship, work permit, etc.).  Upon an Employee accepting Buyer's offer of employment, such Employee shall become a Hired Employee.  After the Transition Period, Buyer shall no longer be obligated to reimburse BCBG for Employee Costs. All termination costs and expenses (the "**Termination Costs**") incurred as a result of Buyer not offering employment to any Employee (other than any Hired Employees) shall be borne by BCBG; provided, however, the Parties shall work together to ensure that Termination Costs do not exceed $2,200,000.

(i)    As it relates to Hired Employees, Buyer shall comply with all laws applicable to, and hereby assumes all liabilities as, a successor employer.  Without limiting the general obligation of the foregoing, Buyer shall recognize the years of service of each Hired Employee, based on his or her service date (in accordance with BCBG policy and past practice) as set forth on Schedule 1(d), for purposes of eligibility, vesting and benefit accrual under the plans, programs and arrangements of Buyer relating to compensation and employee benefit plans, subject to the terms and conditions of Buyer's employee benefit plans and in a manner consistent with Buyer's benefit practices.

(j)    Without limiting Section 1(f), until such time as any Employee is actually hired by Buyer or is terminated by BCBG (or its Affiliates), such Employee will remain an employee of BCBG (or such Affiliates), as applicable, and shall not be deemed to be employees of Buyer for any purpose (except the Hired Employees).

(k)    If Buyer requests in writing, and BCBG agrees to provide or make available, any other service, lease, contract, asset, insurance policy or any other employee during or after the Transition Period, Buyer will bear the full costs and expenses thereof and shall pay or reimburse BCBG for all costs and expenses related thereto or arising in connection therewith.

(l)       Buyer will pay, or reimburse BCBG for the payment of the following insurance premiums that are due and payable with respect to the Transition Period: [General Liability, Automobile, Umbrella, Foreign Package, Workers Compensation and Local Canadian Liability].  During the Transition Period, Buyer will maintain, with respect to the Business, with protections and coverages consistent with the past practice of the Business, General Liability, Automobile, Umbrella, Property and Cargo insurance policies.

### Section 2.       Cooperation; Wrong Pockets.

(a)       Buyer will make Employees and the headquarters and distribution center reasonably available during business hours to BCBG and its Subsidiaries, at no cost to BCBG, during and after the Transition Period for purposes of the winding down of BCBG and its Subsidiaries, including, but not limited to, preparation and provision of books and records, sale by BCBG and its Subsidiaries of any Excluded Assets (including located therein), collection of receivables and identification and separation of assets.

(b)       If, following the Closing, any right, property or asset not forming part of the Acquired Assets is found to have been transferred to or received by Buyer in error or any right, property or asset forming part of the Acquired Assets is found not to have been transferred to or received by Buyer in error, Buyer or BCBG, as applicable, shall transfer, or shall cause its affiliates to transfer, at no cost, to the other Party or its Affiliates, such right, property or asset as soon as practicable.

### Section 3.       Limitation of Liability; Disclaimer of Warranties.

(a)       TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, AND EXCEPT FOR ANY BREACHES OF EITHER PARTY'S CONFIDENTIALITY OR INDEMNIFICATION OBLIGATIONS HEREUNDER, IN NO EVENT SHALL EITHER PARTY HAVE ANY LIABILITY UNDER ANY PROVISION OF THIS AGREEMENT, INCLUDING ANY LIABILITY FOR CONSEQUENTIAL OR OTHER INDIRECT DAMAGES, INCLUDING FOR ANY LOSS OF PROFITS, REVENUE, BUSINESS REPUTATION OR OPPORTUNITY, ANY DIMINUTION OF VALUE, OR ANY DAMAGES (EACH OF WHICH IS HEREBY DISCLAIMED) ARISING FROM OR RELATED TO THE SERVICES PROVIDED HEREUNDER OR THIS AGREEMENT, EXCEPT FOR AND TO THE EXTENT OF ANY DIRECT DAMAGES TO A PARTY CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THE OTHER PARTY IN ITS PERFORMANCE UNDER THIS AGREEMENT.

(b)       (I) BCBG DOES NOT GUARANTEE OR WARRANT THE TRANSITION SERVICES TO BE PROVIDED HEREUNDER, (II) THE TRANSITION SERVICES SHALL BE PROVIDED ON AN "AS IS" AND "WITH ALL FAULTS" BASIS AND (III) THERE ARE NO, AND BUYER IS NOT RELYING ON ANY, EXPRESS OR IMPLIED WARRANTIES OR GUARANTEES OF ANY KIND, INCLUDING ANY WARRANTY OF MERCHANTABILITY, NONINFRINGEMENT OR FITNESS FOR A PARTICULAR PURPOSE, AND ALL SUCH WARRANTIES ARE EXPRESSLY DISCLAIMED.

(c)      The Parties acknowledge that the foregoing limitations of liability are an essential element of this Agreement and that in their absence the pricing and other terms of this Agreement would be substantially different.

**Section 4.       Notices**.  All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally-recognized overnight courier (return receipt requested); (c) on the date sent by e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid.  Such communications must be sent to the respective parties at the following addresses (or at such other address for a Party as shall be specified in a notice given in accordance with this <u>Section 4</u>).

| | |
|---|---|
| If to BCBG, to: | BCBG Max Azria Global Holdings, LLC<br>2761 Fruitland Avenue<br>Vernon, California 90058<br>Attention: Holly Etlin, Chief Restructuring Officer<br>Email:  hetlin@alixpartners.com |
| with a copy (which shall not constitute notice) to: | Kirkland & Ellis LLP<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Attention: Steve Toth<br>               Benjamin Rhode<br>Email:      steve.toth@kirkland.com<br>               benjamin.rhode@kirkland.com |
| | AND |
| | Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, New York 10022<br>Attention: Joshua A. Sussberg, P.C.<br>Email:      joshua.sussberg@kirkland.com |
| If to Buyer, to: | GBG USA Inc.<br>Empire State Building<br>350 Fifth Ave.<br>New York, New York 10118<br>Attention: Robert K. Smits,<br>Executive Vice President and General Counsel<br>Email:      robertsmits@globalbrandsgroup.com |
| with a copy (which shall not | Reed Smith LLP |

constitute notice) to:                    599 Lexington Avenue
                                          New York, New York 10020
                                          Attention: Sahra Dalfen, Esq.
                                          Email:     sdalfen@reedsmith.com

**Section 5.**     **Headings**. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 6.**     **Severability**. If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

**Section 7.**     **Entire Agreement**. This Agreement and the documents to be delivered hereunder constitute the sole and entire agreement of the Parties to this Agreement with respect to the subject matter contained herein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter, other than the Asset Purchase Agreement. In the event of any inconsistency between the statements in the body of this Agreement and the documents to be delivered hereunder, the statements in the body of this Agreement including the Schedules will control; provided that, for the avoidance of doubt, in the case of conflict between the terms of this Agreement and the Asset Purchase Agreement, the terms of the Asset Purchase Agreement shall control.

**Section 8.**     **Successors and Assigns**. This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective successors and permitted assigns.  Neither Party may assign its rights or obligations hereunder without the prior written consent of the other Party, which consent shall not be unreasonably withheld or delayed.

**Section 9.**     **No Third-party Beneficiaries**. This Agreement is for the sole benefit of the Parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 10.**    **Amendment and Modification**. This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each Party hereto.

**Section 11.**    **Waiver**. No waiver by any Party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the Party so waiving.  No waiver by any Party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after such waiver.  No failure to exercise or delay in exercising any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**Section 12.      Governing Law**. Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement and any disputes arising under or relate hereto (whether for breach of contract, tortious conduct or otherwise) shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any choice or conflict of Law provision or rule (whether of the State of New York or any other jurisdiction).

**Section 13.      Submission to Jurisdiction**. Without limitation of either Party's right to appeal any order of the Bankruptcy Court, each Party irrevocably agrees that any proceedings against them arising out of or in connection with this Agreement or the transactions contemplated by this Agreement or disputes relating hereto (whether for breach of contract, tortious conduct or otherwise) shall be brought exclusively in the United States Bankruptcy Court for the Southern District of New York or, if the Bankruptcy Case is closed, in the United States District Court for the Southern District of New York in the county of New York, and each Party irrevocably submits to the exclusive jurisdiction of such courts in personam with respect to any such proceeding and waives to the fullest extent permitted by Law any objection that it may now or hereafter have that any such proceeding has been brought in an inconvenient forum.

**Section 14.      Waiver of Jury Trial**. EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**Section 15.      Specific Performance**. The Parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the Parties shall be entitled to seek specific performance of the terms hereof, in addition to any other remedy to which they are entitled by Law or in equity.

**Section 16.      Counterparts**. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[Signature Page Follows.]*

IN WITNESS WHEREOF, the Parties have executed and delivered this Agreement as of the date first above written.

BUYER:                                          BCBG:

GBG USA INC.                                    BCBG Max Azaria Global Holdings, LLC

By: _____            By: _____
    Name:                                           Name:
    Title:                                          Title:

**Annex I**

**Health and Welfare Benefits**

BCBG shall provide continued administration of and health and welfare benefits coverage to H&W Participants during the Transition Period in BCBG's health and welfare plans as as may be in effect during the Transition Period (the "**H&W Plans**").

**Detailed Description of Services:**

Participation in the H&W Plans by H&W Participants will be in accordance with (and limited to) the plan provisions in effect for BCBG employees covered by the plans on the date hereof. BCBG will process all third party actions and subrogation consistent with the then current terms of the plan and its own past practice under the plans.

Nothing in this Agreement is intended to limit or modify BCBG's ability to amend, modify or terminate the H&W plans at any time and in their sole discretion.

**Cost of Service:**

       (a)     With respect to each H&W Participant, Buyer will pay BCBG (i) with respect to any H&W Plan that is a self-insured health plan, all claims up to any applicable reinsurance or stop-loss insurance policy attachment point, and any other out of pocket costs and expenses incurred by BCBG on or after the Closing Date through the Transition Period in connection with such plans (including, without limitation, any reinsurance premiums, administration fees in respect of such plans;) attributable to H&W Participants (collectively, the "**Self-Insurance Costs**"), (ii) all premiums paid to carriers for fully insured plans on or after the Closing Date through the Transition Period and (iii) any other any other out of pocket costs and expenses incurred by BCBG during the Transition Period in connection with such plans attributable to H&W Participants.   For purposes of this Section Agreement, a claim is deemed to be incurred: (X) with respect to medical, dental, vision and/or prescription drug benefits, on the date the health services giving rise to such claim are rendered; (Y) with respect to life insurance, accidental death and dismemberment and business travel accident insurance, on the date the event giving rise to such claim occurs; and (Z) with respect to disability benefits, on the date a person's disability begins, as determined by the disability benefit insurance carrier or claim administrator, giving rise to such claim.

       (b)     BCBG will provide a monthly billing of the amount of any (i) claims under any self-insurance H&W Plan, (ii) the amount of premiums applicable to the H&W Participants under any fully insured benefit plans and (iii) any other costs as set forth in subsection (a) above.

       (c)     Buyer will pay BCBG for all such billed costs within two (2) business days after receipt. For the avoidance of doubt, Buyer shall remain liable for payments that are required hereunder, even after the expiration of the Transition Period (to the extent attributable to premiums, costs, expenses or claims incurred or made in or with respect to the Transition Period).